UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CARO CAPITAL, LLC, CARO PARTNERS, LLC, JUPITER WELLNESS, INC., BRIAN JOHN, and RICHARD MILLER,<br><br>       Plaintiffs,<br><br>v.<br><br>ROBERT KOCH, BEDFORD INVESTMENT PARTNERS, LLC, KAIZEN ADVISORS LLC, and JOHN DOES 1–10,<br><br>       Defendants. | No.<br><br>**COMPLAINT**<br><br>**Jury Trial Demanded** |

Plaintiffs Caro Capital, LLC, Caro Partners, LLC, Jupiter Wellness, Inc., Brian John, and Richard Miller (together, "**Plaintiffs**"), through undersigned counsel, set forth this Complaint against defendants Robert Koch, Bedford Investment Partners, LLC, Kaizen Advisors LLC, and John Does 1–10 ("**Defendants**"):

1. This is a case about extortion.

2. Defendant Robert Koch is a convicted felon who pleaded guilty to running "pump and dump" schemes in which he and his co-conspirators faked market demand for securities, sold them to unsuspecting retail customers, and ran off with the money.

3. In pleading guilty, Defendant Koch also admitted that from 2006 through 2010, he had repeatedly lied to the federal law enforcement agents investigating his crimes.

1

4. After his convictions and sentencing, Defendant Koch struggled to find gainful employment.

5. Although Defendant Koch had worked in and adjacent to the securities industry for over a decade, his felony convictions prohibited him from returning to his previous work as a stockbroker.

6. Defendant Koch's criminal history also prohibits him from working in broad swaths of the securities industry.

7. For example, Defendant Koch cannot play a significant role in any company that issues securities pursuant to Regulation A or Rule 506 of Regulation D, which are two of the most widely-used exemptions from registration with the Securities and Exchange Commission (the "**SEC**").

8. Over the next several years, Plaintiffs Miller, John, Caro Capital, LLC ("**Capital**") and Caro Partners, LLC ("**Partners**")—securities consulting firms that provide investor relations, marketing, and similar services—sporadically hired Defendant Koch as an independent contractor to work on discrete, one-off projects that were not prohibited by Defendant Koch's criminal history.

9. At all times, Plaintiffs and Defendants agreed that because of Defendant Koch's felony record and bar from the securities industry, Plaintiffs would never compensate Defendant Koch with securities or allow him to purchase securities in Plaintiffs or Plaintiffs' clients.

10. Plaintiffs compensated Defendant Koch for all work he performed as an independent contractor, and ceased using Defendant Koch's services around Christmas 2019.

11. Plaintiff John stopped using Defendant Koch's services after he began increasingly focusing on Plaintiff Jupiter Wellness, Inc. ("**Jupiter**" or the "**Company**"), a company he founded in 2018, which develops over-the-counter consumer products infused with cannabidiol, or "**CBD**," such as sunscreen and eczema treatments.

12. Because Plaintiffs intended for Jupiter to eventually issue securities, the Parties—including Defendant Koch—knew that Defendant Koch's criminal record prohibited him from working for or otherwise participating in Jupiter in any meaningful way.

13. Plaintiffs also stopped using Defendant Koch as an independent contractor because they learned that despite frequent, repeated instructions to the contrary, Defendant Koch had concealed his criminal history from others, including Plaintiffs' clients.

14. Defendant Koch explicitly acknowledged the many reasons why Plaintiffs can no longer hire him to work as an independent contractor.

15. But instead of seeking gainful employment and compensation, Defendant Koch and the entities he controls—including Defendants Bedford Investment Partners, LLC ("**Bedford**") and Kaizen Advisors LLC ("**Kaizen**")—have instigated and continue to escalate a scheme to extort millions of dollars from Plaintiffs.

16. On July 31, 2020, Defendant Koch further escalated his threats by fabricating brand-new allegations in a demand letter (the "**Demand Letter**").

17. Defendant Koch threatened to derail Jupiter's pending initial public offering ("**IPO**"), for which Jupiter had filed an amended registration statement just three days prior (the "**S-1**"), unless Plaintiffs agreed to pay him 1.2 million shares of Jupiter—which, at the S-1's price of $7.50 per share, would be worth $9 million.

18. Defendant Koch knows his demands are meritless: he, himself, has acknowledged that his criminal history prohibits him from receiving such compensation, and that Plaintiffs never would have offered, let alone promised, to compensate or engage him in violation of the securities laws.

