UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------x

CARO CAPITAL LLC, CARO PARTNERS, LLC,
JUPITER WELLNESS, INC., BRIAN JOHN, and
RICHARD MILLER,                                                    Case No.: 1:20-CV-06153

Plaintiffs,

v.

ROBERT KOCH, BEDFORD INVESTMENT
PARTNERS, LLC, KAIZEN ADVISORS LLC,
and JOHN DOES 1-10,

Defendants.

--------------------------------------------------------------------x

## ANSWER AND COUNTERCLAIM OF
## DEFENDANTS ROBERT KOCH
## AND BEDFORD INVESTMENT PARTNERS, LLC

Defendants and Counterclaim Plaintiffs Robert Koch ("**Mr. Koch**") and Bedford

Investment Partners, LLC ("**Bedford**"), by and through their undersigned attorneys, FMS Lawyer

PL and Dovin Ficken, LLC, respectfully submit this Answer and Counterclaim to Plaintiffs' Caro

Capital LLC ("**Caro Capital**"), Caro Partners, LLC, ("**Caro Partners**") Jupiter Wellness, Inc.

("**Jupiter**"), Brian John, ("**John**"), and Richard Miller ("**Miller**"):

## ANSWER

1.    Mr. Koch and Bedford deny the allegations in paragraph 1.

2.    Mr. Koch and Bedford admit the allegations in paragraph 2, except deny the

characterization that he "ran off with the money."

3.      To the extent the allegations of paragraph 3 seek to paraphrase or characterize the contents of a written document, the document speaks for itself and Mr. Koch and Bedford deny the allegations to the extent that they are inconsistent with the document.

4.      Mr. Koch and Bedford deny the allegations in paragraph 4.

5.      To the extent that allegations in paragraph 5 sets forth legal conclusions, no response is required, except Mr. Koch and Bedford admit that Mr. Koch worked in the securities industry for more than a decade.

6.       To the extent that allegations in paragraph 6 sets forth legal conclusions, no response is required.

7.      To the extent that allegations in paragraph 7 sets forth legal conclusions, no response is required.

8.      Mr. Koch and Bedford admit the allegations in paragraph 8, except state that Plaintiffs Miller, John, Caro Capital and Caro Partners entered into numerous oral agreements to hire Mr. Koch and/or Bedford on multiple occasions as a(n) independent contractor(s).

9.      Mr. Koch and Bedford deny the allegations in paragraph 9.

10.     Mr. Koch and Bedford deny the allegations in paragraph 10.

11.     Mr. Koch and Bedford deny the allegations in paragraph 11, except admit that Mr. Koch and Bedford stopped working with Plaintiffs Caro Capital and Caro Partners in approximately October 2019 and that Plaintiff Jupiter develops over-the-counter consumer products infused with cannabidiol.

12.     Mr. Koch and Bedford deny the allegations in paragraph 12.

13.     Mr. Koch and Bedford deny the allegations in paragraph 13.

14.     Mr. Koch and Bedford deny the allegations in paragraph 14.

15.     Mr. Koch and Bedford deny the allegations in paragraph 15.

16.     Mr. Koch and Bedford deny the allegations in paragraph 16, except admit that their counsel sent a demand letter to Plaintiffs' counsel on July 31, 2020.

17.     Mr. Koch and Bedford deny the allegations in paragraph 17, except admit that the July 31, 2020 demand letter requested that Plaintiffs' pay him the 1.2 million shares in Jupiter that Plaintiff John had previously orally promised that Plaintiff John would provide Mr. Koch as compensation for his work for Jupiter.

18.     Mr. Koch and Bedford deny the allegations in paragraph 18.

19.     Mr. Koch and Bedford deny the allegations in paragraph 19.

20.     Mr. Koch and Bedford deny the allegations in paragraph 20, except admit that their counsel attached a (meritorious) draft complaint to the July 31, 2020 demand letter.

21.     Mr. Koch and Bedford deny the allegations in paragraph 21.

22.     Mr. Koch and Bedford deny the allegations in paragraph 22.

## THE PARTIES

23.     Upon information and belief, Mr. Koch and Bedford admit the allegations set forth in paragraph 23.

24.     Upon information and belief, Mr. Koch and Bedford admit the allegations set forth in paragraph 24.

25.     Upon information and belief, Mr. Koch and Bedford admit the allegations set forth in paragraph 25.

26.     Upon information and belief, Mr. Koch and Bedford admit the allegations set forth in paragraph 26.

27.     Upon information and belief, Mr. Koch and Bedford admit the allegations set forth in paragraph 27.

28.     Mr. Koch and Bedford deny the allegations set forth in paragraph 28, especially the false and defamatory allegation that Mr. Koch was ever imprisoned,[1] except admit that Mr. Koch was formerly employed as a registered representative by Stratton Oakmont and that Mr. Koch's CRD number is 1917229.

29.     Mr. Koch and Bedford admit the allegations in paragraph 29, except deny that the NASD suspension occurred in 1997.

30.     Mr. Koch and Bedford admit the allegations in paragraph 30.

31.     Mr. Koch and Bedford admit the allegations in paragraph 31.

32.     Mr. Koch and Bedford admit the allegations in paragraph 32.

33.     Mr. Koch and Bedford deny the allegations in paragraph 33.

34.     Mr. Koch and Bedford deny the allegations in paragraph 34.

35.     Mr. Koch and Bedford deny the allegations in paragraph 35.

36.     To the extent that allegations in paragraph 36 sets forth legal conclusions, no response is required.  Mr. Koch and Bedford deny the allegations in paragraph 36.

### Venue and Jurisdiction

37.     To the extent that allegations in paragraph 37 sets forth legal conclusions, no response is required.  Mr. Koch and Bedford admit that venue is proper in this district.

38.     Mr. Koch and Bedford admit that this Court has personal jurisdiction over them because they are both residents of New York.  Mr. Koch and Bedford lack knowledge or

---

[1] Plaintiffs John and Miller, as well as lawyers in the office of Plaintiffs' counsel, Gusrae Kaplan Nusbaum know this allegation to be false.

4

information sufficient to form a belief as to the truth of the allegations in paragraph 38 relating to Defendant Kaizen.

39.    Mr. Koch and Bedford deny the allegations in paragraph 39.

40.    Mr. Koch and Bedford aver that paragraph 40 sets forth legal conclusions to which no response is required.

41.    Mr. Koch and Bedford deny the allegations in paragraph 41, except admit that Plaintiffs Caro Capital and Caro Partners entered into multiple oral agreements from 2015 through 2019 with Mr. Koch and Bedford to provide certain consulting services to several of the clients of Plaintiffs Caro Capital and Caro Partners.

42.    Mr. Koch and Bedford admit that Caro Capital paid them certain amounts in 2015, 2016, and 2017 but deny the specific amounts stated.

43.    Mr. Koch and Bedford deny the allegations in paragraph 43.

44.    Mr. Koch and Bedford deny the allegations in paragraph 44 as stated.  Mr. Koch and Bedford admit that no Plaintiff ever executed a written contract, but they deny that no contracts were ever entered between Plaintiffs and Mr. Koch and Bedford.

45.    Mr. Koch and Bedford lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 45.

46.    Mr. Koch and Bedford deny the allegations in paragraph 46, except admit that Mr. Koch secured several web domains for the Company.

47.    Mr. Koch and Bedford deny the allegations in paragraph 47.

48.    Mr. Koch and Bedford deny the allegations in paragraph 48.

49.    Mr. Koch and Bedford deny the allegations in paragraph 49.

50.    Mr. Koch and Bedford deny the allegations in paragraph 50.

51.     Mr. Koch and Bedford deny the allegations in paragraph 51.

52.     Mr. Koch and Bedford deny the allegations in paragraph 52.

53.     Mr. Koch and Bedford deny the allegations in paragraph 53.

54.     Mr. Koch and Bedford deny the allegations in paragraph 54.

55.     Mr. Koch and Bedford deny the allegations in paragraph 55.

56.     Mr. Koch and Bedford deny the allegations in paragraph 56.

57.     Mr. Koch and Bedford deny the allegations in paragraph 57.

58.     Mr. Koch and Bedford deny the allegations in paragraph 58, except admit that any company embarking upon an initial public offering is required to disclose in public filings if it is subject to a material pending legal proceeding.

59.     Mr. Koch and Bedford deny the allegations in paragraph 59.

60.     Mr. Koch and Bedford admit the allegations in paragraph 60.

61.     Mr. Koch and Bedford admit the allegations in paragraph 61.

62.     Mr. Koch and Bedford deny the allegations in paragraph 62, except admit that their counsel sent a demand letter to Plaintiffs on June 10, 2020, which demand letter speaks for itself.

63.     Mr. Koch and Bedford admit that their counsel sent a letter to Plaintiffs' counsel on July 9, 2020, but to the extent the allegations of paragraph 63 seek to paraphrase or characterize the contents of a written document, the document speaks for itself and Mr. Koch and Bedford deny the allegations to the extent that they are inconsistent with the document.

64.     Mr. Koch and Bedford admit that their counsel sent a letter to Plaintiffs' counsel on July 31, 2020, but to the extent the allegations of paragraph 64 seek to paraphrase or characterize the contents of a written document, the document speaks for itself and Mr. Koch and Bedford deny the allegations to the extent that they are inconsistent with the document.

65.     To the extent the allegations of paragraph 65 seek to paraphrase or characterize the contents of a written document, the document speaks for itself and Mr. Koch and Bedford deny the allegations to the extent that they are inconsistent with the document.

66.     To the extent the allegations of paragraph 66 seek to paraphrase or characterize the contents of a written document, the document speaks for itself and Mr. Koch and Bedford deny the allegations to the extent that they are inconsistent with the document.

67.     To the extent the allegations of paragraph 67 seek to paraphrase or characterize the contents of a written document, the document speaks for itself and Mr. Koch and Bedford deny the allegations to the extent that they are inconsistent with the document.

68.     To the extent the allegations of paragraph 68 seek to paraphrase or characterize the contents of a written document, the document speaks for itself and Mr. Koch and Bedford deny the allegations to the extent that they are inconsistent with the document.

69.     To the extent the allegations of paragraph 69 seek to paraphrase or characterize the contents of a written document, the document speaks for itself and Mr. Koch and Bedford deny the allegations to the extent that they are inconsistent with the document.

70.     To the extent the allegations of paragraph 70 seek to paraphrase or characterize the contents of a written document, the document speaks for itself and Mr. Koch and Bedford deny the allegations to the extent that they are inconsistent with the document

71.     To the extent the allegations of paragraph 71 seek to paraphrase or characterize the contents of a written document, the document speaks for itself and Mr. Koch and Bedford deny the allegations to the extent that they are inconsistent with the document.

72.     To the extent that allegations in paragraph 72 sets forth legal conclusions, no response is required.  Mr. Koch and Bedford deny the allegations in paragraph 72.

73.    To the extent that allegations in paragraph 73 sets forth legal conclusions, no response is required.  Mr. Koch and Bedford deny the allegations in paragraph 73.

74.    To the extent the allegations of paragraph 74 seek to paraphrase or characterize the contents of a written document, the document speaks for itself and Mr. Koch and Bedford deny the allegations to the extent that they are inconsistent with the document.

75.    To the extent the allegations of paragraph 75 seek to paraphrase or characterize the contents of a written document, the document speaks for itself and Mr. Koch and Bedford deny the allegations to the extent that they are inconsistent with the document.

76.    Mr. Koch and Bedford deny the allegations in paragraph 76.

77.    Mr. Koch and Bedford deny the allegations in paragraph 77.

78.    Mr. Koch and Bedford deny the allegations in paragraph 78.

79.    Mr. Koch and Bedford deny the allegations in paragraph 79.

## CLAIMS

### COUNT I
### Tortious Interference with Prospective Economic Advantage

80.    Mr. Koch and Bedford refer to and incorporate by reference their answers to paragraphs 1 through 79 above as if fully set forth herein.

81.    Mr. Koch and Bedford deny the allegations in paragraph 81.

82.    Mr. Koch and Bedford deny the allegations in paragraph 82.

83.    Mr. Koch and Bedford deny the allegations in paragraph 83.

84.    Mr. Koch and Bedford deny the allegations in paragraph 84.

85.    To the extent that allegations in paragraph 85 sets forth legal conclusions, no response is required.  To the extent that a response is required, Mr. Koch and Bedford deny the allegations in paragraph 85.

86.    To the extent that allegations in paragraph 86 sets forth legal conclusions, no response is required.  To the extent that a response is required, Mr. Koch and Bedford deny the allegations in paragraph 86.

## COUNT II
### Prima Facie Tort

87.    Mr. Koch and Bedford refer to and incorporate by reference their answers to paragraphs 1 through 86 above as if fully set forth herein.

88.    Mr. Koch and Bedford deny the allegations in paragraph 88.

89.    To the extent that allegations in paragraph 89 sets forth legal conclusions, no response is required.  To the extent that a response is required, Mr. Koch and Bedford deny the allegations in paragraph 89.

90.    To the extent that allegations in paragraph 90 sets forth legal conclusions, no response is required.  To the extent that a response is required, Mr. Koch and Bedford deny the allegations in paragraph 90.

## COUNT III
### Defamation

91.    Mr. Koch and Bedford refer to and incorporate by reference their answers to paragraphs 1 through 90 above as if fully set forth herein.

92.    Mr. Koch and Bedford deny the allegations in paragraph 92.

93.    Mr. Koch and Bedford deny the allegations in paragraph 93.

## COUNT IV
### Business Disparagement

94.    Mr. Koch and Bedford refer to and incorporate by reference their answers to paragraphs 1 through 93 above as if fully set forth herein.