19. Furthermore, Defendant Koch's threats are rooted in nothing but malice: throughout 2020, he has told third parties that unless Plaintiffs gave him what he wanted, he would "sue them to ruin the IPO."

20. Indeed, Defendant Koch's new attorney annexed a (baseless) draft complaint to the July 31 demand letter, whose filing would seriously compromise the IPO process and could singlehandedly eviscerate years of preparation and millions of dollars of value created in building Jupiter.

21. Defendants' incessant malevolence caricatures the maxim, "no good deed goes unpunished."

22. Consequently, Plaintiffs file this suit to stop Defendants' extortion in its tracks.

## THE PARTIES

23. Plaintiff Caro Capital, LLC ("**Capital**") is a Florida limited liability company headquartered at 12573 Colony Preserve Drive, Boynton Beach, Florida 33436.

24. Plaintiff Caro Partners, LLC ("**Partners**") is a Florida limited liability company headquartered at 725 North Highway A1A Suite C106, Jupiter, Florida, 33477.

25. Plaintiff Jupiter Wellness, Inc. ("**Jupiter**") is a Florida corporation headquartered at 725 North Highway A1A Suite C106, Jupiter, Florida, 33477, which is in the late stages of effecting a securities offering, which is pending regulatory approval and expected to list on the NASDAQ exchange.

26. Plaintiff Brian John is a natural person and resident of Florida. He is a partner of Capital and Partners and the Chief Executive Officer and a Director of Jupiter.

27. Plaintiff Richard Miller is a natural person and resident of Florida. He is a partner of Capital and Partners and the Chief Operating Officer and a Director of Jupiter.

28. Before committing the felonies that led to his imprisonment, Defendant Robert Koch was a registered representative (CRD #1917229) associated with the broker–dealer Stratton Oakmont Inc. (CRD #19692) ("**Stratton Oakmont**").

29. Defendant Koch, himself, was suspended by the National Association of Securities Dealers ("**NASD**") in October 1997.

30. Defendant Koch never became associated with another broker–dealer, and has not been registered with the NASD or its successor, the Financial Industry Regulatory Authority ("**FINRA**"), since his association that broker–dealer ended in December 1996.

31. Defendant Koch is a resident of Katonah, New York.

32. Defendant Bedford Investment Partners, LLC ("**Bedford**") purports to be "one of the boutique independent commodity trading companies that people rely on by providing integrated trading products and logistics services for participants in the worldwide precious metal and energy markets"[1] and to be headquartered at 324 Jay Street, Katonah, New York, 10536.

33. Defendant Kaizen Advisors LLC ("**Kaizen**") is a Delaware corporation that, upon information and belief, is headquartered in Westchester County, New York.

34. In reality, both Bedford and Kaizen are mere nominees of Defendant Koch, which he functionally uses as fictious business names.

35. Furthermore, upon information and belief, Defendant Koch uses both entities to engage in prohibited activities in the securities industry, such as acting as an unregistered broker and receiving transaction-based compensation.

36. Defendants John Does 1–10 are other nominees that Defendant Koch has used to commit unlawful activity against Plaintiffs.

---

[1] Home, Bedford Investment Partners LLC, **https://perma.cc/WT9Q-F7AR.**

**Venue and Jurisdiction**

37. Pursuant to 28 U.S.C. § 1367(a), venue is proper in this district because Defendants are resident in this district and a substantial part of the events or omissions giving rise to this action occurred in this district.

38. The Court has personal jurisdiction over Defendants Koch and Bedford because they are residents of New York and over Defendant Kaizen because it is headquartered and does business in New York.

39. The nexuses of Defendants' wrongful activity are (a) New York, because they threatened Plaintiffs from New York and because they seek to wrongfully impede Plaintiff Jupiter's listing on NASDAQ, which is also in New York; and (b) Florida, because Defendants targeted their wrongful schemes and acts at Florida, where all Plaintiffs are based.

40. Pursuant to 28 U.S.C. § 1332, this Court has diversity jurisdiction over the Complaint because the Parties are citizens of different states and the damages at issue exceed $75,000.