95.    Mr. Koch and Bedford deny the allegations in paragraph 95.

96.    Mr. Koch and Bedford deny the allegations in paragraph 96.

97.    Mr. Koch and Bedford deny the allegations in paragraph 97.

98.    Mr. Koch and Bedford deny the allegations in paragraph 98.

## COUNT V
### New York General Business Law § 349 – Deceptive Trade Practices

99.    Mr. Koch and Bedford refer to and incorporate by reference their answers to paragraphs 1 through 98 above as if fully set forth herein.

100.    Mr. Koch and Bedford deny the allegations in paragraph 100.

101.    Mr. Koch and Bedford deny the allegations in paragraph 101.

102.    Mr. Koch and Bedford deny the allegations in paragraph 102.

103.    To the extent that allegations in paragraph 103 sets forth legal conclusions, no response is required.  To the extent that a response is required, Mr. Koch and Bedford deny the allegations in paragraph 103.

### Punitive Damages and Attorneys' Fees

104.    Mr. Koch and Bedford refer to and incorporate by reference their answers to paragraphs 1 through 103 above as if fully set forth herein.

105.    Mr. Koch and Bedford deny the allegations in paragraph 105.

106.    Mr. Koch and Bedford deny the allegations in paragraph 106.

107.    Mr. Koch and Bedford deny the allegations in paragraph 107.

### FIRST AFFIRMATIVE DEFENSE

108.    The Complaint fails to state a claim upon which relief can be granted.

## SECOND AFFIRMATIVE DEFENSE

109.    Plaintiffs' claim for Tortious Interference with Prospective Economic Advantage is barred because neither Mr. Koch nor Bedford engaged in any conduct directed at any party with which Plaintiffs had, or sought to have, a business relationship.

## THIRD AFFIRMATIVE DEFENSE

110.    Plaintiffs' claim for Tortious Interference with Prospective Economic Advantage is barred because neither Mr. Koch nor Bedford engaged in any conduct that caused injury to any business relationship that Plaintiffs had with any third party.

## FOURTH AFFIRMATIVE DEFENSE

111.    Plaintiffs' claims for defamation are barred because Mr. Koch's allegedly defamatory statements concerning Plaintiffs are true or substantially true.

## FIFTH AFFIRMATIVE DEFENSE

112.    Plaintiffs' claims for defamation are barred because Defendants did not publish any of the allegedly defamatory statements.

## SIXTH AFFIRMATIVE DEFENSE

113.    Plaintiffs' claims for defamation are barred because Mr. Koch's allegedly defamatory statements are all protected by the self-defense privilege and/or the litigation privilege.

## SEVENTH AFFIRMATIVE DEFENSE

114.    Plaintiffs' claims for defamation are barred because the alleged defamatory statements at issue in the Complaint did not cause or contribute to any damages suffered by Plaintiffs.

## EIGHTH AFFIRMATIVE DEFENSE

115.   Plaintiffs' claim for deceptive trade practices is barred because it fails to allege that any actions of Defendants were misleading to a reasonable consumer or that any such actions were consumer oriented.

## NINTH AFFIRMATIVE DEFENSE

116.   Plaintiffs suffered no damages by reason of the acts complained of in the Complaint, or by any act or omission of Defendants.

## TENTH AFFIRMATIVE DEFENSE

117.   Plaintiffs' alleged damages, if any, are speculative, hypothetical, unsupported by any reasonable methodology, and are not cognizable as a matter of law.

## ELEVENTH AFFIRMATIVE DEFENSE

118.   Plaintiffs' alleged damages, if any, were caused by their own actions, and therefore, they are precluded from recovery from Defendants.

## TWELFTH AFFIRMATIVE DEFENSE

119.   Plaintiffs' claims are barred by the doctrines of unclean hands, promissory estoppel and *in pari delicto*.

## THIRTEENTH AFFIRMATIVE DEFENSE

120.   Plaintiffs' claims are barred by the doctrines of waiver and/or ratification.

## FOURTEENTH AFFIRMATIVE DEFENSE

121.   Plaintiffs' Complaint contains immaterial, impertinent, and/or scandalous matter and allegations that should be stricken by this Court pursuant to Fed. R. Civ. P. 12(f).  Plaintiffs' and their lawyers' purpose in including this material in the Complaint is unrelated to the lawsuit

itself, but it is instead part of a design to intentionally disseminate false and defamatory material about Mr. Koch, for the sole purpose of harassing Mr. Koch and causing him embarrassment.

## FIFTEENTH AFFIRMATIVE DEFENSE

122.    Plaintiffs' claims should be dismissed, in part, because they are not pled with the particularity required by CPLR 3016.

## SIXTEENTH AFFIRMATIVE DEFENSE

123.    Plaintiff's claim for punitive damages is barred because Mr. Koch's and Bedford's actions with respect to Plaintiffs have in all respects been lawful, were undertaken in good faith, lacked ill will or reckless disregard of Plaintiffs' rights, and do not demonstrate willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to the consequences. Any award of punitive damages in this matter would violate the Due Process Clause of the United States Constitution and the corresponding provision of the New York State Constitution.

## SEVENTEENTH AFFIRMATIVE DEFENSE

124.    Mr. Koch and Bedford reserve the right to raise any and all other affirmative defenses they deem proper based on the discovery process or any future development of the case.

## COUNTERCLAIM

Defendants/Counterclaim Plaintiffs Mr. Koch and Bedford assert the following Counterclaim against Plaintiffs/Counterclaim Defendants John, Miller, Caro Capital and Caro Partners and allege as follows:

13

## PRELIMINARY STATEMENT

1.      The action filed by Plaintiffs Caro Capital, Caro Partners, Jupiter, John and Miller is nothing more than Plaintiffs' malicious, bad faith attempt to intimidate Mr. Koch and Bedford and to disparage and smear Mr. Koch, who has spent years repairing and rebuilding his reputation.

2.      Plaintiffs, who have taken advantage of Mr. Koch for years, have liberally sprinkled the phrases "convicted felon," "criminal history," and "criminal record" throughout their Complaint apparently believing that they can blatantly breach their agreements with Mr. Koch merely because of his prior conviction.

3.      In addition, Plaintiffs' counsel in this case has a clear conflict of interest because his law firm formerly had an attorney-client relationship with Mr. Koch, and Mr. Koch met with and shared confidences with his firm, and specifically discussed whether the law firm could represent Mr. Koch against Plaintiffs – **in a case arising out of the *very same facts* as those in this matter**.

4.      Furthermore, Plaintiffs' include in their Complaint damaging, false allegations, such as stating that Mr. Koch was imprisoned, which he never was – a claim that Plaintiffs know is untrue.

5.      Plaintiffs also have the audacity to include particularly disparaging assertions in their Complaint without a shred of evidence to support their claims that, for example, Mr. Koch uses other entities and individuals to engage in prohibited activities in the securities industry, such as acting as an unregistered broker and receiving transaction-based compensation; that Mr. Koch has conspired to violate the securities laws; that Mr. Koch has told Plaintiffs' clients and investors that Plaintiffs structured their supposed compensation agreement with Mr. Koch and/or Bedford in order to evade detection by regulators and intentionally violate the securities laws; and that Mr.

Koch has lied about Plaintiffs' business practices and claimed to others that Plaintiffs regularly violate contracts and the securities laws. These allegations are false and harassing.

6.      Importantly, the gravamen of Plaintiffs' claims is that Mr. Koch is "extorting" and defaming Plaintiffs, and the centerpiece for their claims is a **draft** complaint attached to a demand letter that was **never filed** by Mr. Koch and Bedford, and was **never sent to, or shared with, anyone except Plaintiffs' own counsel**.

7.      In fact, the only publication of the facts involved in this case have been by Plaintiffs themselves by bringing this lawsuit and then by publishing information about the case in Jupiter's most recently filings (Amendments to its Form S-1) with the Securities and Exchange Commission.

8.      Contrary to Plaintiffs' allegations, this action is not about "extortion," it is about the abuse of a nearly three-decade long relationship between Mr. Koch and Plaintiff/Counterclaim Defendant John.

9.      Specifically, this case is about the influence John acquired and abused, taking advantage of Mr. Koch, and betraying Mr. Koch's trust and confidence in John solely for John's personal gain, in a manner that deprived Mr. Koch of the fruits of his labors and of the agreements between himself and John.

10.     John has breached numerous oral agreements with Mr. Koch and Bedford over the course of several years solely to benefit himself and to prevent Mr. Koch from receiving substantial sums that John promised Mr. Koch would receive for his work.

11.     From 2015 through the present, Mr. Koch and Bedford entered into dozens of oral agreements with John and/or Caro Partners or Caro Capital, both of which are mere alter egos of John.

12.    In the oral agreements, John requested that Mr. Koch and Bedford provide consulting services to certain clients (or prospective clients) of Caro Capital or Caro Partners.

13.    Each of the clients (or prospective clients) of Caro Capital or Caro Partners was a corporation that either was a publicly-traded corporation or wished to become a publicly-traded corporation.

14.    John promised Mr. Koch, who is the Managing Director, sole member, and founder of Bedford, that in exchange for Mr. Koch and Bedford's consulting services, Mr. Koch and Bedford would receive a certain percentage of the compensation Caro Partners or Caro Capital received (including both cash and securities of the client corporations).

15.    Depending on various factors involved in each arrangement, John promised Mr. Koch and Bedford that they would receive either one-third (1/3), fifty percent (50%), or forty percent (40%) of the compensation Caro Partners or Caro Capital received from their corporate clients (including both cash and securities of the client corporations).

16.    Also, in approximately the Spring of 2017, Mr. Koch and John discussed their interest in building a company that would sell sunscreen and/or sun care products that would be infused with cannabidiol ("CBD"), which is believed to interreact with the bodies' endocannabinoid system, a large system that helps regulate physiological symptoms like appetite, mood, and sleep, and is thought to help achieve better balance.

17.    Based upon their discussions, Mr. Koch worked as directed by John to build a company to sell CBD-infused sun care products, which was incorporated and named CBD Brands, Inc. n/k/a Jupiter Wellness, Inc. ("CBD Brands," "Jupiter" or the "Company").

18.    At John's direction, Mr. Koch continued to work for the Company, and in approximately late October 2018, John decided to add Plaintiff Miller to the team to run the

16

operations of the Company, and John orally agreed that Mr. Koch would own 1.4 million shares of Jupiter as compensation for his work for the Company.

19.     Subsequently, in or about February of 2019, Mr. Koch and John verbally agreed to modify their agreement concerning Mr. Koch's ownership of the Company to reduce Mr. Koch's ownership in the Company to 1.2 million shares.

20.     Although Mr. Koch and Bedford fully performed the consulting work requested pursuant to the multiple oral agreements, they were only paid a fraction of the total amount they are owed on those agreements.

21.     Despite numerous requests that John/Caro Capital/Caro Partners pay Mr. Koch and Bedford the compensation (both cash and company shares) they were promised by John, John has failed and refused to pay Mr. Koch and Bedford the full amount they are owed.

22.     Likewise, even though Mr. Koch has requested on several occasions that John either give Mr. Koch the shares of the Company that John promised, or that John pay Mr. Koch for those shares, John has absolutely refused to act on these requests.

23.     In fact, despite Mr. Koch's performing work for the Company, and in direct contravention of John's promises that Mr. Koch is entitled to own shares in the Company, John has now informed Mr. Koch that Mr. Koch is not entitled to any ownership of the Company or any compensation for the work he performed for the Company.

24.     By refusing to pay Mr. Koch and Bedford the cash and shares that John promised to pay them, John has breached numerous oral agreements he made with Mr. Koch and Bedford costing them millions of dollars.

25.     Mr. Koch and Bedford now bring this Counterclaim to recover the damages that they have suffered and continue to suffer as a result of John's multiple breaches of oral contracts.

17

## JURISDICTION AND VENUE

26.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) because there is complete diversity between the parties and the amount in controversy exceeds $75,000.00, exclusive of interest and costs, the sum specified by 28 U.S.C. § 1332.

27.     Venue in this District is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims asserted in this action occurred in this district.

## THE PARTIES

28.     Counterclaim Plaintiff Mr. Koch is an individual domiciled in Westchester County in the State of New York; is a citizen of the State of New York; and is *sui juris*.

29.     Counterclaim Plaintiff Bedford is a New York Limited Liability Company with its principal place of business in Westchester County in the State of New York, and its sole member, Plaintiff Mr. Koch, is a citizen of the State of New York.

30.     Counterclaim Defendant John is an individual domiciled in the State of Florida. Counterclaim Defendant John is *sui juris* and has submitted to the jurisdiction of this Court by virtue of filing this action.

31.     Counterclaim Defendant Caro Capital is a Florida Limited Liability Company with its principal place of business at 12573 Colony Preserve Drive Boynton Beach, Florida 33436. There are two members of Caro Capital:  Counter Defendants John and Miller, both of whom are Florida citizens.  For purposes of diversity jurisdiction, Caro Capital is a citizen of the State of Florida and has submitted to the jurisdiction of this Court by virtue of filing this action.

32.     Counterclaim Defendant Caro Partners is a Florida Limited Liability Company with its principal place of business at 344 Kingfisher Drive Jupiter, Florida 33458.  Caro Partners' sole

member is Counter Defendant John, who is a citizen of Florida.  For purposes of diversity jurisdiction, Caro Partners is a citizen of the State of Florida and has submitted to the jurisdiction of this Court by virtue of filing this action.

33.     Counterclaim Defendant Miller is an individual domiciled in the State of Florida. Counterclaim Defendant Miller is *sui juris* and has submitted to the jurisdiction of this Court by virtue of filing this action.

## **BACKGROUND FACTS**

34.     Mr. Koch has known John and Miller since the early or mid-1990s when all three of them worked together at Stratton Oakmont, Inc.

35.     Mr. Koch makes no secret of the fact that in June 2012, he was sentenced on several felony counts relating to actions he took more than a decade ago and to which he had previously pleaded guilty.

36.     Although the Sentencing Opinion included mention of a prison term, two days after the Sentencing Opinion was signed, the Court held that the term of imprisonment was reduced to "time served."  In other words, Mr. Koch was never required to, and never did, serve a single day in prison.