**Plaintiffs Do Not Owe Defendants Anything at All, Let Alone "Compensation"**

41. From 2015 through 2019, Capital and/or Partners retained the independent contractor services of Defendant Koch to work on a handful of discrete investor relations and consulting projects, sometimes paying Defendant Koch through his nominees, Defendants Bedford and Kaizen.

42. Capital paid Defendants approximately $37,000 in 2015; $94,000 in 2016; and $54,000 in 2017.

43. From 2017 to 2019, meanwhile, Partners paid Defendants approximately $800,000 for work Defendant Koch did in connection with services performed for a particular pharmaceutical client of Partners ("**Client A**").

44. No Plaintiff ever executed any contract with any Defendant, let alone an employment or equity contract entitling any Defendant to compensation or additional work.

45. In late 2018, Plaintiff John began winding down Partners and Capital to focus on building Plaintiff Jupiter.

46. Defendant Koch's involvement with Plaintiff Jupiter was extremely limited: in late 2018 or early 2019, he (a) secured a web domain name for the Company (which the Company does not use), and (b) introduced Plaintiffs to three people who would invest a total of less than $45,000 in the Company.

47. From the founding of Jupiter, the Parties knew and discussed that Defendants could not be extensively involved in Jupiter or earn significant compensation

from or equity in the Company because (a) Plaintiffs intended for Jupiter to soon file an IPO and (b) Defendant Koch's felony record barred him from participating.

48. Moreover, regardless of federal law, Plaintiffs were no longer interested in working with Defendant Koch: after receiving hundreds of thousands of dollars for his work on the Client A project, Defendant Koch had ceased working in good faith.

49. Furthermore, Plaintiffs recently had learned that Defendant Koch had hidden his criminal history from others, including Plaintiffs' clients.

50. Defendant Koch's lies to Plaintiffs' clients were particularly material because Plaintiffs Miller and John had repeatedly, explicitly instructed him to disclose his criminal history to any Plaintiff client with which he interacted.

51. Plaintiffs also had increasing suspicions that Defendant Koch had been using other entities, such as Defendants Bedford, Kaizen, and John Does 1–10, as nominees in order to evade the securities laws.

**Defendants Are Attempting to Extort Plaintiffs**

52.     Initially, Defendants did not protest that their work from Plaintiffs had dried up.

53.     Presumably, the significant compensation that Partners had paid Defendant Koch gave him nothing to complain about: in the first seven months of 2019, alone, Partners paid Defendant Koch, through Defendant Bedford, nearly $300,000 for services rendered for Client A.

54.     But by late 2019, Defendant Koch came back to Plaintiffs—and instead of asking for more work, now claimed, for the very first time, that Plaintiffs owed him unarticulated sums arising under unidentified contracts for unspecified services rendered.

55.     When Plaintiffs rebuffed his advances, Defendant Koch not only escalated his demands, but also began defaming Plaintiffs to third parties, including Plaintiffs' clients and investors.

56.     For example, in spring 2020, Defendant Koch called "**Investor A**," falsely claimed that Plaintiffs owed him money—pursuant to contracts that Defendant Koch knew did not exist—and told Investor A that unless Plaintiffs gave him "millions" he would "ruin the IPO" of Jupiter by filing a lawsuit.

57.     Defendant Koch called "**Investor B**" and repeated the same threat.

58.     Defendant Koch knew that a well-timed lawsuit could "ruin the IPO" of the nascent Company by, among other things, scaring away investors; ruining the extensive work product necessary to offer securities to the public; endangering underwriter

10

participation; and jeopardizing the proposed offering's ability to be approved by the SEC and NASDAQ.

59. In or around March 2020, Defendant Koch retained an attorney to send a demand letter to Plaintiffs, claiming that they owed him unpaid compensation.

60. Plaintiffs quickly responded by asking Defendant Koch to identify and provide any contracts that entitled him to that claimed compensation.

61. When Defendant Koch failed to do so, he and his lawyer parted ways.

62. Several months later, a new lawyer sent another demand letter on Defendants' behalf.

63. When Plaintiffs again asked Defendants to identify and provide any contracts entitling them to the claimed compensation, Defendants' new attorney simply said that the law recognizes the existence of oral contracts, and escalated their demands.

64. On July 31, 2020, Defendants sent Plaintiffs yet another demand letter demanding even more than they had in previous demands; enclosed a draft complaint (the "**Draft Complaint**"); and threatened that they would sue for, among other damages, 1.2 million shares of Jupiter if Plaintiffs did not respond within five days and agree to provide an accounting.