37.     In fact, Mr. Koch was a cooperating witness for the U.S. government for more than six years and received the benefit of a "5K letter" from the U.S. Attorney's Office for the Southern District of New York to the Court requesting a sentence below the federal sentencing guidelines based on substantial assistance and cooperation provided by Mr. Koch.

38.     Since his guilty pleas and sentencing, Mr. Koch has worked exceptionally hard to rehabilitate his personal reputation, has continued to do work for charities in the greater New York

area, has always disclosed his past to those individuals with whom he may have a business relationship, and has not violated any securities laws.

39.     After his sentencing, Mr. Koch worked successfully in the commodities industry at Defendant/Counterclaim Plaintiff Bedford.

**John Made Numerous Oral Promise to Mr. Koch, upon which Mr. Koch Relied, and Pursuant to which Mr. Koch and Bedford Performed Work that Benefitted John, But John Has Absolutely Failed to Pay Mr. Koch and Bedford What He Promised He Would Pay**

Caro Capital, LLC

40.     Caro Capital is a "a full service financial consulting firm specializing in assisting emerging growth companies primarily in the sub- $100 million space with Investor Relations, Public Relations, Roadshow & Networking, and Introductions to investment bankers, brokers, market makers, attorneys and auditors and other related services."[2]

41.     John and Miller are the two members of Caro Capital and John is the sole member of Caro Partners.

42.     Upon information and belief, although Miller is legally a member of Caro Capital, John dominated and controlled Caro Capital, including in all dealings with Mr. Koch and Bedford.

43.     In or about March 2015, after another employee of Caro Capital left the company, because of Mr. Koch's experience and network of contacts, John contacted Mr. Koch to ask if he would be willing to render consulting services through Bedford to Caro Capital's corporate clients.

44.     John verbally promised Mr. Koch that he and Bedford would receive one-third (1/3) of all compensation (cash and corporate stock and/or warrants) paid to Caro Capital by its

---

[2] https://www.globenewswire.com/news-release/2016/11/01/1139215/0/en/CHRON-Announces-That-It-Has-Engaged-Consulting-Firm-Caro-Capital.html.

corporate clients to whom Mr. Koch and Bedford rendered consulting services, less any office costs and expenses.

45.     Mr. Koch knew that John, as one of the two members of, and as the dominating force behind, Caro Capital, would be privy to information that Mr. Koch could not know, including the amount of compensation (cash and corporate stock and/or warrants) Caro Capital would be paid by its corporate clients to whom Mr. Koch and Bedford rendered consulting services, but based upon Mr. Koch's previous personal relationship and business dealings with John, he trusted and had confidence that John/Caro Capital would provide Mr. Koch and Bedford with the compensation that John had promised they would receive for their consulting services.

46.     Mr. Koch also knew that he and Bedford would be completely dependent upon John/Caro Capital to pay Mr. Koch and Bedford the true amount that Mr. Koch and Bedford were owed pursuant to their oral agreement with John/Caro Capital, but based upon Mr. Koch's previous personal relationship and business dealings with John, he trusted and had confidence that John/Caro Capital would not abuse the influence John had over Mr. Koch and Bedford, and that John would provide Mr. Koch and Bedford with the compensation that he had promised they would receive for their consulting services.

47.     Mr. Koch and Bedford's relationship with John/Caro Capital was one of trust and confidence.

48.     Based upon this relationship of trust and confidence, beginning in March 2015, Mr. Koch and Bedford began rendering consulting services to certain Caro Capital clients, or prospective clients.

49.     In or about March of 2015, John asked Mr. Koch and Bedford to provide consulting services to Caro Capital client American Cannabis Company, Inc. ("AMMJ") and verbally agreed

to pay Mr. Koch and Bedford one-third (1/3) of all compensation (cash and corporate stock and warrants) that AMMJ paid to Caro Capital.

50.     Mr. Koch and Bedford performed on the oral agreement and fully performed all of the agreed-upon consulting services to AMMJ.

51.     Neither Caro Capital nor John ever paid Mr. Koch and Bedford the compensation (cash and corporate stock and/or warrants) they were promised for consulting services rendered to AMMJ, but because Caro Capital is a corporate entity in which Mr. Koch and Bedford have no equity ownership and for which they rendered consulting services as an independent contractor, Mr. Koch and Bedford are unsure of the total compensation (cash and corporate stock and/or warrants) that AMMJ paid to Caro Capital, and Mr. Koch and Bedford are unable to determine the amount of compensation they are due as a result of the Defendants' breach of oral agreement.

52.     In or about March of 2015, John asked Mr. Koch and Bedford to provide consulting services to Caro Capital client PetVivo Holdings Inc. ("PETV") and verbally agreed to pay Mr. Koch and Bedford one-third (1/3) of all compensation (cash and corporate stock and warrants) that PETV paid to Caro Capital.

53.     Mr. Koch and Bedford performed on the oral agreement and fully performed all of the agreed-upon consulting services to PETV.

54.     Neither Caro Capital nor John ever paid Mr. Koch and Bedford the compensation (cash and corporate stock and/or warrants) they were promised for consulting services rendered to PETV, but because Caro Capital is a corporate entity in which Mr. Koch and Bedford have no equity ownership and for which they rendered consulting services as an independent contractor, Mr. Koch and Bedford are unsure of the total compensation (cash and corporate stock and/or

22

warrants) that PETV paid to Caro Capital, and Mr. Koch and Bedford are unable to determine the amount of compensation they are due as a result of the Defendants' breach of oral agreement.

55.    In or about April of 2015, John asked Mr. Koch and Bedford to provide consulting services to Caro Capital client One Clean Planet, Inc. ("CLPT") and verbally agreed to pay Mr. Koch and Bedford one-third (1/3) of all compensation (cash and corporate stock and warrants) that CLPT paid to Caro Capital.

56.    Mr. Koch and Bedford performed on the oral agreement and fully performed all of the agreed-upon consulting services to CLPT.

57.    Because Caro Capital is a corporate entity in which Mr. Koch and Bedford have no equity ownership and for which they rendered consulting services as an independent contractor, Mr. Koch and Bedford are unsure of the total compensation (cash and corporate stock and/or warrants) that CLPT paid to Caro Capital, and Mr. Koch and Bedford are unable to determine whether they received the full amount of compensation that they were promised.

58.    In or about May of 2015, John asked Mr. Koch and Bedford to provide consulting services to Caro Capital client MassRoots, Inc. ("MSRT") and verbally agreed to pay Mr. Koch and Bedford one-third (1/3) of all compensation (cash and corporate stock and warrants) that MSRT paid to Caro Capital.

59.    Mr. Koch and Bedford performed on the oral agreement and fully performed all of the agreed-upon consulting services to MSRT.

60.    Neither Caro Capital nor John ever paid Mr. Koch and Bedford the compensation (cash and corporate stock and/or warrants) they were promised for consulting services rendered to MSRT, but because Caro Capital is a corporate entity in which Mr. Koch and Bedford have no equity ownership and for which they rendered consulting services as an independent contractor,

Mr. Koch and Bedford are unsure of the total compensation (cash and corporate stock and/or warrants) that MSRT paid to Caro Capital, and Mr. Koch and Bedford are unable to determine the amount of compensation that they are due as a result of the Defendants' breach of oral agreement, although upon information and belief, Mr. Koch and Bedford are owed in excess of Fifty Thousand Dollars ($50,000) for their consulting services rendered to MSRT.

61.     In or about June of 2015, John asked Mr. Koch and Bedford to provide consulting services to Caro Capital client TapImmune, Inc. ("TPIV") and verbally agreed to pay Mr. Koch and Bedford one-third (1/3) of all compensation (cash and corporate stock and warrants) that TPIV paid to Caro Capital.

62.     Mr. Koch and Bedford performed on the oral agreement and fully performed all of the agreed-upon consulting services to TPIV.

63.     Because Caro Capital is a corporate entity in which Mr. Koch and Bedford have no equity ownership and for which they rendered consulting services as an independent contractor, Mr. Koch and Bedford are unsure of the total compensation (cash and corporate stock and/or warrants) that TPIV paid to Caro Capital, and Mr. Koch and Bedford are unable to determine whether they received the full amount of compensation that they were promised.

64.     In or about July of 2015, John asked Mr. Koch and Bedford to provide consulting services to Caro Capital client Beverly Hill Group, Inc. ("BHGI") and verbally agreed to pay Mr. Koch and Bedford one-third (1/3) of all compensation (cash and corporate stock and warrants) that BHGI paid to Caro Capital.

65.     Mr. Koch and Bedford performed on the oral agreement and fully performed all of the agreed-upon consulting services to BHGI.

24

66.     Neither Caro Capital nor John ever paid Mr. Koch and Bedford the compensation (cash and corporate stock and/or warrants) they were promised for consulting services rendered to BHGI, but because Caro Capital is a corporate entity in which Mr. Koch and Bedford have no equity ownership and for which they rendered consulting services as an independent contractor, Mr. Koch and Bedford are unsure of the total compensation (cash and corporate stock and/or warrants) that BHGI paid to Caro Capital, and Mr. Koch and Bedford are unable to determine the amount of compensation that they are due as a result of the Defendants' breach of oral agreement.

67.     In or about September of 2015, John asked Mr. Koch and Bedford to provide consulting services to Caro Capital client Cardiff International, Inc. ("CDIF") and verbally agreed to pay Mr. Koch and Bedford one-third (1/3) of all compensation (cash and corporate stock and warrants) that CDIF paid to Caro Capital.

68.     Mr. Koch and Bedford performed on the oral agreement and fully performed all of the agreed-upon consulting services to CDIF.

69.     Neither Caro Capital nor John ever paid Mr. Koch and Bedford the compensation (cash and corporate stock and/or warrants) they were promised for consulting services rendered to CDIF, but because Caro Capital is a corporate entity in which Mr. Koch and Bedford have no equity ownership and for which they rendered consulting services as an independent contractor, Mr. Koch and Bedford are unsure of the total compensation (cash and corporate stock and/or warrants) that CDIF paid to Caro Capital, and Mr. Koch and Bedford are unable to determine the amount of compensation that they are due as a result of the Defendants' breach of oral agreement.

70.     In or about September of 2015, John asked Mr. Koch and Bedford to provide consulting services to Caro Capital client Alliance Bioenergy Plus, Inc. ("ALLM") and verbally

agreed to pay Mr. Koch and Bedford one-third (1/3) of all compensation (cash and corporate stock and warrants) that ALLM paid to Caro Capital.

71.     Mr. Koch and Bedford performed on the oral agreement and fully performed all of the agreed-upon consulting services to ALLM.

72.     Neither Caro Capital nor John ever paid Mr. Koch and Bedford the compensation (cash and corporate stock and/or warrants) they were promised for consulting services rendered to ALLM, but because Caro Capital is a corporate entity in which Mr. Koch and Bedford have no equity ownership and for which they rendered consulting services as an independent contractor, Mr. Koch and Bedford are unsure of the total compensation (cash and corporate stock and/or warrants) that ALLM paid to Caro Capital, and Mr. Koch and Bedford are unable to determine the amount of compensation that they are due as a result of the Defendants' breach of oral agreement.

73.     In or about September of 2015, John asked Mr. Koch and Bedford to provide consulting services to Caro Capital client BioPower Operations Corporation ("BOPO") and verbally agreed to pay Mr. Koch and Bedford one-third (1/3) of all compensation (cash and corporate stock and warrants) that BOPO paid to Caro Capital.

74.     Mr. Koch and Bedford performed on the oral agreement and fully performed all of the agreed-upon consulting services to BOPO.

75.     Neither Caro Capital nor John ever paid Mr. Koch and Bedford the compensation (cash and corporate stock and/or warrants) they were promised for consulting services rendered to BOPO, but because Caro Capital is a corporate entity in which Mr. Koch and Bedford have no equity ownership and for which they rendered consulting services as an independent contractor, Mr. Koch and Bedford are unsure of the total compensation (cash and corporate stock and/or

warrants) that BOPO paid to Caro Capital, and Mr. Koch and Bedford are unable to determine the amount of compensation that they are due as a result of the Defendants' breach of oral agreement.

76.    In or about October of 2015, John asked Mr. Koch and Bedford to provide consulting services to Caro Capital client Tomichi Creek Outfitters and its recently acquired division, Grasshopper Staffing, (jointly "TCKF") and verbally agreed to pay Mr. Koch and Bedford one-third (1/3) of all compensation (cash and corporate stock and warrants) that TCKF paid to Caro Capital.

77.    Mr. Koch and Bedford performed on the oral agreement and fully performed all of the agreed-upon consulting services to TCKF.

78.    Neither Caro Capital nor John ever paid Mr. Koch and Bedford the compensation (cash and corporate stock and/or warrants) they were promised for consulting services rendered to TCKF, but because Caro Capital is a corporate entity in which Mr. Koch and Bedford have no equity ownership and for which they rendered consulting services as an independent contractor, Mr. Koch and Bedford are unsure of the total compensation (cash and corporate stock and/or warrants) that TCKF paid to Caro Capital, and Mr. Koch and Bedford are unable to determine the amount of compensation that they are due as a result of the Defendants' breach of oral agreement.

79.    In or about October of 2015, John asked Mr. Koch and Bedford to provide consulting services to Caro Capital client Efactor Group Corp. ("EFCT") and verbally agreed to pay Mr. Koch and Bedford one-third (1/3) of all compensation (cash and corporate stock and warrants) that EFCT paid to Caro Capital.

80.    Mr. Koch and Bedford performed on the oral agreement and fully performed all of the agreed-upon consulting services to EFCT.