**Only Malice has Motivated Defendants' Unlawful Threats**

65. The Draft Complaint, standing alone, reveals that Defendants' only motive is to extort "compensation" to which they know they have no right, by threatening action that could kill the IPO and the significant investment in and profits expected from the IPO.

66. Approximately 150 paragraphs of the Draft Complaint recite nonexistent "oral contracts" that supposedly entitle Defendants to compensation from Plaintiffs—including for dozens of deals for which Defendants had no contracts at all, and had never even worked on.

67. But beginning at paragraph 155, the Draft Complaint gets to the point: Defendants claim—without a scintilla of supporting fact—that Defendant Koch and Plaintiff John co-founded Jupiter.

68. To prove that he owns 50% of Jupiter, Defendant Koch plans to allege that he "started registering domain names" and "began developing several logos."

69. But even the Draft Complaint explicitly acknowledges that **because Defendant Koch is a convicted felon, he could never be involved in Jupiter if it issued stock pursuant to Regulation A.**

70. Indeed, the Draft Complaint explicitly states, **"Because of prior legal issues, Mr. Koch could not be associated with a public offering of Jupiter['s] securities pursuant to Regulation A."**

71. Instead, Defendant Koch claims that he should have been a co-founder and co-owner of Jupiter because the parties' intent always was to offer securities pursuant to Regulation D Rule 506 ("**Rule 506**"):

> [Defendant] Koch, [Plaintiff] John, and [Plaintiff] Miller intended to try to take Jupiter wellness through an [IPO] utilizing [ . . . ] the exemption from registration in Rule 405 of Reg[ulation] D, 17 C.F.R. § 230.506. [But Plaintiffs] John and Miller decided to use a different exemption from SEC registration (Regulation A) to sell shares to the public in an [IPO]. Because of prior legal issues, [Defendant] Koch could not be associated with a public offering of Jupiter Wellness's securities pursuant to Regulation A at that time.

72. But Rule 506 also disqualifies "bad actors" like Defendant Koch!

73. Moreover, NASDAQ listing rules prohibit bad actors like Defendant Koch from being associated with Plaintiff Jupiter.

74. In other words, Defendants' most recent demand letter, itself, acknowledges that his threatened lawsuit cannot achieve the relief it supposedly seeks.

75. Furthermore, Defendants threaten that they not only would allege that Defendant Koch co-founded Jupiter, but that Plaintiff John intentionally structured Defendant Koch's compensation to circumvent the statutory and regulatory ban on "bad actors" like Defendant Koch participating in public offerings:

> Because [Defendant Koch] had been a founder of Jupiter Wellness had worked to help Jupiter Wellness go public [sic], and because he could not own shares of Jupiter Wellness if it were to have a public offering pursuant to Regulation A, [Plaintiff] John, both individually and in his capacity as the [CEO] of Jupiter Wellness, promised [Defendant] Koch that if [Defendant] Koch allowed [Plaintiffs] John and Miller to proceed with a public offering of Jupiter Wellness securities pursuant to Regulation A, [Plaintiff] John would provide the 1.2 million shares of Jupiter Wellness at a date in the future.

Draft Complaint ¶ 165.

76. In other words, Defendant Koch's draft complaint explicitly alleges that he is entitled to an accounting and compensation **because he, himself, conspired to violate the securities laws—again.**

77. Defendants' own July 31 demand letter and draft complaint show that they know or should know that their threatened lawsuit is meritless or will fail.

78. But at this point, Defendants' true motive is not to obtain truly earned income: instead, it to either extort millions of dollars from Plaintiff, or—if Defendants don't get what they want—derail the IPO.

79. In fact, just four days ago, Defendant Koch again called Investor B and told him that the **sole purpose** of the July 31 demand letter and the actions threatened therein is to "stop the IPO."

## CLAIMS

### COUNT I
### Tortious Interference with Prospective Economic Advantage

80. Plaintiffs repeat the foregoing allegations as if set forth herein.

81. At all relevant times, Defendants knew that Plaintiffs intended and were working toward issuing securities of Jupiter to the public.

82. Defendants also knew that Plaintiffs planned to do so pursuant to an exemption from registration that barred Defendants from participating.