81.     Neither Caro Capital nor John ever paid Mr. Koch and Bedford the compensation (cash and corporate stock and/or warrants) they were promised for consulting services rendered to EFCT, but because Caro Capital is a corporate entity in which Mr. Koch and Bedford have no equity ownership and for which they rendered consulting services as an independent contractor, Mr. Koch and Bedford are unsure of the total compensation (cash and corporate stock and/or warrants) that EFCT paid to Caro Capital, and Mr. Koch and Bedford are unable to determine the amount of compensation that they are due as a result of the Defendants' breach of oral agreement.

82.     In or about December of 2015, John asked Mr. Koch and Bedford to provide consulting services to Caro Capital client Star Mountain Resources, Inc. ("SMRS") and verbally agreed to pay Mr. Koch and Bedford one-third (1/3) of all compensation (cash and corporate stock and warrants) that SMRS paid to Caro Capital.

83.     Mr. Koch and Bedford performed on the oral agreement and fully performed all of the agreed-upon consulting services to SMRS.

84.     Neither Caro Capital nor John ever paid Mr. Koch and Bedford the compensation (cash and corporate stock and/or warrants) they were promised for consulting services rendered to SMRS, but because Caro Capital is a corporate entity in which Mr. Koch and Bedford have no equity ownership and for which they rendered consulting services as an independent contractor, Mr. Koch and Bedford are unsure of the total compensation (cash and corporate stock and/or warrants) that SMRS paid to Caro Capital, and Mr. Koch and Bedford are unable to determine the amount of compensation that they are due as a result of the Defendants' breach of oral agreement.

85.     In or about December of 2015, John asked Mr. Koch and Bedford to provide consulting services to Caro Capital client Next Graphite, Inc. ("GPNE") and verbally agreed to

pay Mr. Koch and Bedford one-third (1/3) of all compensation (cash and corporate stock and warrants) that GPNE paid to Caro Capital.

86.     Mr. Koch and Bedford performed on the oral agreement and fully performed all of the agreed-upon consulting services to GPNE.

87.     Neither Caro Capital nor John ever paid Mr. Koch and Bedford the compensation (cash and corporate stock and/or warrants) they were promised for consulting services rendered to GPNE, but because Caro Capital is a corporate entity in which Mr. Koch and Bedford have no equity ownership and for which they rendered consulting services as an independent contractor, Mr. Koch and Bedford are unsure of the total compensation (cash and corporate stock and/or warrants) that GPNE paid to Caro Capital, and Mr. Koch and Bedford are unable to determine the amount of compensation that they are due as a result of the Defendants' breach of oral agreement.

88.     In or about January of 2016, John asked Mr. Koch and Bedford to provide consulting services to Iao Kun Group Holding Company ("IKGH") and verbally agreed to pay Mr. Koch and Bedford one-third (1/3) of all compensation (cash and corporate stock and warrants) that IKGH paid to Caro Capital.

89.     Mr. Koch and Bedford performed on the oral agreement and fully performed all consulting services to IKGH.

90.     Because Caro Capital is a corporate entity in which Mr. Koch and Bedford have no equity ownership and for which they rendered consulting services as an independent contractor, Mr. Koch and Bedford are unsure of the total compensation (cash and corporate stock and/or warrants) that IKGH paid to Caro Capital, and Mr. Koch and Bedford are unable to determine whether they received the full amount of compensation that they were promised.

91.     In or about July of 2016, John asked Mr. Koch and Bedford to provide consulting services to Pivot Pharmaceuticals Inc ("PVOTF") and verbally agreed to pay Mr. Koch and Bedford one-third (1/3) of all compensation (cash and corporate stock and warrants) that PVOTF paid to Caro Capital.

92.     Mr. Koch and Bedford performed on the oral agreement and fully performed all of the agreed-upon consulting services to PVOTF.

93.     Neither Caro Capital nor John ever paid Mr. Koch and Bedford the compensation (cash and corporate stock and/or warrants) they were promised for consulting services rendered to PVOTF, but because Caro Capital is a corporate entity in which Mr. Koch and Bedford have no equity ownership and for which they rendered consulting services as an independent contractor, Mr. Koch and Bedford are unsure of the total compensation (cash and corporate stock and/or warrants) that PVOTF paid to Caro Capital, and Mr. Koch and Bedford are unable to determine the amount of compensation that they are due as a result of the Defendants' breach of oral agreement.

94.     In or about July of 2016, John asked Mr. Koch and Bedford to provide consulting services to Caro Capital client International Western Petroleum, Inc. ("INWP") and verbally agreed to pay Mr. Koch and Bedford one-third (1/3) of all compensation (cash and corporate stock and/or warrants) that INWP paid to Caro Capital.

95.     Mr. Koch and Bedford performed on the oral agreement and fully performed all of the agreed-upon consulting services to INWP.

96.     Neither Caro Capital nor John ever paid Mr. Koch and Bedford the compensation (cash and corporate stock and/or warrants) they were promised for consulting services rendered to INWP, but because Caro Capital is a corporate entity in which Mr. Koch and Bedford have no

equity ownership and for which they rendered consulting services as an independent contractor, Mr. Koch and Bedford are unsure of the total compensation (cash and corporate stock and/or warrants) that INWP paid to Caro Capital, and Mr. Koch and Bedford are unable to determine the amount of compensation that they are due as a result of the Defendants' breach of oral agreement.

97.     In or about July of 2016, John asked Mr. Koch and Bedford to provide consulting services to Caro Capital client The Chron Organization, Inc. ("CHRO") and verbally agreed to pay Mr. Koch and Bedford one-third (1/3) of all compensation (cash and corporate stock and/or warrants) that CHRO paid to Caro Capital.

98.     Mr. Koch and Bedford performed on the oral agreement and fully performed all of the agreed-upon consulting services to CHRO.

99.     Neither Caro Capital nor John ever paid Mr. Koch and Bedford the compensation (cash and corporate stock and/or warrants) they were promised for consulting services rendered to CHRO, but because Caro Capital is a corporate entity in which Mr. Koch and Bedford have no equity ownership and for which they rendered consulting services as an independent contractor, Mr. Koch and Bedford are unsure of the total compensation (cash and corporate stock and/or warrants) that CHRO paid to Caro Capital, and Mr. Koch and Bedford are unable to determine the amount of compensation that they are due as a result of the Defendants' breach of oral agreement, although upon information and belief, Mr. Koch and Bedford are owed well over One Hundred Thousand Dollars ($100,000) for their consulting services rendered to CHRO.

Caro Partners LLC

100.     In 2016, Miller was injured in an accident and was unable to work for a long period.

31

101.    Because Miller was unable to work, John, asserting his control over Caro Capital, decided to incorporate Caro Partners and perform all future work through Caro Partners instead of through Caro Capital.

102.    Caro Partners is also "is a full service financial consulting firm specializing in assisting emerging growth companies primarily in the sub-$100 million space with Investor Relations, Public Relations, Roadshow & Networking, and Introductions to investment bankers, brokers, market makers, attorneys and auditors and other related services."[3]

103.    In or about October of 2016, because of Mr. Koch's experience and network of contacts, and because his consulting had been very lucrative to Caro Capital, John asked Mr. Koch and Bedford to render their consulting services to Caro Partners' corporate clients.

104.    John verbally promised Mr. Koch and Bedford that they would receive fifty percent (50%) of all compensation (cash and corporate stock and/or warrants) paid to Caro Partners by its corporate clients to whom Mr. Koch and Bedford rendered consulting services less any office costs and expenses.

105.    Mr. Koch knew that John, as the sole member of Caro Partners, would be privy to information that Mr. Koch could not know, including the amount of compensation (cash and corporate stock and/or warrants) that would be paid to Caro Partners by its corporate clients to whom Mr. Koch and Bedford rendered consulting services, but based upon Mr. Koch's previous personal relationship and business dealings with John, he trusted and had confidence that John would provide Mr. Koch and Bedford with the compensation that John had promised they would receive for their consulting services.

---

[3] https://www.prnewswire.com/news-releases/caro-partners-engaged-to-present-originclear-to-investors-and-markets-300459819.html.

106.    Mr. Koch also knew that Mr. Koch and Bedford would be completely dependent upon John/Caro Partners to pay Mr. Koch and Bedford the true amount that Mr. Koch and Bedford were owed pursuant to their oral agreement with John/Caro Partners, but based upon Mr. Koch's previous personal relationship and business dealings with John, he trusted and had confidence that John would not abuse the influence he had over Mr. Koch and Bedford, and that John would provide Mr. Koch and Bedford with the compensation that John had promised they would receive for their consulting services.

107.    Mr. Koch and Bedford's relationship with John and Caro Partners was one of trust and confidence.

108.    Based upon this relationship of trust and confidence, beginning in or about November of 2016, Mr. Koch and Bedford began rendering consulting services to certain Caro Partners' clients, or prospective clients.

109.    In or about November of 2016, John asked Mr. Koch and Bedford to provide consulting services to Caro Partners client AppYea, Inc. ("APYP") and verbally agreed to pay Mr. Koch and Bedford fifty percent (50%) of all compensation (cash and corporate stock and/or warrants) that APYP paid to Caro Partners.

110.    Mr. Koch and Bedford performed on the oral agreement and fully performed all of the agreed-upon consulting services to APYP.

111.    Neither Caro Partners nor John ever paid Mr. Koch and Bedford the compensation (cash and corporate stock and/or warrants) they were promised for consulting services rendered to APYP, but because Caro Partners is a corporate entity in which Mr. Koch and Bedford have no equity ownership and for which they rendered consulting services as an independent contractor, Mr. Koch and Bedford are unsure of the total compensation (cash and corporate stock and/or

warrants) that APYP paid to Caro Partners, and Mr. Koch and Bedford are unable to determine the amount of compensation that they are due as a result of the Defendants' breach of oral agreement, although upon information and belief, Mr. Koch and Bedford are owed well over One Hundred Thousand Dollars ($100,000) for their consulting services rendered to APYP.

112.    In or about November of 2016, John asked Mr. Koch and Bedford to provide consulting services to Caro Partners client Green EnviroTech Holding Corp. ("GETH") and verbally agreed to pay Mr. Koch and Bedford fifty percent (50%) of all compensation (cash and corporate stock and/or warrants) that GETH paid to Caro Partners.

113.    Mr. Koch and Bedford performed on the oral agreement and fully performed all of the agreed-upon consulting services to GETH.

114.    Neither Caro Partners nor John ever paid Mr. Koch and Bedford the compensation (cash and corporate stock and/or warrants) they were promised for consulting services rendered to GETH, but because Caro Partners is a corporate entity in which Mr. Koch and Bedford have no equity ownership and for which they rendered consulting services as an independent contractor, Mr. Koch and Bedford are unsure of the total compensation (cash and corporate stock and/or warrants) that GETH paid to Caro Partners, and Mr. Koch and Bedford are unable to determine the amount of compensation that they are due as a result of the Defendants' breach of oral agreement.

115.    In or about November of 2016, John asked Mr. Koch and Bedford to provide consulting services to Caro Partners client Drone USA, Inc. ("DRUS") and verbally agreed to pay Mr. Koch and Bedford fifty percent (50%) of all compensation (cash and corporate stock and/or warrants) that DRUS paid to Caro Partners.

34

116.    Mr. Koch and Bedford performed on the oral agreement and fully performed all of the agreed-upon consulting services to DRUS.

117.    Neither Caro Partners nor John ever paid Mr. Koch and Bedford the compensation (cash and corporate stock and/or warrants) they were promised for consulting services rendered to DRUS, but because Caro Partners is a corporate entity in which Mr. Koch and Bedford have no equity ownership and for which they rendered consulting services as an independent contractor, Mr. Koch and Bedford are unsure of the total compensation (cash and corporate stock and/or warrants) that DRUS paid to Caro Partners, and Mr. Koch and Bedford are unable to determine the amount of compensation that they are due as a result of the Defendants' breach of oral agreement.

118.    In or about December of 2016, John asked Mr. Koch and Bedford to provide consulting services to Caro Partners client Flex-Power Inc. ("FLXP") and verbally agreed to pay Mr. Koch and Bedford fifty percent (50%) of all compensation (cash and corporate stock and/or warrants) that FLXP paid to Caro Partners.

119.    Mr. Koch and Bedford performed on the oral agreement and fully performed all of the agreed-upon consulting services to FLXP.

120.    Neither Caro Partners nor John ever paid Mr. Koch and Bedford the compensation (cash and corporate stock and/or warrants) they were promised for consulting services rendered to FLXP, but because Caro Partners is a corporate entity in which Mr. Koch and Bedford have no equity ownership and for which they rendered consulting services as an independent contractor, Mr. Koch and Bedford are unsure of the total compensation (cash and corporate stock and/or warrants) that FLXP paid to Caro Partners, and Mr. Koch and Bedford are unable to determine the amount of compensation that they are due as a result of the Defendants' breach of oral agreement.

121.    In or about December of 2016, John asked Mr. Koch and Bedford to provide consulting services to Caro Partners client The Chron Organization, Inc. ("CHRO") and verbally agreed to pay Mr. Koch and Bedford fifty percent (50%) of all compensation (cash and corporate stock and/or warrants) that CHRO paid to Caro Partners.

122.    Mr. Koch and Bedford performed on the oral agreement and fully performed all of the agreed-upon consulting services to CHRO.

123.    Neither Caro Partners nor John ever paid Mr. Koch and Bedford the compensation (cash and corporate stock and/or warrants) they were promised for consulting services rendered to CHRO, but because Caro Partners is a corporate entity in which Mr. Koch and Bedford have no equity ownership and for which they rendered consulting services as an independent contractor, Mr. Koch and Bedford are unsure of the total compensation (cash and corporate stock and/or warrants) that CHRO paid to Caro Partners, and Mr. Koch and Bedford are unable to determine the amount of compensation that they are due as a result of the Defendants' breach of oral agreement, although upon information and belief, Mr. Koch and Bedford are owed well over One Hundred Thousand Dollars ($100,000) for their consulting services rendered to CHRO.