83. Defendants have interfered with this process by, among other acts to be revealed in discovery, attempting to extort Plaintiffs; abusing the legal process; and defaming Plaintiffs to their clients and investors.

84. Defendants' actions were not reasonable or otherwise-legitimate commercial behavior; instead, they were illegal and fraudulent acts, with no purpose but to harm Plaintiffs.

85. In fact, Defendant Koch has boasted that the **only** reason why he is threatening Plaintiffs is to "ruin the IPO."

86. Defendants' tortious interference has caused Plaintiffs significant damages to be revealed in discovery and proven at trial.

**COUNT II**
**Prima Facie Tort**

87. Plaintiffs repeat the foregoing allegations as if set forth herein.

88. Defendants have intentionally harmed Plaintiffs by, among other wrongful conduct, spreading damaging lies about Plaintiffs to their clients and investors and attempting to derail the Jupiter IPO.

89. Defendants have no excuse or justification for their tortious acts.

90. Defendants' tortious acts have caused Plaintiff specific and measurable loss, including decreased investor interest and substantially increased costs of issuing Jupiter's securities, including subjecting Jupiter and the other Plaintiffs to unnecessary and costly regulatory scrutiny.

## COUNT III
## Defamation

91. Plaintiffs repeat the foregoing allegations as if set forth herein.

92. Defendants have told Plaintiffs' clients and investors numerous lies that have harmed Plaintiffs, including that they owe Defendants millions of dollars in compensation; that they promised Defendant Koch—a felon three times over—approximately one million shares in Jupiter; and that they structured their supposed compensation agreement with Defendants in order to evade detection by regulators and intentionally violate the securities laws.

93. In doing so, Defendants have damaged Plaintiffs in an amount to be revealed during discovery and proven at trial.

## COUNT IV
## Business Disparagement

94. Plaintiffs repeat the foregoing allegations as if set forth herein.

95. Defendants have told lies that impugn Plaintiffs' businesses basic integrity by, for example, telling third parties that Plaintiffs structured Defendants' compensation in order to violate the securities laws.

96. These lies are particularly damaging to Plaintiffs because Plaintiffs Capital, Partners, Miller, and John have long and respectable track records in the securities industry, and because Plaintiff Jupiter is in the late stages of becoming a NASDAQ-traded issuer.

97. Because these statements impugn Plaintiffs' "basic integrity," general damages are presumed.

98. Regardless, Defendants have damaged Plaintiffs in an amount to be revealed during discovery and proven at trial.

## COUNT V
## New York General Business Law § 349 – Deceptive Trade Practices

99. Plaintiffs repeat the foregoing allegations as if set forth herein.

100. As discussed <u>supra</u>, Defendants have repeatedly lied about their own qualifications to do business, including by concealing Defendant Koch's criminal record.

101. Defendants also have lied about Plaintiffs' business practices to Plaintiffs' investors and clients, claiming that Plaintiffs regularly violate contracts and the securities laws.

102. Particularly because these lies impact the proper issuance and trading of securities, Defendants' deceptive acts also harm the public at large.

103. Defendants' deceptive business practices have harmed Plaintiffs in an amount to be revealed during discovery and proven at trial.

## Punitive Damages and Attorneys' Fees

104. Plaintiffs repeat the previous allegations as if set forth herein.

105. Defendants' conduct is egregious and should shock the conduct of all reasonable people.

106. To deter others from engaging in similarly conscience-shocking behavior and punish Defendants for their misconduct, the Court should hold them accountable for their blatantly false, intentional, and / or reckless conduct.

107. Plaintiffs seek no less than $5 million in punitive damages, as well as reimbursement of all costs and attorneys' fees incurred herein.

## RELIEF REQUESTED

WHEREFORE, Plaintiffs demand the following relief:

(i) Damages in an amount to be determined at trial, totaling no less than $5 million; and

(ii) punitive damages in an amount of no less than $5 million; all costs and attorneys' fees; incidental and consequential relief; and such other and further relief that the Court finds just and proper.

GUSRAE KAPLAN NUSBAUM PLLC

/s/Martin H. Kaplan
Martin H. Kaplan
Kari Parks
120 Wall Street
New York, New York 10005
(212) 269-1400
mkaplan@gusraekaplan.com
kparks@gusraekaplan.com

*Attorneys for Plaintiffs*

Dated: August 6, 2020
         New York, New York