124.    In or about January of 2017, John asked Mr. Koch and Bedford to provide consulting services to Caro Partners client Pressure Biosciences Inc. ("PBIO") and verbally agreed to pay Mr. Koch and Bedford fifty percent (50%) of all compensation (cash and corporate stock and/or warrants) that PBIO paid to Caro Partners.

125.    Mr. Koch and Bedford performed on the oral agreement and fully performed all of the agreed-upon consulting services to PBIO.

126.    Neither Caro Partners nor John ever paid Mr. Koch and Bedford the compensation (cash and corporate stock and/or warrants) they were promised for consulting services rendered to

PBIO, but because Caro Partners is a corporate entity in which Mr. Koch and Bedford have no equity ownership and for which they rendered consulting services as an independent contractor, Mr. Koch and Bedford are unsure of the total compensation (cash and corporate stock and/or warrants) that PBIO paid to Caro Partners, and Mr. Koch and Bedford are unable to determine the amount of compensation that they are due as a result of the Defendants' breach of oral agreement.

127.    In or about February of 2017, John asked Mr. Koch and Bedford to provide consulting services to Caro Partners client Fision Corp. ("FSSN") and verbally agreed to pay Mr. Koch and Bedford fifty percent (50%) of all compensation (cash and corporate stock and/or warrants) that FSSN paid to Caro Partners.

128.    Mr. Koch and Bedford performed on the oral agreement and fully performed all of the agreed-upon consulting services to FSSN.

129.    Neither Caro Partners nor John ever paid Mr. Koch and Bedford the compensation (cash and corporate stock and/or warrants) they were promised for consulting services rendered to FSSN, but because Caro Partners is a corporate entity in which Mr. Koch and Bedford have no equity ownership and for which they rendered consulting services as an independent contractor, Mr. Koch and Bedford are unsure of the total compensation (cash and corporate stock and/or warrants) that FSSN paid to Caro Partners, and Mr. Koch and Bedford are unable to determine the amount of compensation that they are due as a result of the Defendants' breach of oral agreement.

130.    In or about May of 2017, John asked Mr. Koch and Bedford to provide consulting services to Caro Partners client Medical Cannabis Payment Solutions ("REFG") and verbally agreed to pay Mr. Koch and Bedford fifty percent (50%) of all compensation (cash and corporate stock and/or warrants) that REFG paid to Caro Partners.

131.    Mr. Koch and Bedford performed on the oral agreement and fully performed all of the agreed-upon consulting services to REFG.

132.    Neither Caro Partners nor John ever paid Mr. Koch and Bedford the compensation (cash and corporate stock and/or warrants) they were promised for consulting services rendered to REFG, but because Caro Partners is a corporate entity in which Mr. Koch and Bedford have no equity ownership and for which they rendered consulting services as an independent contractor, Mr. Koch and Bedford are unsure of the total compensation (cash and corporate stock and/or warrants) that REFG paid to Caro Partners, and Mr. Koch and Bedford are unable to determine the amount of compensation that they are due as a result of the Defendants' breach of oral agreement.

133.    In or about May of 2017, John asked Mr. Koch and Bedford to provide consulting services to Caro Partners client OriginClear, Inc. ("OCLN") and verbally agreed to pay Mr. Koch and Bedford fifty percent (50%) of all compensation (cash and corporate stock and/or warrants) that OCLN paid to Caro Partners.

134.    Mr. Koch and Bedford performed on the oral agreement and fully performed all of the agreed-upon consulting services to OCLN.

135.    Neither Caro Partners nor John ever paid Mr. Koch and Bedford the compensation (cash and corporate stock and/or warrants) they were promised for consulting services rendered to OCLN, but because Caro Partners is a corporate entity in which Mr. Koch and Bedford have no equity ownership and for which they rendered consulting services as an independent contractor, Mr. Koch and Bedford are unsure of the total compensation (cash and corporate stock and/or warrants) that OCLN paid to Caro Partners, and Mr. Koch and Bedford are unable to determine the amount of compensation that they are due as a result of the Defendants' breach of oral agreement.

136.   In or about August of 2017, John asked Mr. Koch and Bedford to provide consulting services to Caro Partners client Sydys Corp. ("SYYC") and verbally agreed to pay Mr. Koch and Bedford fifty percent (50%) of all compensation (cash and corporate stock and/or warrants) that SYYC paid to Caro Partners.

137.   Mr. Koch and Bedford performed on the oral agreement and fully performed all of the agreed-upon consulting services to SYYC.

138.   Neither Caro Partners nor John ever paid Mr. Koch and Bedford the compensation (cash and corporate stock and/or warrants) they were promised for consulting services rendered to SYYC, but because Caro Partners is a corporate entity in which Mr. Koch and Bedford have no equity ownership and for which they rendered consulting services as an independent contractor, Mr. Koch and Bedford are unsure of the total compensation (cash and corporate stock and/or warrants) that SYYC paid to Caro Partners, and Mr. Koch and Bedford are unable to determine the amount of compensation that they are due as a result of the Defendants' breach of oral agreement.

139.   In or about August of 2017, John asked Mr. Koch and Bedford to provide consulting services to Caro Partners client Spindle, Inc. ("SPDL") and verbally agreed to pay Mr. Koch and Bedford fifty percent (50%) of all compensation (cash and corporate stock and/or warrants) that SPDL paid to Caro Partners.

140.   Mr. Koch and Bedford performed on the oral agreement and fully performed all of the agreed-upon consulting services to SPDL.

141.   Neither Caro Partners nor John ever paid Mr. Koch and Bedford the compensation (cash and corporate stock and/or warrants) they were promised for consulting services rendered to SPDL, but because Caro Partners is a corporate entity in which Mr. Koch and Bedford have no

39

equity ownership and for which they rendered consulting services as an independent contractor, Mr. Koch and Bedford are unsure of the total compensation (cash and corporate stock and/or warrants) that SPDL paid to Caro Partners, and Mr. Koch and Bedford are unable to determine the amount of compensation that they are due as a result of the Defendants' breach of oral agreement.

142.    In or about October of 2017, Mr. Koch had dinner in New York City with Dr. Glynn Wilson, Chief Executive Officer of TapImmune, Inc. ("TPIV"), a former client of Caro Capital.

143.    During this dinner meeting, Dr. Wilson informed Mr. Koch that, although TPIV was no longer using the consulting services of Caro Capital, TPIV was interested in retaining consulting services from Mr. Koch and Bedford.

144.    Shortly thereafter, in or about October of 2017, because of the trust and confidence he had in John, rather than simply keep this business opportunity to himself and Bedford, Mr. Koch informed John about the conversation that Mr. Koch had with Dr. Wilson and TPIV's desire to retain consulting services from Mr. Koch and Bedford, but not from Caro Capital.

145.    In or about October of 2017, John verbally promised Mr. Koch that he and Bedford could continue to render consulting services to TPIV as a client of Caro Partners, rather than a client of Caro Capital, and John also verbally promised that Mr. Koch and Bedford would receive fifty percent (50%) of all compensation (cash and corporate stock and/or warrants) TPIV paid to Caro Partners less any office costs and expenses.

146.    Mr. Koch and Bedford performed on the oral agreement and fully performed all of the agreed-upon consulting services to TPIV.[4]

---

[4] TPIV subsequently, in October of 2018, completed a merger with Marker Therapeutics, Inc. In connection with the merger, TapImmune Inc. changed its name to Marker Therapeutics, Inc. ("MRKR"). Mr. Koch and Bedford continued providing consulting services to MRKR after the company merged and changed its name. Throughout this Answer and Counterclaim, Mr. Koch and Bedford refer to both TPIV and MRKR as TPIV for ease of reference. Mr. Koch and Bedford's

147.    Neither Caro Partners nor John ever paid Mr. Koch and Bedford the compensation (cash and corporate stock and/or warrants) they were promised for consulting services rendered to TPIV, but because Caro Partners is a corporate entity in which Mr. Koch and Bedford have no equity ownership and for which they rendered consulting services as an independent contractor, Mr. Koch and Bedford are unsure of the total compensation (cash and corporate stock and/or warrants) that TPIV paid to Caro Partners, and Mr. Koch and Bedford are unable to determine the amount of compensation that they are due as a result of the Defendants' breach of oral agreement, although upon information and belief, Mr. Koch and Bedford are owed in excess of Three Hundred Seventy Thousand Dollars ($370,000) for their consulting services rendered to TPIV.

148.    In or about April of 2018, John asked Mr. Koch and Bedford to provide consulting services to Caro Partners client Water Technologies International, Inc. ("WTII") and verbally agreed to pay Mr. Koch and Bedford fifty percent (50%) of all compensation (cash and corporate stock and/or warrants) that WTII paid to Caro Partners.

149.    Mr. Koch and Bedford performed on the oral agreement and fully performed all of the agreed-upon consulting services to WTII.

150.    Neither Caro Partners nor John ever paid Mr. Koch and Bedford the compensation (cash and corporate stock and/or warrants) they were promised for consulting services rendered to WTII, but because Caro Partners is a corporate entity in which Mr. Koch and Bedford have no equity ownership and for which they rendered consulting services as an independent contractor, Mr. Koch and Bedford are unsure of the total compensation (cash and corporate stock and/or warrants) that WTII paid to Caro Partners, and Mr. Koch and Bedford are unable to determine the

---

counterclaims relating to TPIV specifically incorporate the total compensation (cash and corporate stock and/or warrants) that TPIV and/or MRKR paid to Caro Partners.

amount of compensation that they are due as a result of the Defendants' breach of oral agreement, although upon information and belief, Mr. Koch and Bedford are owed in excess of One Hundred Thousand Dollars ($100,000) for their consulting services rendered to WTII.

151.    In or about April of 2018, John asked Mr. Koch and Bedford to provide consulting services to Caro Partners client Tonix Pharmaceuticals Holding Corp. ("TNXP") and verbally agreed to pay Mr. Koch and Bedford fifty percent (50%) of all compensation (cash and corporate stock and/or warrants) that TNXP paid to Caro Partners.

152.    Mr. Koch and Bedford performed on the oral agreement and fully performed all of the agreed-upon consulting services to TNXP.

153.    Neither Caro Partners nor John ever paid Mr. Koch and Bedford the compensation (cash and corporate stock and/or warrants) they were promised for consulting services rendered to TNXP, but because Caro Partners is a corporate entity in which Mr. Koch and Bedford have no equity ownership and for which they rendered consulting services as an independent contractor, Mr. Koch and Bedford are unsure of the total compensation (cash and corporate stock and/or warrants) that TNXP paid to Caro Partners, and Mr. Koch and Bedford are unable to determine the amount of compensation that they are due as a result of the Defendants' breach of oral agreement.

154.    In or about June of 2018, John asked Mr. Koch and Bedford to provide consulting services to Caro Partners client Genprex, Inc. ("GNPX") and verbally agreed to pay Mr. Koch and Bedford fifty percent (50%) of all compensation (cash and corporate stock and/or warrants) that GNPX paid to Caro Partners.

155.    Mr. Koch and Bedford performed on the oral agreement and fully performed all of the agreed-upon consulting services to GNPX.

156.    Neither Caro Partners nor John ever paid Mr. Koch and Bedford the compensation (cash and corporate stock and/or warrants) they were promised for consulting services rendered to GNPX, but because Caro Partners is a corporate entity in which Mr. Koch and Bedford have no equity ownership and for which they rendered consulting services as an independent contractor, Mr. Koch and Bedford are unsure of the total compensation (cash and corporate stock and/or warrants) that GNPX paid to Caro Partners, and Mr. Koch and Bedford are unable to determine the amount of compensation that they are due as a result of the Defendants' breach of oral agreement, although upon information and belief, Mr. Koch and Bedford are owed in excess of One Hundred Fifty Thousand Dollars ($150,000) for their consulting services rendered to GNPX.

157.    In or about July of 2018, John asked Mr. Koch and Bedford to provide consulting services to Caro Partners client Dyadic International, Inc. ("DYAI") and verbally agreed to pay Mr. Koch and Bedford fifty percent (50%) of all compensation (cash and corporate stock and/or warrants) that DYAI paid to Caro Partners.

158.    Mr. Koch and Bedford performed on the oral agreement and fully performed all of the agreed-upon consulting services to DYAI.

159.    Neither Caro Partners nor John ever paid Mr. Koch and Bedford the compensation (cash and corporate stock and/or warrants) they were promised for consulting services rendered to DYAI, but because Caro Partners is a corporate entity in which Mr. Koch and Bedford have no equity ownership and for which they rendered consulting services as an independent contractor, Mr. Koch and Bedford are unsure of the total compensation (cash and corporate stock and/or warrants) that DYAI paid to Caro Partners, and Mr. Koch and Bedford are unable to determine the amount of compensation that they are due as a result of the Defendants' breach of oral agreement.

160.    In February 2019, John asked Mr. Koch to change their oral agreements moving forward so that John would receive sixty percent (60%) and Mr. Koch would receive (40%) of all compensation (cash and corporate stock and/or warrants) paid to Caro Partners by its corporate clients to whom Mr. Koch rendered his consulting services less any office costs and expenses.

161.    And, in February of 2019, Mr. Koch agreed that, going forward, John would receive sixty percent (60%) and Mr. Koch would receive (40%) of all compensation (cash and corporate stock and/or warrants) paid to Caro Partners by its corporate clients to whom Mr. Koch rendered his consulting services less any office costs and expenses.

162.    In or about June of 2019, John asked Mr. Koch and Bedford to provide consulting services to Caro Partners client Edison Nation, Inc. ("EDNT") and verbally agreed to pay Mr. Koch and Bedford forty percent (40%) of all compensation (cash and corporate stock and/or warrants) that EDNT paid to Caro Partners.

163.    Mr. Koch and Bedford performed on the oral agreement and fully performed all of the agreed-upon consulting services to EDNT.

164.    Neither Caro Partners nor John ever paid Mr. Koch and Bedford the compensation (cash and corporate stock and/or warrants) they were promised for consulting services rendered to EDNT, but because Caro Partners is a corporate entity in which Mr. Koch and Bedford have no equity ownership and for which they rendered consulting services as an independent contractor, Mr. Koch and Bedford are unsure of the total compensation (cash and corporate stock and/or warrants) that EDNT paid to Caro Partners, and Mr. Koch and Bedford are unable to determine the amount of compensation that they are due as a result of the Defendants' breach of oral agreement.

165.    In or about July of 2019, John asked Mr. Koch and Bedford to provide consulting services to Caro Partners client Victory Marine Holdings Corp. ("VMHG") and verbally agreed to pay Mr. Koch and Bedford forty percent (40%) of all compensation (cash and corporate stock and/or warrants) that VMHG paid to Caro Partners.

166.    Mr. Koch and Bedford performed on the oral agreement and fully performed all of the agreed-upon consulting services to VMHG.

167.    Because Caro Partners is a corporate entity in which Mr. Koch and Bedford have no equity ownership and for which they rendered consulting services as an independent contractor, Mr. Koch and Bedford are unsure of the total compensation (cash and corporate stock and/or warrants), if any, that VMHG paid to Caro Partners, and Mr. Koch and Bedford are unable to determine whether they received the full amount of compensation that they were promised.

Shares of CBD Brands, Inc. n/k/a Jupiter Wellness, Inc.

168.    In approximately the Spring of 2017, Mr. Koch and John discussed creating a company that would sell sunscreen and/or sun care products that would be infused with cannabidiol ("CBD"), which is believed to interreact with the body's endocannabinoid system, a large system that helps regulate physiological symptoms like appetite, mood, and sleep, and is thought to help achieve better balance.

169.    At John's direction, Mr. Koch worked with John to build this company, which was eventually incorporated and named CBD Brands, Inc. n/k/a Jupiter Wellness, Inc. ("Jupiter" or the "Company").

170.    In approximately April 2017, Mr. Koch came up with the idea of naming the Company's sunscreen brand "Kannasun" or "Kannisun."

45

171.    Beginning in or about April of 2017, and continuing for several months thereafter, Mr. Koch started registering domain names that he believed might be beneficial in helping the Company in the future, including Kannisun.com and CBDbrands.net.

172.    In or about April of 2017, Mr. Koch also began developing several logos for the Kannisun brand, and John agreed that the Company might wish to utilize one of these logos for the Company.

173.    Sometime thereafter, based upon Mr. Koch's suggested names for the Company's sunscreen product, John decided to name the product, "CaniSun," and to this day, the Company markets a trademarked line of products under the "CaniSun" brand name.

174.    At John's direction, Mr. Koch continued to work for the Company and, in the fall of 2018, they began talking about trying to sell the CBD based tanning lotion in certain stores about which they knew.

175.    In approximately October 2018, John verbally agreed with Mr. Koch that John would register a corporation that could use one of the domain names that Mr. Koch had already registered and that the two of them could own the Company with John owning slightly more than fifty percent and Mr. Koch owning slightly less than fifty percent.

176.    But, John informed Mr. Koch that, although John wanted Mr. Koch to continue to be involved in the Company, he wanted to make sure that Mr. Koch's name was not associated with the Company in case anyone did a background search and found out about Mr. Koch's criminal history.

177.    John verbally promised Mr. Koch that, because he did not want Mr. Koch's name associated with the Company, John would hold onto any shares in the Company that belonged to

Mr. Koch and that Mr. Koch should trust John and continue working for the Company because John would make sure Mr. Koch received his ownership interest in the Company.

178.    In reliance on this oral promise, Mr. Koch continued working for the Company.

179.    As he had told Mr. Koch he would, John caused a Certificate of Incorporation for "CBD Brands, Inc." to be filed in Delaware on October 24, 2018, which enabled the Company to take advantage of several domain names that Mr. Koch had previously registered.

180.    In or around late October 2018, John decided to employ Miller to run operations for the Company, and John promised Mr. Koch that Mr. Koch's ownership in the Company would continue to be held by John, and that any share ownership that Miller would receive would not affect Mr. Koch's ownership in the 3 million shares that John was going to hold for himself and Mr. Koch.

181.    Around that same time, in the fall of 2018, John began working with a Canadian company, Namex Explorations, Inc. ("Namex"), that was interested in completing a reverse merger with CBD Brands, and John instructed Mr. Koch to continue working for the Company to consummate the reverse merger by helping introduce potential investors in the Company to John, among other things at John's instruction.

182.    For example, on November 14, 2018, in response to an email from a director of Namex requesting a summary of CBD Brands' business plan from John, John immediately emailed Mr. Koch writing, "Call me about this I need your help with it today."

183.    At John's request, Mr. Koch drafted the summary business plan to be provided to Namex.

184.    In addition, in November 2018, when discussing the Company with Dr. Glynn Wilson, the Chairman and CEO of a Caro Partners' client for which Mr. Koch and Bedford had

provided consulting services, Mr. Koch asked Dr. Wilson if he would be interested in joining the board of directors of the Company.

185.    Because of Mr. Koch's relationship with, and request to, Dr. Wilson, Dr. Wilson agreed to serve on the board of directors, and he is currently Chairman of the Board.

186.    In or about early December 2018, at John's direction, Mr. Koch began drafting a PowerPoint presentation to be shared with Namex and other potential investors in the Company.

187.    Mr. Koch emailed John asking John to review the draft to make sure John liked the presentation draft, and John responded, "Looks great.  Keep going."

188.    Unfortunately, the reverse merger with Namex was never consummated.

189.    Throughout 2019, Mr. Koch continued to perform work for the Company at John's direction in reliance upon John's promise that John would "take care of" Mr. Koch.

190.    Mr. Koch's work included, but was not limited to, continuing to introduce potential investors in the Company to John; introducing John to investment bankers in New York who could potentially assist in helping the Company go public; and setting up meetings with potential investors and merger partners.

191.    In February 2019, John asked Mr. Koch to change their agreement of joint ownership of the 3 million shares of CBD Brands so that John would instead receive 60% (1.8 million shares) and Mr. Koch would receive 40% (1.2 million shares).

192.    Mr. Koch agreed to this modification, and John agreed to continue to hold all of the shares for both himself and Mr. Koch.

193.    However, contrary to the parties' agreement, and despite Mr. Koch's continuing to work for Jupiter in reliance thereon, John later told Mr. Koch that he intended to retain all of the

shares himself and that Mr. Koch would not receive any Jupiter shares, or any other compensation from Jupiter.

194.    John's current refusal to meet the obligations of his agreement with Mr. Koch concerning Mr. Koch's ownership in the Company and his failure to acknowledge that Mr. Koch performed valuable work for the Company is not only a breach of their verbal agreement, it clearly constitutes a breach of John's fiduciary duty to Mr. Koch.

195.    Mr. Koch trusted and reposed confidence in John to abide by his agreement to hold shares of the Company for Mr. Koch, and in reliance on John's promises and having faith in John because of their long personal relationship and business dealings, Mr. Koch continued to perform valuable work for the Company.

196.    John acknowledged that Mr. Koch had substantial ownership in, and would benefit from his ownership in, the Company in several items of written correspondence that he sent to Mr. Koch.

197.    For instance, discussing the Company's IPO, on June 24, 2019, John wrote Mr. Koch that "this could be the biggest deal any of us of ever done and it's ours to f\*\*k up so we got to be cautious and do things right".

198.    Two days later, on June 26, 2019, John sent an email to four people with the subject line "New Rule" and warning, "All, As we are about to become a publicly-traded company we have to be very careful with everything we do. No one is to post anything anywhere on any social media or anything else anywhere without management of CBD Brands approval first. Thank you".

199.    Similarly, on August 14, 2019, John texted Mr. Koch, that they should try to sign all potential Caro Partners clients they had at the time and "between that and CBD Brands **we** should be able to walk away by the end of the year," (emphasis added) implying that both he and

Mr. Koch were about to make a lot of money from both their Caro Partners work and their ownership in the Company.

200.     Nevertheless, over the next several months, John suddenly took the position that Mr. Koch had little, if any, ownership in the Company.

201.     Having finally had enough of John's failure to abide by his promises, on May 15, 2020, Mr. Koch sent a demand letter to John and copied CBD Brands' Board of Directors demanding that John pay Mr. Koch and Bedford the compensation that John had promised, and specifically that Mr. Koch receive the 1.2 million shares in CBD Brands that John had promised to Mr. Koch for his work for the Company.

202.     In response, John sent a reply email to Mr. Koch, copying the directors of the Company and counsel for the Company stating that Mr. Koch's demand letter was "completely inaccurate and in my opinion nothing more than extortion. . . . If you believe you are owe [*sic*] some compensation for some reason, please provide the agreements stating such to myself and the board . . . ."

203.     Of course, in an evident and premeditated attempt to secure Mr. Koch's services without compensating him, John had all along avoided entering into any written agreements with Mr. Koch.

204.     Indeed, John admitted as much in an October 1, 2019 text to Mr. Koch in which he wrote, ". . . Bobby I have and would never put something in writing to pay someone to do IR that has two Felonies for doing pump and dump."

205.     And just seven days after Mr. Koch sent his demand letter to John, on May 22, 2020, John filed an amendment to CBD Brands, Inc.'s Certificate of Incorporation and changed the Company's name to Jupiter Wellness, Inc., which appears to have been done solely in response

to the demand letter so John can downplay Mr. Koch's contributions to the Company and claim that the Company is not even using any of the domain names Mr. Koch transferred to the Company.

206.    Jupiter is now on the verge of its initial public offering of shares, and the Company will be offering units (each unit consisting of one share of common stock and one warrant) at an assumed price of seven dollars and fifty cents ($7.50) per unit.

207.    Thus, the 1.2 million shares of Jupiter that Mr. Koch is owed will presumably be worth approximately Nine Million Dollars ($9,000,000) when the shares begin trading publicly.

208.    By refusing even to recognize that Mr. Koch performed valuable services for the Company and refusing to provide Mr. Koch with the Company shares (or the fair value of the shares) that John promised Mr. Koch, John has caused Mr. Koch to suffer damages of Nine Million Dollars ($9,000,000).

**John's Failure to Pay Promised Compensation to Mr. Koch, John's Asserting Control Over His Relationship with Mr. Koch, John's Taking Advantage of Mr. Koch, and John's Refusal to Help Mr. Koch Keep His House By Withholding Money Owed**

209.    Throughout their relationship, Mr. Koch was dependent upon, and trusted, John to meet his contractual obligations and pay the compensation promised to Mr. Koch and Bedford.

210.    However, during their Caro Capital, Caro Partners, and Jupiter business relationships, John has always been quick to lord over Mr. Koch his felony convictions, and to belittle and demean Mr. Koch whenever Mr. Koch requested that John pay him all of the compensation he had promised.

211.    In late 2018, Mr. Koch explained to John that Mr. Koch was going to need approximately $250,000 by July 2019 so that Mr. Koch could purchase his house out of foreclosure.

212.    Mr. Koch explained to John that Mr. Koch and Bedford were still owed money for work that they had performed for John/Caro Partners, and Mr. Koch would be counting on John to pay Mr. Koch the compensation John had promised so that he could "buy back" his house and ensure that his family would not be displaced from the only home Mr. Koch's two children have ever known and where Mr. Koch and his wife have made their home for two decades.

213.    Despite knowing that Mr. Koch would be counting on him to pay the money he owed Mr. Koch in order to save his house, John never missed an opportunity to assert complete dominance in his relationship with Mr. Koch.

214.    For example, in December 2018, discussing, among other things, the fact that a mutual acquaintance had brought up Mr. Koch's felony convictions and embarrassed Mr. Koch, John sent a text to Mr. Koch saying, "everyone's entitled to their opinion you won't find lotta people that will do business with someone with a track record like yours Bob it is what it is".

215.    Feeling accosted by John's text, Mr. Koch responded that he did not believe he had done poorly for John/Caro Partners and mentioned that, based in part of consulting services that Mr. Koch and Bedford had provided to Caro Partners' clients TapImmune, Inc. ("TPIV"), Caro Partners/John continued to hold, what Mr. Koch believed was, $300,000 worth of MRKR shares, which Caro Partners/John had received from TPIV.[5]

216.    John was quick to belittle what he called "Koch math" and claimed, "we each have 65,000 shares [multiplied by $4 per share] is 240 [sic] grand not 300."

217.    John also forwarded a portion of a text to Mr. Koch in which the person had texted, "It was more about your decision to work with Koch."

---

[5] As noted above, TPIV completed a merger with Marker Therapeutics, Inc. In connection with the merger, TapImmune Inc. changed its name to Marker Therapeutics, Inc. ("MRKR"), and all shares of TPIV that Caro Partners received from TPIV were converted to MRKR shares.

218.     To explain the text, John texted, "Here [is] the lasted one from herb and gary my old bosses. Told Mag they think I'm gonna spend some time in jail..."

219.     Using this text as leverage over Mr. Koch, adding insult to injury, John texted, "That's pretty much everybody we know or anybody ever done business with all says the same thing to me somethings got a change in the split for me taking the risk when we're done," meaning that John wanted to keep more than fifty percent (50%) of the compensation (cash and corporate stock and/or warrants) paid to Caro Partners by its corporate clients to whom Mr. Koch and Bedford rendered consulting services.

220.     Realizing that John might be about to renege on their oral agreements, and concerned that John could be threatening to withhold agreed-upon compensation from him, Mr. Koch texted back, "So the money I am counting on for my house and future [- you're going to screw] me and my family."

221.     To determine whether John was threatening not to pay Mr. Koch what he and Bedford were owed, Mr. Koch followed up by asking John, "Is this something you're even considering"?

222.     Backing off on his texts slightly, but continuing to assert his influence over and abuse of Mr. Koch's trust and confidence, John assured Mr. Koch that "[he had] never [screwed anybody] over in my entire life[,] but all my friends I know we're [*sic*] starting to worry about me obviously doing business with you."

223.     Mr. Koch continued working for the Company and in approximately late January or early February of 2019, because John had not paid Mr. Koch and Bedford the cash, stock, and/or warrants that Mr. Koch and Bedford were entitled to receive under several of their oral agreements, Mr. Koch flew to Florida and reminded John that Mr. Koch needed to receive approximately

53

$250,000 of the money he and Bedford were entitled to receive so that Mr. Koch could purchase his house out of foreclosure in July 2019.

224.    In response, on February 9, 2019, John sent Mr. Koch an email saying that their verbal business agreements pursuant to which (a) Mr. Koch and Bedford were entitled to receive fifty percent (50%) of all compensation paid to Caro Partners and (b) John was to hold fifty percent of certain shares of the Company for Mr. Koch " is completely not fair. I take all the risk, I do all the BS and its [*sic*] my track record of 25 years and reputation that lands us ANY deals. . . . Over the last 4 months you have done little but beg for money and try to squeeze every dime you can from the Company [whether] you deserve it or not. Not 1 deal signed, and you raised s*** for CBD brands . . . ."

225.    The email continued, "I value what you do bring to the equation, but [what's] fair is fair and I won't hit you with a 70-30 spilt like almost everyone suggested, but I defiantly [*sic*] think 60-40 is fair. I certainly deserve an extra 10% for all the risk I take an [*sic*] everything I do. . . . Hopefully this is acceptable to you as I think [it's] MORE than fair. If not, you can certainly go do your own thing and I still love you and you will always be my brother."

226.    Despite John's taking advantage of Mr. Koch and changing their oral agreements, in a February 10, 2019 email, Mr. Koch agreed to the modification of his oral agreements with John stating, "I agree with the 60/40 going forward including CBD Brands as I totally appreciate the risk you take and agree with you" thereby agreeing that (a) there would be a 60-40 split moving forward so John/Caro Partners would receive 60% of all compensation from Caro Partners' clients on which Mr. Koch and Bedford performed consulting services and (b) John would own 60% of the 3 million shares of the Company stock that John promised Mr. Koch he was holding for himself and Mr. Koch, meaning that Mr. Koch would now be entitled to receive only 1.2 million shares.

227.    In his email to John, Mr. Koch also listed several deals on which he believed John/Caro Partners still owed Mr. Koch and Bedford for consulting services they had rendered, and Mr. Koch ended his email by asking, "Do you agree with the numbers above?"

228.    John never provided an answer to Mr. Koch's question, and instead replied, "I'm sure you would like it that way but it's my 25-year-old business[, it] is my 500 deals[,] and my reputation[.] did you think I was just going to give you 50% of my 25-year-old business for nothing???"

229.    Following John's email failing to answer Mr. Koch's question about the money he and Bedford were owed, Mr. Koch and John sent numerous emails to one another over the course of three days that are emblematic of their working relationship and John's taking advantage of Mr. Koch and belittling Mr. Koch whenever he requested that he and Bedford receive the compensation John had promised.

230.    First, Mr. Koch told John, "You know what's going on with me trying to save my house as I came down there two weeks ago to explain to you and there were no issues going forward . . . liquidating the remaining 65000 shares [of MRKR shares John/Caro Partners still held] and [in fact] you sent me a wire for 25,000 as you sold 5000 the next week and were to sell 5000 again each week" but then John decided not to continue with this plan.

231.    Mr. Koch also asked John, "I want you to think about this for a moment; I want you for one second to step in my shoes and take a step back, Nothing; not one thing that I have help[ed] build is in my name or even my wife's or children's name[s.] [W]e rely solely in the trust of a brother [John] who 1 would do anything for. You again know I am at your mercy but to call it begging for money each week after that in which I earned is not right."

232.    Later, Mr. Koch sent another email response to John, once again, laying out Mr. Koch's position writing, "Do you know what it feels like when 100% of everything you do is in someone else['] hand[s,] and the rug could be pulled from under your feet at any time. . . . Not saying that you would f**k me or my family but to cut my portion of Marker [MRKR} in my opinion is wrong as I 100% brought this back to the table a year later," and Mr. Koch told John that he "need[ed] to settle the house" and he wanted John to sell the shares of MRKR before April 2019 when other MRKR investors who purchased shares in a private placement would be free to sell their restricted shares and could flood the market.

233.    John's response was, "Yes[,] I am sure [it] is an uncomfortable feeling[.] unfortunately you made the decisions you made and you got two felonies[.] it's no one else's fault but your own[,] and then you have to deal with unfortunately it affects me because [] it makes it very risky even do business with [you and] I've lost business because of your background so you can't be a one-way street where [] you [are] trying to squeeze everything out you can and I just get f****d with everything on the backend like losing deals because of your background paying for the office paying for your count for the taxes paying for the transfers wires fees deposits and doing everything 10% across-the-board I think that's very fair".

234.    And then, John sent another email telling Mr. Koch, "Or we can go 10% from here on forward as you should just but then you gonna pay me the 200 grand you lost me on GNPX. Either way I don't think what I'm asking for is out of line whatsoever and any person I've ever even talk to it thinks it should be more so I think 10% is very very generous on my behalf".

235.    Mr. Koch objected to John's characterization that John had lost $200,000 on the GNPX deal, but John wrote back that this calculated sum was "Simple, it[']s a signed[,] sealed

deal for 10K a month and 150K shares we lost because of your background, not mine," thus implying that John/Caro Partners had never received any compensation from GNPX.

236.    Thereafter, John continued to demean Mr. Koch writing, "Its also ok for me to scrape you out of the poor house. Use my knowledge of 25 years, my track record and my clients to make the living you now make, but you lose me GPNX and I am supposed to eat it. Thats a one sided street and point [o]f view and exactly why we are now doing 60-40. You[r] head is not right."

237.    Mr. Koch responded that, contrary to what GNPX's CEO had told John, Mr. Koch had disclosed his background to the CEO (and had a witness to this fact who reminded the CEO of this conversation), but Mr. Koch believed that the CEO just used Mr. Koch's background as an excuse to avoid paying for the work Mr. Koch, Bedford, and John/Caro Partners had provided because GNPX stock had just suffered a major downturn, and Mr. Koch also wrote, "You knew my background years ago and it[']s constantly thrown in my face... I am personally hurt by what you are saying....like I have no experience and I am just using you."

238.    John responded, in part, "Nothing is being thrown in your face and I probably would [*sic*] even brought it up but you told me before Christmas we're gonna have two new Nasdaq big deal[s] [that] you [tried] to get yourself[,] and lost both of them[.] obviously without me involved in using my track record reputation you couldn't sign s\*\*t or make a dime in this business. So[,] the fact that you think the way you do is why your track record working with other people is so bad it's completely off f\*\*\*\*\*g out of touch. You should be thanking your lucky f\*\*\*\*\*g stars that I even agreed to work with somebody with your reputation no one else would. I've dragged you from not being able to buy Christmas gifts in 2 years to how you living today and you're still not happy just trying to squeeze f\*\*\*\*\*g money get it every f\*\*\*\*\*g dime you can out every day."

239.    Mr. Koch's response included, "Do you honestly think I am ungrateful as I have stated and thanked you numerous times. Thank you but again you think I am trying to squeeze every dime I am not and there seems to be resentment towards me because I simply asked for what was earned.. I stated in numerous emails that I am trying to get a mortgage and stall for time . . . Do you think I am shaking you down on things I earned? . . . No[,] I am not as I am just trying to save what I have and pay off what I have from what was earned."

240.    Then, Mr. Koch sent a final email in which he included, "It[,]s only when you do not like how your business is looking that you attack me and my character the percentages of what I earn fully knowing I am at your mercy as everything is in your name[.]," "What I earned prior was just never distributed out as we made a choice to hold [MRKR] until February and the remaining shares until the 15th of February came free[,]" " Now its February and I want out of [MRKR] before April when everyone at $2.50 comes free and over the next ten weeks so I can buy out the mortgage and then sell the house and move to Florida. be closer to you and all[,]" and "Listen I love you truly as a brother and I am truly grateful for all and offered to take 60/40 going forward because I appreciate all you have done but please show a little appreciation to me as well. Please think again on what you are doing and why you are doing this with [MRKR] Stock and my 60000 shares that were earned that remain out the 100000 which was my side."

241.    After this email string, John did send Mr. Koch some cash in February and March, but nowhere near what Mr. Koch and Bedford were owed, and nowhere near enough to help Mr. Koch buy his house out of foreclosure.

242.    Over the next several months, Mr. Koch and Bedford continued providing services for both Caro Partners and the Company, and Mr. Koch repeatedly requested that John provide Mr. Koch and Bedford with a portion of the compensation they were owed from prior consulting

arrangements so that Mr. Koch could avoid losing his house. But John – asserting his control over their relationship to his benefit – steadfastly refused to pay Mr. Koch and Bedford any of the money they were owed.

243.    On or about May 1, 2019, Mr. Koch flew to Florida to play in the Els for Autism Golf Challenge where he played the entire day with John, and during which John admitted that he had lied to Mr. Koch when he written in February that Mr. Koch had caused Caro Partners to lose the GNPX deal and that Caro Partners had, in fact, been paid in full and received GNPX shares from GNPX.

244.    After admitting that he had lied about GNPX, John told Mr. Koch that John had a gift for Mr. Koch and that Mr. Koch would receive his and Bedford's full portion of the GNPX shares.

245.    Several days later, on May 6, 2019, Mr. Koch called John to ask if John/Caro Partners could pay Mr. Koch and Bedford the money that they were owed so Mr. Koch would have the funds necessary to save his house.

246.    In response, on that same day, May 6. 2019. John sent several texts to Mr. Koch, which included the following: "So you haven't signed a deal since last year. You didn't raise the money for CBD Brands and now that's f****d You lost the one client we had could even keep him happy haven't raise the dime for the old golf challenge. I don't know what you think that I'm gonna sit here and drain all the capital that we have and let these companies die but that's not gonna happen," and "I told Kelli [John's wife] this morning I [one] hundred percent knew I was going to get this call from you Monday morning begging for money. So in the usual Bobby Koch fashion we are trying to wiggle your way and it put people in the corner in expection [sic] for

nothing you come down here you didn't raise the money for CBD Brands to try and say I want to million shares for what you didn't do your f*****g job because were friends?"

247.    Mr. Koch replied by asking, "are you serious[?]" and stating, "I'm in a life or death situation here stressed out of my mind and all I am asking is what we talked about weeks ago. You stated it was not an issue if I needed it. I have been setting up meetings bringing deals to the table and raised more money than anybody I need to let my attorney know at 3 pm. I have been pawning jewelry doing everything [to] get to 190k where I am today."

248.    John then texted, "Bobby I think your lawyer is full of s**t show me something signed by the judge saying that if you give up $250,000 you get the f*****g house and I'll worry about finding the money for you I think he's full of s**t because it just doesn't make sense it does it it's a legal what he's trying to do".

249.    Mr. Koch then pleaded with John texting, "It's my money that I earned . . . That I am asking for . . . There is a settlement conference regarding my house tomorrow and the attorneys agreed on 250k for settlement and I have two weeks but will not sign the deal unless I have it because if I do not god [forbid] my kids are on the street . . . All I am asking is for my portion to be sold you even said you could do a next day if needed".

250.    John responded by stating, "I'm curious to hear what you think your portion is because as usual you like to add numbers in a special kind away in your own head".

251.    Mr. Koch texted, "I'm curious to think what you think".

252.    Confirming that their oral agreements were now modified, John wrote, "It's not hard to figure out based on a 6040 split".

253.    Because he was not privy to the payments John had received from Caro Partners clients and did not know the number of shares in MRKR that John still held, Mr. Koch texted, "So 20000 shares . . . Maybe even 25k . . . On 60 40".

254.    Demeaning Mr. Koch once again, John wrote, "Well that's that Bob Math again. So we sold 100,000 shares the first go around what you got 50% off to the penny . . . Now were selling the last hundred thousand shares."

255.    Eventually, John sent a text stating, "Normally I wouldn't give a s**t or even bust your balls about it and just give you what you needed but I feel like for the last year you've done nothing but try and live off the marker haven't signed a deal," effectively admitting that, even though he still held at least 100,000 shares of MRKR (50% of which he owed to Mr. Koch and Bedford pursuant to their oral agreement), John was not going to pay Mr. Koch what he was owed simply because John didn't feel like it.

256.    On June 5, 2019, John texted Mr. Koch, "CBD Brands now has about $12,000 left in the bank and just had to pay $2000 rent I'm waiting for a document because I have to go throw 50 in there just to keep it in business".

257.    When Mr. Koch asked, "What do you mean 50[?]," John wrote, "50,000" to which Mr. Koch replied, "Why[?]"

258.    John answered, "Why because the public company that we took [money] off investors and I'm not gonna want to go out of f*****g business because we couldn't raise enough money to keep it f*****g going".

259.    Mr. Koch then asked, "Out of the mrkr money[?]," which included money that John/Caro Partners owed Mr. Koch and Bedford.

260.    John confirmed that he was going to use money from Caro Partners, at least half of which was owed to Mr. Koch and Bedford and which Mr. Koch needed to save his house, and loan that money to the Company when he replied, "That's the only money we got in a world where the hell else is it going to go I sure as f**k ain't going to get thrown in jail because we didn't raise the f*****g money we were supposed to".

261.    Although Mr. Koch asked John on a couple other occasions to pay what he and Bedford were owed, John refused to do so.

262.    For example, on June 12, 2019, Mr. Koch texted John, "I am living on air and everything I have saved is now going towards bills. Things have to change. I have gotten nothing since April 12 in monies earned . I had 65k shares left at the end of Dec and only saw 150k since the 10th of December from mrkr. I understood why but it seems you could give a flying f**k about this business or what I am dealing with personally. It's obvious that you avoid me because you are afraid I will ask for it which I have not except the one time but if you don't want to deal with me let me know but I am trying to rebuild for us."

263.    In response, John wrote, "I don't know what you're frustrated about you have nobody to be frustrated with but yourself one thing I know from experience is that when I'm not involved nobody can make money in this business . . . So if anybody should be frustrated it should be me because I have had over the last 15 years at least 10 people hitch their wagon to me and when they start making money then get lazy and leave me holding the bag".

264.    Again, on June 19, 2019, Mr. Koch asked John for money when he texted, "I need cash for the house . . . From the mrkr sell, and John replied, "Ok".

265.    Although Mr. Koch continued to ask John to send him money from selling shares in MRKR, John only sent $20,000 on June 28, 2019, which was far too little to help Mr. Koch save his house.

266.    Mr. Koch realized that he was not going to be able to count on receiving any additional money from John to help save his house.

267.    In July of 2019, Mr. Koch was able to extend the deadline to purchase his house out of foreclosure until July 2020, but pursuant to the extension, Mr. Koch would need to pay $300,000, not $250,000, to avoid losing his house - $50,000 more than if he had been able to purchase the house in July 2019.

268.    Thus, by failing to pay Mr. Koch and Bedford any of the compensation they had earned, John caused Mr. Koch to suffer damages of at least $50,000.

269.    On several other occasions in 2019, Mr. Koch asked John to pay him the money that he and Bedford had earned, but each time, John refused to pay the money, and also asserted that John did not owe Mr. Koch anything.

270.    For example, on October 1, 2019, John texted Mr. Koch saying, "My plan has always been to try and help you get the money you need to buy your house. But I'll be damned if I'm gonna sit around here running a public company signing all the deals servicing all the customers and doing everything myself".

271.    Mr. Koch eventually tired of continuously being denied the money John owed him and Bedford and simply told John that he would refrain from asking for the money he was owed until the new deadline for him to save his house, July 2020, was approaching, but that when Mr. Koch needed the money to pay to save his house, he would ask for it, and he expected John to pay him the money that John had promised he would pay.

63

272.    On February 14, 2020, Mr. Koch texted John saying, "Sell my portion of gnpx today" referring to the GNPX shares that had been provided to Caro Partners, which John had lied about receiving, later admitted to Mr. Koch that he had lied, told Mr. Koch he would pay Mr. Koch what he and Bedford had earned, but then failed to provide.

273.    John responded, "That s**t is long gone" confirming that John had apparently sold shares that rightfully belonged to Mr. Koch and Bedford and failed to pay them any of the money.

274.    Incredulous, Mr. Koch texted back, "Thought you were [going] to hold as it was going higher . . . Well it did".

275.    John then retorted, "When you're broke d**k and have no clients because you're building a f******g company for 16 months you sell everything that's not nailed down" once again apparently confirming that John used all funds to which he had access, including money he had promised Mr. Koch, to his personal benefit.

276.    Despite Mr. Koch's repeated requests that John pay him the money he and Bedford had earned so Mr. Koch could pay the $300,000 to save his house, John steadfastly refused to pay Mr. Koch.

277.    As a result, Mr. Koch was forced to scramble to put together funds to pay to save his house in July 2020.

278.    Fortunately, despite John's wrongful withholding of money owed, Mr. Koch was able to pay to save his house.

279.    However, by refusing to provide a portion of the compensation John had promised Mr. Koch and Bedford, John caused Mr. Koch severe anguish and additional damages of at least Fifty Thousand Dollars ($50,000).

280.    The numerous breaches of multiple oral promises by John have caused Mr. Koch and Bedford to suffer damages in an amount that is believed to exceed Ten Million Dollars ($10,000,000).

## COUNT ONE
### (Breach of Contract)
### (As to Counterclaim Defendants John, Caro Capital and Caro Partners)

281.    Mr. Koch and Bedford re-allege and incorporate by reference each and every allegation set forth above as if fully set forth herein.

282.    Mr. Koch and Bedford met all of their obligations under their multiple oral agreements with Counterclaim Defendants by performing consulting services to many of Caro Capital and Caro Partners' clients (or prospective clients).

283.    Counterclaim Defendants breached the parties' multiple oral agreements by failing and refusing to pay Mr. Koch and Bedford the compensation (cash, common stock, and warrant), as agreed.

284.    Mr. Koch has met all of his obligations his oral agreements with Counterclaim Defendants by performing work for CBD Brands, Inc. n/k/a Jupiter Wellness, Inc.

285.    Counterclaim Defendants breached their agreements with Mr. Koch by refusing to give Mr. Koch the 1.2 million shares of the Company, as agreed.

286.    As a direct and proximate result of Counterclaim Defendants' multiple breaches, Mr. Koch and Bedford have suffered damages in excess of Ten Million dollars ($10,000,000).

## COUNT TWO
### (Unjust Enrichment)
### (As to all Counterclaim Defendants)

287.    Mr. Koch and Bedford re-allege and incorporate by reference each and every allegation set forth above as if fully set forth herein.

288.     Counterclaim Defendants induced Mr. Koch and Bedford to provide consulting services to certain corporate clients of Caro Capital and Caro Partners knowing that they would benefit from the services that Mr. Koch and Bedford provided.

289.     Counterclaim Defendants induced Mr. Koch to work for the Company knowing that they would benefit from the services that Mr. Koch provided.

290.     The work that Mr. Koch and Bedford performed for Caro Capital and Caro Partners clients inured to the benefit of Counterclaim Defendants at Mr. Koch and Bedford's expense.

291.     The work that Mr. Koch performed for the Company inured to the benefit of Counterclaim Defendants at Mr. Koch's expense.

292.     Counterclaim Defendants knowingly accepted and retained the financial benefit conferred by Mr. Koch and Bedford at the expense of Mr. Koch and Bedford.

293.     Counterclaim Defendants have been unjustly enriched by retaining a benefit from Mr. Koch and Bedford for which Counterclaim Defendants agreed to but failed to pay; it is against equity and good conscience to permit Counterclaim Defendants to retain the benefit conferred; and justice requires that Counterclaim Defendants be compelled to disgorge the benefit conferred by Mr. Koch and Bedford.

**COUNT THREE**
**(Fraudulent Inducement)**
**(As to Counterclaim Defendant John)**

294.     Mr. Koch and Bedford re-allege and incorporate by reference each and every allegation set forth above as if fully set forth herein.

295.     John told Mr. Koch that he did not want Mr. Koch's name mentioned anywhere in any Company documents, and therefore, repeatedly assured Mr. Koch that he could, and would, hold the 3 million shares of Jupiter for himself and for Mr. Koch.

296.    However, John knew at the time he made them that these representations were false, because John knew in fact that he could not legally hold shares of Jupiter belonging to Mr. Koch if Jupiter was going to offer its shares to investors utilizing an exemption from Securities and Exchange Commission registration in Rule 506 of Regulation D unless Mr. Koch's history was disclosed to potential investors in writing,

297.    John also knew at the time he made them that these representations were false, because John also knew in fact that he could not legally hold shares of Jupiter belonging to Mr. Koch if Jupiter was going to offer its shares to investors utilizing an exemption from Securities and Exchange Commission registration in Regulation A.

298.    In making these representations to Mr. Koch, John intended to induce Mr. Koch to rely on this representation so that Mr. Koch would provide valuable services to the Company.

299.    Because of the confidence and trust Mr. Koch had in John, Mr. Koch relied on John's representation that John would hold shares of Jupiter purportedly belonging to Mr. Koch.

300.    As a result of his reliance on John's misrepresentation, Mr. Koch has been injured by John in an amount to be proven at trial

**COUNT FOUR**
**(Breach of Fiduciary Duty)**
**(As to Counterclaim Defendant John)**

301.    Mr. Koch and Bedford re-allege and incorporate by reference each and every allegation set forth above as if fully set forth herein.

302.    Because Mr. Koch and Bedford's relationship with John was founded upon trust and confidence that Mr. Koch reposed in John, because John and Mr. Koch had prior business dealings, because John was privy to information that Mr. Koch could not know, because Mr. Koch and Bedford were completely dependent upon John to pay Mr. Koch and Bedford the true amount

that Mr. Koch and Bedford were owed pursuant to their oral agreements with John/Caro Capital/Caro Partners, and because John acquired and exerted influence over Mr. Koch such that John effectively controlled Mr. Koch, John owed Mr. Koch and Bedford a fiduciary, or other trust-based duty, with respect to their business dealings.

303.     John has breached the fiduciary duties he owed Mr. Koch and Bedford by, *inter alia*, withholding funds owed to Mr. Koch and Bedford, lying to Mr. Koch about funds and stock Caro Partners received from certain clients certain portions of which Mr. Koch and Bedford are entitled to receive, failing to acknowledge that Mr. Koch performed valuable services for Jupiter Wellness, and failing to acknowledge that Mr. Koch is owed anything for his services to Jupiter Wellness.

304.     Mr. Koch and Bedford have been directly damaged as a result of John's breaches of fiduciary duty in an amount to be proven at trial.

## COUNT FIVE
### (Full Accounting)
### (As to Counter Defendants Caro Capital and Caro Partners)

305.     Mr. Koch and Bedford re-allege and incorporate by reference each and every allegation set forth above as if fully set forth herein.

306.     Mr. Koch and Bedford's relationship with John/Caro Capital/Caro Partners was one of trust and confidence.

307.     Mr. Koch and Bedford trusted John to be honest and forthright in providing Mr. Koch and Bedford the compensation (cash and corporate stock and/or warrants) that John had promised they would receive for their consulting services.

308.     Because of this relationship of trust and confidence, John owes Mr. Koch and Bedford a fiduciary duty with respect to the business affairs of Caro Capital and Caro Partners.

309.    As a result of this trust-based fiduciary relationship between Mr. Koch and Bedford and John, Mr. Koch and Bedford are entitled to an accounting with respect to Caro Capital.

310.    As a result of this trust-based fiduciary relationship between Mr. Koch and Bedford and John, Plaintiffs are entitled to an accounting with respect to Caro Partners.

311.    Mr. Koch and Bedford have previously demanded such an accounting from Caro Capital, Caro Partners, John, and Miller.

312.    Caro Capital, Caro Partners, John, and Miller have failed and/or refused to provide such an accounting.

313.    On information and belief, John/Caro Capital/Caro Partners have failed and/or refused to provide such an accounting in order to conceal John's wrongful acts in contravention of his agreements with Mr. Koch and Bedford and in violation of Mr. Koch and Bedford's right to receive an accounting.

314.    An accounting from both Caro Capital and Caro Partners is necessary to determine the true and full information about the financial dealings between Caro Capital and Caro Partners and their respective clients and to determine Mr. Koch and Bedford's monetary damages based upon the consulting services they rendered to clients of Caro Capital and Caro Partners.

### COUNT SIX
### (Defamation)
### (As to all Counterclaim Defendants)

315.    Mr. Koch and Bedford re-allege and incorporate by reference each and every allegation set forth above as if fully set forth herein.

316.    Plaintiffs' Complaint contains immaterial, impertinent, and/or scandalous matter and allegations that their lawyers have included in the Complaint for purposes unrelated to the lawsuit itself, but they are instead part of a design to disseminate knowingly false and defamatory

material about Mr. Koch to intimidate and harass Mr. Koch, to cause him embarrassment, and to disparage and smear Mr. Koch, who has spent years repairing and rebuilding his reputation.

317.    These allegations in Plaintiffs' Complaint are so needlessly defamatory as to warrant the inference of express malice.

318.    In making these defamatory allegations, Plaintiffs have damaged Mr. Koch in an amount to be revealed during discovery and proven at trial.

### Punitive Damages and Attorneys' Fees

319.    Mr. Koch and Bedford re-allege and incorporate by reference each and every allegation set forth above as if fully set forth herein.

320.    As discussed above, John's conduct is egregious and should shock the conscience of all reasonable people.

321.    To deter others from engaging in similar conscience-shocking behavior and to punish John for his misconduct, the Court should hold John accountable for his blatant fraudulent, intentional, and/or reckless conduct.

322.    Mr. Koch and Bedford seek no less than $5 million in punitive damages as well as reimbursement of all costs and attorneys' fees incurred herein.

**WHEREFORE**, Mr. Koch and Bedford respectfully pray for judgment as follows:

(a)      Damages in an amount to be determined at trial, totalling no less than $10 million, plus interest;

(b)      An order for an accounting with respect to both Caro Capital and Caro Partners for all compensation (including both cash and securities of the client corporations) paid to Caro Capital and Caro Partners by its corporate clients to whom Mr. Koch and Bedford rendered consulting services and an accounting detailing the receipt by John/Caro Capital/Caro Partners of any securities of Caro Capital and/or Caro Partners corporate clients to whom Mr. Koch and Bedford rendered consulting services and any sales or transfers of these corporate securities by John/Caro Capital/Caro Partners;

and

(c)                Punitive damages in an amount of no less than $5 million; all costs and attorneys' fees; incidental and consequential relief; and such other and further relief as the Court finds just and proper.

Dated: August 31, 2020

FMS Lawyer PL

/s/ Frank Smith
Frank Smith

9900 Stirling Road, Suite 226
Cooper City, Florida 33024
Tel.  954-985-1400
Fax. 954-241-6947
frank.smith@fmslawyer.com

DOVIN FICKEN LLC

/s/ Edward J. Dovin
Edward J. Dovin  (*pro hac vice* pending)

/s/ Christopher J. Moyen
Christopher J. Moyen (*pro hac vice* pending)

3414 Peachtree Road NE
Suite 625, Monarch Plaza
Atlanta, Georgia 30326
(770) 829-3869 (phone)
(770) 829-3865 (fax)
Email: ejdovin@dovinficken.com
       cjmoyen@dovinficken.com

**Attorneys for Robert Koch and**
**Bedford Investment Partners, LLC**