```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:__4/23/2021__
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
                                                                       :
CARO CAPITAL, LLC, CARO PARTNERS, LLC,                                 :
JUPITER WELLNESS, INC., BRIAN JOHN, and                                :
RICHARD MILLER,                                                        :
                                                                       :              20-cv-6153 (LJL)
                                        Plaintiff,                     :
                                                                       :              OPINION & ORDER
              -v-                                                      :
                                                                       :
ROBERT KOCH, BEDFORD INVESTMENT                                        :
PARTNERS, LLC, KAIZEN ADVISORS LLC, and                               :
JOHN DOES 1-10,                                                        :
                                                                       :
                                        Defendants.                    :
                                                                       :
-----------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

        Plaintiffs-Counterclaim-Defendants Caro Capital LLC ("Caro Capital"), Caro Partners

LLC ("Caro Partners"), Jupiter Wellness, Inc. ("Jupiter"), Brian John ("John") and Richard

Miller ("Miller") (collectively the "Caro Parties") brought this suit against Defendants-

Counterclaim-Plaintiffs Robert Koch ("Koch"), Bedford Investment Partners, LLC ("Bedford"),

Kaizen Advisors LLC ("Kaizen") and John Does 1-10 (collectively the "Bedford Parties"),

alleging claims for tortious interference with prospective economic advantage, prima facie tort,

defamation, business disparagement, and deceptive trade practices.  Dkt. No. 1 (the "Complaint"

or "Compl.").  The Bedford Parties counterclaimed, claiming breach of contract, unjust

enrichment, fraudulent inducement, breach of fiduciary duty, accounting, and defamation.  The

Caro Parties have moved for judgment on the pleadings on all the Bedford Parties' claims

pursuant to Federal Rule of Civil Procedure 12(c).  For the following reasons, the motion is

granted and the counterclaim is dismissed without prejudice to the Bedford Parties filing an

amended pleading addressing the deficiencies identified in this opinion in its breach of contract claim.

## FACTUAL BACKGROUND

### The Parties

Caro Capital is a financial consulting firm specializing in assisting emerging growth companies.  Dkt. No. 13 ("Counterclaim" or "Countercl.") ¶ 40.  Caro Partners is a financial consulting firm in the same industry.  *Id*. ¶ 102.  John and Miller are the two members of Caro Capital and John is the sole member of Caro Partners.  *Id*. ¶ 41.

Bedford is a "boutique independent commodity trading compan[y]" that "provide[s] integrated trading products and logistics services for participants in the worldwide precious metal and energy markets."  Compl. ¶ 32.  Kaizen is a Delaware corporation headquartered in New York.  *Id*. ¶ 33.  Koch is affiliated with both Bedford and Kaizen.

Koch, John, and Miller have known each other since the early or mid-1990s when all three of them worked together at Stratton Oakmont, Inc.  *Id*. ¶ 34.  Koch has a criminal history. He pleaded guilty to several counts of felony securities fraud and was sentenced in June 2012. *Id*. ¶ 35.  After the sentencing opinion was signed, the Court reduced the term of imprisonment to time served.  *Id*. ¶ 36.  Because of his convictions, Koch is not permitted to take on certain roles in the securities industry.  *Id*. ¶ 6.

### The Bedford Parties' Consulting

From 2015 to 2019, Miller, John, Caro Capital and Caro Partners sporadically hired Koch as an independent contractor to work on discrete projects.  *Id*. ¶¶ 8, 41.  The parties never entered into a written contract for any of these projects.  *Id*. ¶ 44.

The Bedford Parties allege that, under the verbal agreements, John requested that Koch

and Bedford provide consulting services to prospective clients of Caro Capital and Caro Partners. Countercl. ¶ 12.  John promised Koch that he would receive a certain percentage of the compensation Caro Capital or Caro Partners received, including both cash and securities.  *Id.* ¶ 14.  According to Koch, depending on various factors involved in each arrangement, John promised Koch and Bedford that they would receive one-third, fifty percent, or forty percent of the compensation the Caro Parties received.  *Id.* ¶ 15.

The Counterclaim alleges that the Bedford Parties performed consulting services on behalf of thirty-five of the Caro Parties' clients in the period between April 2015 and July 2018, but that the Caro Parties did not pay them what they were owed.  The Bedford Parties allege that they do not know how much they are owed under the agreements: "Neither Caro Capital nor John ever paid Mr. Koch and Bedford the compensation (cash and corporate stock and/or warrants) they were promised for consulting services rendered . . ., but because Caro Capital is a corporate entity in which Mr. Koch and Bedford have no equity ownership and for which they rendered consulting services as an independent contractor, Mr. Koch and Bedford are unsure of the total compensation . . . that they are due as a result of the Defendants' breach of oral agreement."  *See, e.g.*, Countercl. ¶ 78.  The Bedford Parties allege price amounts they are owed in relation to three of the thirty-five agreements.  They allege that they are owed $50,000 for services rendered to MassRoots, Inc., *id.* ¶ 60, $100,000 for services rendered to The Chron Organization, *id.* ¶ 123, and $370,000 for services rendered to TapImmune, Inc., *id.* ¶ 147.

**Jupiter Wellness**

In later 2018, John began focusing his efforts on Jupiter, a company which develops over the counter consumer products infused with cannabidiol ("CBD"), such as sunscreen and eczema treatments.  *Id.* ¶¶ 11, 45.  The Caro Parties claim that, because they intended that Jupiter would

eventually issue securities, Koch's criminal record prohibited him from participating meaningfully in Jupiter. *Id*. ¶ 12.  The Caro Parties further claim that Koch's involvement in Jupiter was limited to securing a web domain name for the company and introducing Plaintiffs to three people who invested a small amount of money in Jupiter. *Id.* ¶ 46.  They additionally allege that they stopped using Koch because they learned that he had concealed his criminal history from others, including Plaintiffs' clients. *Id*. ¶ 13.

The Bedford Parties tell a very different story.  According to the Bedford Parties, in Spring of 2017, Koch and John began discussing building a business in the sale of CBD infused sunscreen products, "which is believed to interreact [sic] with the bodies' [sic] endocannabinoid system, a large system that helps regulate physiological symptoms like appetite, mood, and sleep, and is thought to help achieve better balance."  Countercl. ¶¶ 16, 168.  Koch maintains that he worked on this business, which was originally named CBD Brands, as directed by John.  *Id*. ¶ 17.  Koch alleges that he developed several possible logos for the brand, that he came up with possible names for the business, and that he registered domain names on behalf of the brand.  *Id*. ¶¶ 170-73. Koch alleges that he performed other work for the company, including preparing a summary business plan for a Canadian company that was interested in completing a reverse merger with CBD Brands.  *Id*. ¶ 181.  He further claims that he induced Jupiter's current Chairman to serve on the board of directors.  *Id*. ¶ 185.  His work "included, but was not limited to, continuing to introduce potential investors in the Company to John; introducing John to investment bankers in New York who could potentially assist in helping the Company go public; and setting up meetings with potential investors and merger partners.  *Id*. ¶ 190.

Koch alleges that, in October 2018, he and John orally agreed that Koch would own 1.4 million shares of Jupiter as compensation for his work for the Company.  *Id*. ¶ 18.  However,

John held onto all shares of the Company, because he did not want anyone to know that Koch was affiliated with the company.  *Id*. ¶ 177.  In February 2019, Koch and John orally agreed to modify their agreement to reduce Koch's ownership to 1.2 million shares.  *Id*. ¶ 19.  Later, Koch alleges, John told him that he intended to retain all of the shares himself and that Koch would not receive any Jupiter shares, or any other compensation from Jupiter.  *Id*. ¶ 193.

**Koch's Financial Troubles and Conflict with John**

During the later years of his relationship with John, Koch was suffering financial troubles.  In late 2018, Koch explained to John that he would need $250,000 so that he could purchase his house out of foreclosure.  *Id*. ¶ 211.  Koch explained to John that he was counting on the promised compensation to keep his house.  *Id*. ¶ 212.  In December 2018, discussing the fact that an acquaintance had brought up Koch's felony convictions, John wrote "everyone's entitled to their opinion and you won't find lotta people that will do business with someone with a track record like yours Bob it is what it is."  *Id*. ¶ 214.  Koch responded that he did not believe he had done poorly, and mentioned that Caro Partners continued to hold what he believed was $300,000 worth of Marker shares, which had been received from a client of the Caro Parties and which he believed he was entitled to.  *Id*. ¶ 215.  John called this "Koch math" and claimed "we each have 65,000 shares is [sic] 240 grand not 300."  *Id*. ¶ 216.   John wrote: "Here [is] the last one from herb and gary my old bosses. Told Mag they think I'm gonna spend some time in jail."  *Id*. ¶ 218.  John texted: "That's pretty much everybody we know or anybody ever done business with all says the same thing to me somethings got a [sic] change in the split for me taking the risk when we're done."  *Id*. ¶ 219.  Koch responded: "So the money I am counting on for my house and future [- you're going to screw] me and my family."  *Id*. ¶ 220.  He followed up "Is this something you're even considering?"  *Id*. ¶ 221.  John assured Koch that "[he had] never

5

[screwed anybody] over in my entire life[,] but all my friends I know we're [sic] starting to worry about me obviously doing business with you." *Id.* ¶ 222.

In late January or early February 2019, Koch flew to Florida and reminded John that Koch needed to receive $250,000 of the money so that he could purchase his house out of foreclosure. *Id.* ¶ 223. On February 9, 2019, John sent Koch an email saying that their business agreement "is completely not fair. I take all the risk, I do all the BS and its [sic] my track record of 25 years and reputation that lands us ANY deals. . . . Over the last 4 months you have done little but beg for money and try to squeeze every dime you can from the Company [whether] you deserve it or not. Not 1 deal signed, and you raised s*** for CBD brands." *Id.* ¶ 224. The email continued, "I value what you bring to the equation, but [what's] fair is fair and I won't hit you with a 70-30 split like almost everyone suggested, but I defiantly [sic] think 60-40 is fair. I certainly deserve an extra 10% for all the risk I take an [sic] everything I do. . . . Hopefully this is acceptable to you as I think [it's] MORE than fair. If not, you can certainly go do your own thing and I still love you and you will always be my brother." *Id.* ¶ 225.

In a February 10, 2019 email, Koch agreed to the modification of the agreements: "I agree with the 60/40 going forward including CBD Brands as I totally appreciate the risk you take and agree with you." *Id.* ¶ 226. In his email, Koch listed several deals on which he believed John and Caro Partners owed him for consulting services. *Id.* ¶ 227. He asked: "Do you agree with the numbers above?" *Id.* John replied: "I'm sure you would like it that way but it's my 25-year old business[, it] is my 500 deals[,] and my reputation[.] did you think I was just going to give you 50% of my 25-year-old business for nothing???" *Id.* ¶ 228.

Koch sent another email: "Do you know what it feels like when 100% of everything you do is in someone else[']s hand[s,] and the rug could be pulled from under your feet at any time. .

. . Not saying that you would f**k me or my family but to cut my portion of Marker in my opinion is wrong as I 100% brought this back to the table a year later." *Id.* ¶ 232. John replied: "Yes[,] I am sure [it] is an uncomfortable feeling[.] unfortunately you made the decisions you made and you got two felonies[.] it's no one else's fault but your own[,] and then you have to deal with unfortunately it affects me because [] it makes it very risky even do business with [you and] I've lost business because of your background so you can't be a one-way street where [] you [are] trying to squeeze everything out you can and I just get f****d with everything on the backend like losing deals because of your background paying for the office paying for your count for the taxes paying for the transfers wires fees deposits and doing everything 10% across-the-board I think that's very fair." *Id.* ¶ 233.

On May 1, Koch played in a golf tournament with John. *Id.* ¶ 243.[1]  Several days later, Koch called John to ask if John/Caro Partners could pay Koch and Bedford the money that they were owed. *Id.* ¶ 245.  In response, John wrote: "So you haven't signed a deal since last year. You didn't raise the money for CBD Brands and now that's f****d You lost the one client we had could even keep him happy haven't raise the dime for the old golf challenge. I don't know what you think that I'm gonna sit here and drain all the capital that we have and let these companies die but that's not gonna happen," and "I told Kelli [John's wife] this morning I [one] hundred percent knew I was going to get this call from you Monday begging for money. So in the usual Bobby Koch fashion we are trying to wiggle your way and it put people in the corner in expection [sic] for nothing you come down here you didn't raise the money for CBD Brands to try and say I want to million shares for what you didn't do you f*****g job because were

---

[1] The parties dispute which golf tournament it was.  According to Koch it was the Els for Autism Golf Challenge.  John counters that it was the Rooney Spring Golf Tournament.

friends?" *Id*. ¶ 246.

Koch replied: "are you serious" and stated "I'm in a life or death situation here stressed out of my mind and all I am asking is what we talked about weeks ago.  You stated it was not an issue if I needed it.  I have been setting up meetings bringing deals to the table and raised more money than anybody I need to let my attorney know at 3 pm. I have been pawning jewelry doing everything [to] get to 190k where I am today." *Id*. ¶ 247.

John replied: "Bobby I think your lawyer is full of s**t show my something signed by the judge saying that if you give up $250,000 you get the f*****g house and I'll worry about finding the money for you I think he's full of s**t because it just doesn't make sense it does it it's a legal what he's trying to do." *Id*. ¶ 248.  Koch replied: "It's my money that I earned . . . That I am asking for . . . There is a settlement conference regarding my house tomorrow and the attorneys agreed on 250k for settlement and I have two weeks but will not sign the deal unless I have it because if I do not god [forbid] my kids are on the street . . . All I am asking for my portion to be sold you even said you could do a next day if needed." *Id*. ¶ 249.

John responded: "I'm curious to hear what you think your portion is because as usual you like to add numbers in a special kind away in your own head." *Id*. ¶ 250.  Koch replied: "I'm curious to think what you think." *Id*. ¶ 251.  John replied: "It's not hard to figure out based on a 6040 split." *Id*. ¶ 252.  Koch texted: "So 20000 shares . . . Maybe even 25k . . . On 60 40." *Id*. ¶ 253.  John wrote: "Well that's that Bob Math again.  So we sold 100,000 shares the first go around what you got 50% off to the penny . . . Now were selling the last hundred thousand shares." *Id*. ¶ 254.  John stated: "Normally I wouldn't give a s**t or even bust your balls about it and just give you what you needed but I feel like for the last year you've done nothing but try and live off the marker haven't signed a deal." *Id*. ¶ 255.  On June 5, 2019, John texted Koch

"CBD Brands now has about $12,000 left in the bank and just had to pay $2000 rent I'm waiting for a document because I have to go throw 50 in there just to keep it in business." *Id.* ¶ 256. Koch wrote "What do you mean 50." *Id.* ¶ 257.  John wrote: "50,000," to which Koch replied "Why[?]" *Id.*  John answered "Why because the public company that we took [money] off investors and I'm not gonna want to go out of f*****g business because we couldn't raise enough money to keep it f*****g going." *Id.* ¶ 258.  Koch asked: "Out of the mrkr money[?]". *Id.* ¶ 259.  John wrote: "That's the only money we got in a world where the hell else is it going to go I sure as f**k ain't going to get thrown in jail because we didn't raise the f*****g money we were supposed to." *Id.* ¶ 260.

On June 12, 2019, Koch texted John: "I am living on air and everything I have saved is now going toward bills.  Things have to change.  I have gotten nothing since April 12 in monies earned.  I had 65k shares left at the end of Dec and only saw 150k since the 10th of December from mrkr. I understood why but it seems you could give a flying f**k about the business or what I'm dealing with personally.  It's obvious that you avoid me because you are afraid I will ask for it which I have not except the one time but if you don't want to deal with me let me know but I am trying to rebuild for us." *Id.* ¶ 262.  John responded: "I don't know what you're frustrated about you have nobody to be frustrated with but yourself one thing I know from experience is that when I'm not involved nobody can make money in this business . . . So if anybody should be frustrated it should be me because I have had over the last 15 years at least 10 people hitch their wagon to me and when they start making money then get lazy and leave m [sic] holding the bag." *Id.* ¶ 263.

In July 2019, Koch was able to extend the deadline to purchase his home out of foreclosure, but stated he would need to pay $300,000 instead of $250,000.  *Id.* ¶ 267.

On October 1, 2019, John texted Koch saying "My plan has always been to try and help you get the money you need to buy your house. But I'll be damned if I'm going to sit around here running a public company signing all the deals servicing all the customers and doing everything myself." *Id.* ¶ 270.

On February 14, 2020, Koch texted John saying, "Sell my portion of gnpx today." *Id.* ¶ 272. John responded: "That s**t is long gone." *Id.* ¶ 273. Koch then texted back "Thought you were [going] to hold it as it was going higher . . . Well it did." *Id.* ¶ 274. John retorted: "When you're broke d**k and have no clients because you're building a f*****g company for 16 months you sell everything that's not nailed down." *Id.* ¶ 275.

**The Litigation**

On May 15, 2020, Koch sent a demand letter to John demanding that John pay him the 1.2 million shares he had promised. *Id.* ¶ 201. In response, John sent an email to Koch stating that the letter was "completely inaccurate and in my opinion nothing more than extortion. . . . If you believed you are ow [sic] some compensation for some reason, please provide the agreements stating such to myself and the board." *Id.* ¶ 202. On May 22, 2020, John filed an amendment to CBD Brand's Certificate of Incorporation and changed the name of the company to Jupiter Wellness, Inc. *Id.* ¶ 205.

On July 31, 2020, Koch sent a second demand letter (the "Demand Letter") to the Caro Parties, demanding that they pay him the 1.2 million shares in Jupiter that he claimed John had previously orally promised him as compensation for his work on Jupiter. *Id.* ¶ 17.

The Caro Parties filed suit on August 6, 2020, alleging that the Demand Letter was intended to derail Jupiter's pending initial public offering ("IPO"), for which Jupiter had filed an amended registration statement three days prior. *Id.* They alleged that Koch was attempting to

extort them for millions of dollars by holding up Jupiter's IPO.

The Bedford Parties responded with the Counterclaim that is the subject of the instant motion on August 31, 2020.

## LEGAL STANDARD

"The same standard applicable to Fed. R. Civ. P. 12(b)(6) motions to dismiss applies to Fed. R. Civ. P. 12(c) motions for judgment on the pleadings." *Bank of N.Y. v. First Millennium, Inc.*, 607 F.3d 905, 922 (2d Cir. 2010) (citing *Sheppard v. Beerman*, 18 F.3d 147, 150 (2d Cir. 1994)).  Thus, the Court must "accept all factual allegations in the complaint as true and draw all reasonable inferences in [P]laintiff's favor." *Hayden v. Paterson*, 594 F.3d 150, 160 (2d Cir. 2010) (quoting *Johnson v. Rowley*, 569 F.3d 40, 43-44 (2d Cir. 2009) (per curiam)).  Defendant's motion must be granted unless the Complaint includes "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555).  Likewise, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause action will not do.'" *Id.* (quoting *Twombly*, 550 U.S. at 555).  Put another way, the plausibility requirement "calls for enough fact to raise a reasonable expectation that discovery will reveal evidence [supporting the claim]." *Twombly*, 550 U.S at 556; *see also Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 46 (2011).  "In bringing a motion for judgment on the pleadings, the movant 'impliedly admits the truth of its adversary's allegations and the falsity of its own allegations that have been denied by that adversary.'" *City of Almaty v. Ablyazov*, 2019 WL 1430155, at *3 (S.D.N.Y. Mar. 29, 2019) (quoting *Giaconda Law Grp. PLLC v. Kenzie*, 941 F. Supp. 2d 424, 427 (S.D.N.Y. 2013)).

**DISCUSSION**

**A.      Breach of Contract**

Under New York law, in order to succeed on a breach of contract claim, a plaintiff must show (1) the formation of an agreement; (2) performance by one party; (3) breach of the agreement by the other; and (4) damages.  *Berman v. Sugo LLC*, 580 F. Supp. 2d 191, 202 (S.D.N.Y. 2008).  "A sufficient pleading for breach of contract must 'at a minimum, allege the terms of the contract, each element of the alleged breach and the resultant damages in a plain and simple fashion.'"  *Warren v. John Wiley & Sons, Inc.*, 952 F. Supp. 2d 610, 624 (S.D.N.Y. 2013) (quoting *Zaro Licensing, Inc. v. Cinmar, Inc.*, 779 F. Supp. 276, 286 (S.D.N.Y. 1991)).  "New York courts require plaintiffs to 'plead the provisions of the contract upon which the claim is based'—in other words, 'a complaint in a breach of contract action must set forth the terms of the agreement upon which liability is predicated.'"  *Anders v. Verizon Commuc'ns*, 2018 WL 2727883, at *8-*9 (S.D.N.Y. June 5, 2018) (quoting *Window Headquarters, Inc. v. MAI Basic Four, Inc.*, 1993 WL 312899, at *3 (S.D.N.Y. Aug. 12, 1993)).

"It is well settled that for a contract to be valid, the agreement between the parties must be definite and explicit so their intention may be ascertained to a reasonable degree of certainty. Even if the parties believe that they are bound, if the terms of the agreement are so vague and indefinite that there is no basis or standard for deciding whether the agreement had been kept or broken, or to fashion a remedy, and no means by which such terms may be made certain, then there is no enforceable contract."  *Foros Advisors LLC v. Digital Globe, Inc.*, 333 F. Supp. 3d 354, 360 (S.D.N.Y. 2018) (quoting *Candid Prods., Inc. v. Int'l Skating Union*, 530 F. Supp. 1330, 1333 (S.D.N.Y. 1982)).  "Thus, to plead a claim for breach of contract . . ., plaintiff 'must provide specific allegations as to an agreement between the parties, the terms of that agreement,

and what provisions of the agreement were breached as a result of the acts at issue.'"  *Nuevos Aires Shows LLC v. Bühler*, 2020 WL 1903995, at *4 (S.D.N.Y. Apr. 17, 2020) (quoting *Valentini v. Citigroup, Inc.*, 837 F. Supp. 2d 304, 327 (S.D.N.Y. 2011)).  "The terms of a contract are reasonably certain if they provide a basis for determining the existence of a breach and for giving an appropriate remedy."  Restatement (Second) of Contracts § 33(2).  Under New York law, where the definiteness of a contract is at issue, "[w]hen a court encounters indefinite terms, but finds that the parties did intend to form a contract, . . . the court then must attempt to attach a sufficiently definite meaning to [the] bargain."  *B. Lewis Productions, Inc. v. Maya Angelou & Hallmark Cards, Inc.*, 2005 WL 1138474, at *6 (S.D.N.Y. May 12, 2005) (internal quotation marks and citation omitted); *see also 166 Mamaroneck Ave. Corp. v. 151 E. Post Rd. Corp.*, 575 N.E.2d 104, 106 (N.Y. 1991) ("[W]here it is clear from the language of an agreement that the parties intended to be bound and there exists an objective method for supplying a missing term, the court should endeavor to hold the parties to their bargain.").  "Striking down a contract as indefinite and in essence meaningless 'is at best a last resort.'"  *166 Mamaroneck*, 575 N.E.2d at 106 (quoting *Cohen & Sons v. Lurie Woolen Co.*, 133 N.E. 370, 371 (N.Y. 1921)).

Oral contracts are "as enforceable as . . . written one[s]."  *Charles Hyman, Inc. v. Olsen Indus., Inc.*, 642 N.Y.S.2d 306, 309 (1st Dep't 1996).  "As a practical matter, however, for all but the simplest of transactions, the burden of establishing the terms of the verbal contract—which falls to the proponent—presents a formidable obstacle to its enforcement."  *Id.*  "Before a court will impose [a] contractual obligation, it must ascertain that a contract was made and that its terms are definite."  *Id.*

In the Counterclaim, the Bedford Parties allege that they formed 35 different verbal contracts with the Caro Parties for consulting services provided to the Caro Parties' clients.  Each

of the 35 contracts are alleged in the Counterclaim in nearly identical language.  The Bedford

Parties allege that John "asked Mr. Koch and Bedford to provide consulting services" to one of

his clients; that John verbally agreed to pay Koch either 1/3, 40%, or 50%, depending on the

contract, of all the compensation he received from the client; that Koch "performed on the oral

agreement and fully performed all of the agreed-upon consulting services" to the client; that

neither Caro Capital nor John ever paid Mr. Koch or Bedford the compensation they were

promised; and that Mr. Koch does not know how much he is owed, because the client paid the

Caro Parties directly.  For the majority of the contracts, the Bedford Parties do not allege how

much they are owed; for three of the contracts, the Bedford Parties state an approximate figure

"upon information and belief": $50,000 for work on behalf of MassRoots, Inc.; $100,000 for

work on behalf of The Chron Organization; and $370,000 for services rendered to TapImmune,

Inc.  The Counterclaim provides no additional development of what the nature of the consulting

services provided was, nor any specifics about the nature of the performance, including any

specifics about the time by which it was to be performed, or the time at which it was actually

performed.

The Bedford Parties' pleading does not allege contract terms that are sufficiently

"definite" to be enforceable as to any of the alleged 35 oral contracts.  "If an agreement is not

reasonably certain in its material terms, there can be no legally enforceable contract."  *166*

*Mamaroneck Ave.*, 575 N.E.2d at 104 (internal quotation marks and citations omitted).  The New

York Court of Appeals had held that the doctrine of definiteness serves two purposes: "First,

unless a court can determine what the agreement is, it cannot know whether the contract has been

breached, and it cannot fashion a proper remedy. . . . Second, the requirement of definiteness

assures that courts will not impose contractual obligations when the parties did not intend to

14

conclude a binding agreement." *Cobble Hill Nursing Home, Inc. v. Henry & Warren Corp.*, 548 N.E.2d 203, 206 (N.Y. 1989).  "While the settled principles are easily articulated, their proper application has sometimes proved elusive." *Id.*  "The difficulty is that the concept of definiteness cannot be reduced to a precise, universal measurement.  The standard is necessarily flexible, varying for example with the subject of the agreement, its complexity, the purpose for which the contract is made, the circumstances under which it was made, and the relation of the parties." *Id.*

The terms alleged by the Bedford Parties are insufficient either to demonstrate that the parties reached a meeting of the minds such that it can be said that they formed a contract or to provide the Court or the alleged breaching party any basis upon which to judge whether the alleged non-breaching party has performed its obligations sufficient to bring a claim for breach of contract.  Although the Bedford Parties allege that one of the terms of the alleged oral contract was definite—the term upon which they sue—New York law requires that "an agreement [be] reasonably certain in its material terms," not just some of its material terms.  *Id.* at 206. "[T]here must be a manifestation of mutual assert to essential terms."  *Id.*

Here, while the Bedford Parties allege the identity of the specific client corresponding to the contract for each of the alleged 35 oral contracts, the specific months in which the Caro Parties asked Koch to render services, and the percentage of compensation he and Bedford were to receive for the work on behalf of each client, Dkt. No. 35 at 14, they are entirely vague and indefinite as to the nature or quantity of the "consulting services" Koch was to provide.  In the absence of any alleged "extrinsic standard that makes its meaning clear," *Cobble Hill*, 484 N.E.2d at 206, the term "consulting services" is entirely vacuous.  The dictionary defines "consulting" as making "a business of giving professional advice, either to the public or to those

practically engaged in the profession." *Consulting*, *Oxford English Dictionary* (3d ed. 2021). It could refer to an obligation to have a ten minute conversation; it also could refer to an obligation to make oneself and a staff available on a 7-day a week 24-hours a day basis over a lengthy period of time to address any and all questions that may arise. It could refer to a vast array of work activities—some requiring more specialized knowledge than others and some (such as acting as a finder) barred by the Statute of Frauds and others not. Without any content to the nature and quantity of the alleged obligation the Bedford Parties were assuming for their large percentage of the revenues earned by the Caro Parties, there is no basis for the Court to determine whether there was a meeting of the minds or that the Bedford Parties performed their obligations so as to be able to hold the Caro Parties in breach.

The district court decisions in *Anders v. Verizon Communications, Inc.*, 2018 WL 2727883 (S.D.N.Y. June 5, 2018) and *DeSilva v. North Shore-Long Island Jewish Health System., Inc.*, 2012 WL 748760 (E.D.N.Y. Mar. 7, 2012), are on point. In *Anders*, plaintiffs alleged that they made an oral agreement with the defendants, under which, in exchange for $16,000, one of the defendants would "do everything in his power to seek justice for the plaintiffs by doing whatever was necessary to rectify the injustice"; that he would "arrange a meeting with Verizon's Chief Executive officer and address the issues regarding [the plaintiff's] treatment by Verizon"; that he would "make a lot of noise via his media programs exposing them for discriminatory and racist practices"; and that he would "contact Verizon . . . to settle a dispute out of court." *Anders*, 2018 WL 2727883, at *8.

The court held that the contract was not sufficiently definite to be enforceable. "[I]t is unclear what the specific terms of the agreement were with respect to the action that [the defendants] were to take, the goal that [the defendants] were supposed to accomplish, and how

long [the defendants] should attempt to achieve that goal.  Accordingly, Plaintiffs' breach of contract claim fails, as Plaintiffs have failed to allege the 'essential terms of the parties' purported contract.'"  *Id*. at *9 (quoting *DeSilva*, 2012 WL 748760, at *8)).

In *DeSilva*, the plaintiffs, former employees of the defendant, alleged that the defendant had, inter alia, failed to pay them wages in accordance with their employment contract.  The complaint stated that "[d]efendants contracted to hire Plaintiffs and Class Members at a set rate of pay, with a minimum work scheduled for a particular position, and under set terms of employment," and that "[t]he terms of this express oral contract included defendants' explicit promise to compensate Plaintiffs and Class members for 'all hours worked,' in return for the labor and services provided by Plaintiffs and Class members.  The labor and services provided by Plaintiffs and Class members included tasks, . . . performed by Plaintiffs and Class members pursuant to defendants' Unpaid Work policies."  *Id*. at *8.  The term upon which Plaintiffs were suing was definite—there was a set rate of pay.  The court nonetheless held that the claim failed the definiteness requirement because the description of the obligations Plaintiffs had agreed to assume in exchange for that set rate of pay were "general and conclusory."  *Id*.

In this case, as in *Anders*, the Counterclaim fails to allege what actions the Bedford parties were to take with respect to each of the alleged oral contracts, what goal they were supposed to accomplish, and how long they had to achieve that goal.  As in *DeSilva*, the Bedford Parties similarly allege that the consideration for the payment was "consulting services," a term as indefinite as "labor and services" in *DeSilva*.  Because the term "consulting services" in the alleged verbal agreement is too indefinite to be enforceable, the Caro Parties' motion to dismiss the contract claims is granted.

The Bedford Parties also allege that they are contractually entitled to 1.2 million shares of

Jupiter.  They allege that Koch and John began discussing creating a company that would sell sunscreen and skin care products containing CBD in Spring 2017; that Koch worked to build the company, including by purchasing domain names; that in October 2018 John verbally agreed "that John would register a corporation that could use one of the domain names that Mr. Koch had . . . registered and that the two of them could own the Company with John owning slightly more than fifty percent and Mr. Koch owning slightly less than fifty percent"; that John would hold on to Koch's shares to conceal his involvement in the Company; and that in February 2019, John asked Koch to change their agreement so that John would receive 60% of the shares to Koch's 40% and that Koch agreed.  Countercl. ¶¶ 168-192.  The Counterclaim cites emails between John and Koch reflected the renegotiated shares.  Countercl. ¶¶ 225-226.

These allegations, too, are not sufficient to state a breach of contract claim.  Like the other contracts, the terms are too indefinite for the Court to enforce.  The October 2018 conversation cited by the Bedford Parties consists only of the statement that "the two of them could own the Company," which is not a definite statement of terms; further, the account of the October 2018 conversation does not explain what Koch was required to do in consideration of the 1.5 million shares he alleges he was initially promised.  The Counterclaim asserts a few specific activities Koch engaged in on behalf of the new Company and generally that he "continued working for the company."  Countercl. ¶ 178.  These allegations are not sufficient for the Court to determine what was agreed upon.

The same is true of the February 2019 renegotiation.  John asked Koch to change the agreement so that he would receive 60%.  But the new agreement still does not include terms about what Koch was to do in exchange for the shares.  The Counterclaim additionally makes no allegations about any activities Koch undertook on behalf of Jupiter in the period after February

2019, and thus the Court cannot find that the February 2019 emails on their own constituted an enforceable contract.  *Kastil v. Carro*, 536 N.Y.S.2d 63, 64 (1st Dep't 1988) ("[P]ast consideration is no consideration.").  Because the allegations in the Counterclaim do not establish a sufficiently definite contractual agreement regarding Jupiter to enforce, the claim is dismissed.

### B.    Defamation

The Bedford Parties claim that Plaintiffs defamed Koch by asserting in the Complaint that Koch had been imprisoned as a result of his felony conviction.  In order to plead defamation, a complaint must allege (1) a false statement of material fact; (2) publication to a third party; (3) lack of privilege or authorization; and (4) damages.  *See Stepanov v. Dow Jones & Co., Inc.*, 987 N.Y.S.2d 37, 41-42 (1st Dep't 2014).

The Bedford Parties' defamation claims are entirely based on and rooted in the language of the Complaint.  The Bedford Parties complain that Plaintiffs alleged in the Complaint that Koch was imprisoned as a result of his conviction, when in fact his sentence was reduced to time served.  Further, the Counterclaim alleges that the Complaint includes the following defamatory claims: "Mr. Koch uses other entities and individuals to engage in prohibited activities in the securities industry, such as acting as an unregistered broker and receiving transaction-based compensation; that Mr. Koch has conspired to violate the securities laws; that Mr. Koch has told Plaintiffs' clients and investors that Plaintiffs structured their supposed compensation agreement with Mr. Koch and/or Bedford in order to evade detection by regulators and intentionally violate the securities laws; and that Mr. Koch has lied about Plaintiffs' business practices and claimed to others that Plaintiffs regularly violate contracts and securities laws."  Dkt. No. 13 ¶ 5.  The Bedford Parties cite four paragraphs of the Complaint which they allege contain defamatory

allegations:

- "[U]pon information and belief, Defendant Koch uses [Bedford and Kaizen] to engage in prohibited transactions in the securities industry, such as acting as an unregistered broker and receiving transaction based compensation." Compl. ¶ 35.

- "Plaintiffs also had increasing suspicions that Defendant Koch had been using other entities such as Defendants Bedford, Kaizen, and John Does 1-10, as nominees in order to evade the securities laws." Compl. ¶ 51.

- "Defendants' incessant malevolence caricatures the maxim, 'no good deed goes unpunished.'" Compl. ¶ 21.

- "Defendants have told Plaintiffs' clients and investors numerous lies that have harmed Plaintiffs, including that they owe Defendants millions of dollars in compensation; that they promised Defendant Koch – a felon three times over – approximately one million shares in Jupiter; and that they structured their supposed compensation agreement with Defendants in order to evade detection by regulators and intentionally violate the securities laws." Compl. ¶ 92.

The Bedford Parties make no allegations about representations John made outside the context of this litigation.

The Bedford Parties' defamation claim cannot proceed. In the first place, "statements made during the course of a judicial . . . proceeding are clearly protected by an absolute privilege 'as long as such statements are material and pertinent to the questions involved.'" *Rosenberg v. MetLife, Inc.*, 866 N.E.2d 439, 443 (N.Y. 2007) (quoting *Weiner v. Weintraub*, 239 N.E.2d 540, 540 (N.Y. 1968)). That principle of law was first stated by the New York Court of Appeals in *Youmans v. Smith*, 47 N.E. 265 (1897), and has been affirmed as recently as 2015, *see Front, Inc. v. Khalil*, 28 N.E.3d 15, 18 (N.Y. 2015) ("[A]bsolute immunity from liability for defamation exists for oral or written statements made by attorneys in connection with a proceeding before a court 'when such works and writings are material and pertinent to the questions involved.'") (quoting *Youmans*, 47 N.E. at 265). "The privilege embraces anything that may possibly be

pertinent" to a case. *Andrews v. Gardiner*, 121 N.E.2d 341, 343 (N.Y. 1918). Parties are entitled

to some leeway in their advocacy of the case, in the interest of justice and in ensuring that the

arguments on each side are forcefully presented. Thus, "statements by parties and their attorneys

are absolutely privileged if, by any view, or under any circumstances, they are pertinent to the

litigation." *O'Brien v. Alexander*, 898 F. Supp. 162, 171 (S.D.N.Y. 1995). "The concept of

pertinent material is 'extremely broad' and 'embraces anything that may possibly or plausibly be

relevant or pertinent, with the barest rationality, divorced from any palpable or pragmatic degree

of probability.'" *Lipin v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 202 F. Supp. 2d 126, 137

(S.D.N.Y. 2002) (quoting *O'Brien*, 898 F. Supp. at 171)).

The most recent statement of the principle was in the Second Circuit's decision in *Brown

v. Maxwell*, 929 F.3d 41 (2d Cir. 2019), where the court went to lengths to explain that the

privilege applies only where the allegations of the complaint are material and pertinent:

> While common law courts have generally interpreted the litigation privilege
> broadly, they nevertheless maintain an important (if rarely implemented) limitation
> on its scope: to qualify for the privilege, a statement must be material and pertinent
> to the questions involved. It follows, then, that immaterial and impertinent
> statements are (at least nominally) actionable, *particularly when they are so
> needlessly defamatory as to warrant the inference of express malice*. It seems to
> us that when a district court strikes statements from the record pursuant to Fed. R.
> Civ. P. 12(f) on the ground that the matter is 'impertinent' and 'immaterial,' it
> makes the very same determination that permits a defamation action under the
> common law. We think the judicial system would be well served were our common
> law courts to revitalize this crucial qualification to the litigation privilege.

*Id.* at 54 n.47 (emphasis added) (internal citations and quotation marks omitted); *see also First

Indemnity of Am. Ins. Co. v. Shinas*, 2009 WL 3154282, at *11 (S.D.N.Y. Sept. 30, 2009)

(holding that an action for defamation may like "where the statement is 'so obviously [not

pertinent] . . . and so needlessly defamatory as to warrant the inference of express malice.'")

(quoting *Martirano v. Frost*, 307 N.Y.S.2d 425, 427 (2d Dep't 1969)).

The Bedford Parties argue that the statements made in the Complaint are not material to the action, and that the Complaint "contains outrageous language and overly graphic descriptions, which are totally unnecessary and clearly included in order to smear and defame Koch."  Dkt. No. 35 at 33.  But all of the allegations cited by the Bedford Parties as immaterial or impertinent are plainly relevant to this case.  The Caro Parties' complaint is for extortion, defamation and business disparagement.  The essence of their claim is that on the eve of Jupiter's initial public offering, Koch made falsely and defamatory public statements demanding that the Caro Parties pay him 1.2 million shares of Jupiter (with $9 million) that the Caro Parties say that he is not owed.  The challenged statements all are in service of their argument that the Caro Parties would not have agreed and did not agree to pay him, as a three-time felon who had been sentenced to a term of imprisonment, the stock compensation he says he was owed.  They allege he is falsely demanding a payout simply to permit the public offering to go forward.

Thus, the allegations that Koch is a three-time felon, that he is barred from certain activities, that he has engaged in prohibited securities transactions, that he has evaded the securities laws, and that he has been sentenced to a term of imprisonment are material and pertinent to the Caro Parties' complaint.  They are relevant to and make more likely the Caro Parties' claim that Koch's demands are not part of any good-faith dispute but of an extortionate campaign to prey on them at a moment of vulnerability to demand money to which Koch knows he is not entitled.  *See Lipin*, 202 F. Supp. 2d at 137.

Moreover, even if the statements were not absolutely privileged, the Bedford Parties' claim would fail for the absence of an alleged material false misstatement of fact.  The characterization of the Bedford Parties' activities as "incessant malevolence," while perhaps extravagant, is an expression of opinion, and therefore not actionable as defamation.  *See Davis*

*v. Boeheim*, 24 N.Y.3d 262, 269 (2014) ("[E]xpressions of opinion, as opposed to assertions of fact, are deemed privileged and, no matter how offensive, cannot be the subject of an action for defamation.").

The further statement in the Complaint that "[b]efore committing the felonies that led to his imprisonment, Defendant Robert Koch was a registered representative," Compl. ¶ 28, is not materially false.  *See Guccione v. Hustler Magazine, Inc.*, 800 F.2d 298, 301 (2d Cir. 1986) ("truth is an absolute, unqualified defense" to a claim of defamation).  The Bedford Parties admit that Koch was sentenced to 78 months in federal prison, but claim that "two days after the Sentencing Opinion was signed, the Court held that the term of imprisonment was reduced to 'time served.'"  Countercl. ¶ 36.  The thrust of the statement, read in context, is that Koch committed a felony that the judge believed warranted a term of imprisonment; it did not focus on his actual service of the term of imprisonment.  *See Korkala v. W.W. Norton & Co.*, 618 F. Supp. 152, 155 (S.D.N.Y. 1985) ("Slight inaccuracies of expression are immaterial provided that the defamatory charge is true in substance.").  Moreover, even as to the service of a term of imprisonment, the statement is not false: a defendant receives a sentence of "time served," when he has served time. *See, e.g.*, *Spina v. Dep't of Homeland Sec.*, 470 F.3d 116, 125 (2d Cir. 2006) (holding that time spent in pre-conviction detention is properly considered part of a "term of imprisonment" for statutory purposes); *United States v. D'Oliveira*, 402 F.3d 130 (2d Cir. 2005) (holding that a "sentence of 'time served' [is] an unambiguous pronouncement of a specific term of imprisonment—the amount of time actually served."); *Time Served*, *Black's Law Dictionary* (11th ed. 2019) ("time served" is defined as "[t]he time that a person has actually spent in jail or prison" or "[t]he presentence time that a defendant spent incarcerated").

###### C.      Fraudulent Inducement

The Caro Parties move to dismiss the Bedford Parties' claim of fraudulent inducement. In order to plead fraudulent inducement, a party must allege, at the standards of Federal Rule of Civil Procedure 9(b), that the defendant (1) intentionally made (2) a material misrepresentation of fact (3) in order to defraud or mislead, and that (4) the opposing party reasonably relied on the misrepresentation and (5) suffered damages as result.  *See Connaughton v. Chipotle Mexican Grill, Inc.*, 23 N.Y.S.3d 216, 218 (1st Dep't 2016); *see also Eurycleia Partners, LP v. Seward & Kissel, LLP*, 910 N.E.2d 976, 979 (N.Y. 2009) ("The elements of a cause of action for fraud require a material misrepresentation of a fact, knowledge of its falsity, an intent to induce reliance, justifiable reliance by the plaintiff and damages.").

The Bedford Parties' allegation turns on the claim that after John induced Koch to enter into agreements to provide services for pay and after Koch performed those services, John indicated for the first time that he could not compensate Koch because of his prior criminal history.  Countercl. ¶¶ 193, 200.  The Bedford Parties argue that because John knew of Koch's criminal record at the time he requested Koch's services and promised to compensate him, Countercl. ¶ 34, it necessarily follows that John and the Caro Parties knew—at the time they made the promise to pay—that they would not fulfill that promise.

That claim of fraudulent inducement fails for two independent reasons.  First, accepting the allegation that John did promise to pay Koch in connection with the Jupiter contract, as the Court must at this stage, and that he failed to pay him because of Koch's known criminal history, it by no means follows that John understood at the time of the alleged promise that Koch's criminal history would prevent his payment or that John formed the intention at that earlier time not to pay Koch.  The Bedford Parties' allegation is based on a non-sequitur.  The laws regarding

the employment a felon can undertake related to securities transactions are complicated; the Bedford Parties themselves argue that his prior convictions would not preclude the Caro Parties from paying Koch what he claims he was owed.  That a party states after an alleged contract is formed that he has reached the conclusion that the law prohibits him from satisfying that contract does not establish that the party had the intention to breach when the original promise was made. *See Lee Chu v. Ling Sun Chu*, 234 N.Y.S.2d 849, 850 (1st Dep't 1962) (holding that, where the only evidence of the breaching party's intention was the breach itself, "[t]here [was] absolutely no proof to sustain a finding, nor is there any evidence from which we may draw an inference, that at the time the promises were made there was no intention to perform").

Second, even assuming that at the time of the alleged promise, John knew he would not perform and that the Caro Parties then did not perform, those allegations would at most support a breach of contract claim (which fails for other reasons here).  It would not support a fraud claim. "[I]t is well-established that misrepresentations of a future intent to perform under a contract" are not sufficient to plead fraudulent inducement.  *PetEdge, Inc. v. Garg*, 234 F. Supp. 3d 477, 492 (S.D.N.Y. 2017); *see also Wall v. CSX Transp., Inc.*, 471 F.3d 410, 416 (2d Cir. 2016) ("[A]llegations that defendant entered into a contract while lacking the intent to perform it are insufficient to support [a fraud] claim."); *Int'l Bus. Machines Corp. v. Simon*, 376 F. Supp. 3d 292, 300-01 (S.D.N.Y. 2019) ("[A]lleging that the promisor had no intention, at the time of the contract's making, to perform its obligations thereunder[] is insufficient to state an independent fraud claim under New York law.") (citation and alterations omitted).  In order to maintain a claim of fraud in such a situation, "a plaintiff must either: (i) demonstrate a legal duty separate from the duty to perform under the contract; or (ii) demonstrate a fraudulent misrepresentation collateral or extraneous to the contract."  *Bridgestone/Firestone, Inc. v. Recovery Credit Servs.,*

*Inc.*, 98 F.3d 13, 20 (2d Cir. 1996).  No such allegations are made here.

Thus, even if it were a reasonable inference to assume that John never intended to perform, it cannot overcome the rule that an intention to breach a contract, even prior to formation of the contract, does not constitute fraudulent inducement.  *See Telecom Int'l Am., Ltd. v. AT&T Corp.*, 280 F.3d 175, 196 (2d Cir. 2001) ("[W]here a fraud claim arises out of the same facts as plaintiff's breach of contract claim, with the addition only of an allegation that defendant never intended to perform the precise promises spelled out in the contract between the parties, the fraud claim is redundant and plaintiff's sole remedy is for breach of contract."); *Papa's-June Music, Inc. v. McLean*, 921 F. Supp. 1154, 1160 (S.D.N.Y. 1996) (holding that where "the only fraud alleged arises out of the same facts that serve as the basis for the breach of contract claim" . . . the "fraud claim fails to state a claim for fraud on which relief can be granted"); *Caniglia v. Chi. Tribune-N.Y. News Syndicate, Inc.*, 612 N.Y.S.2d 146, 147 (1st Dep't 1994) ("It is well settled that a cause of action for fraud does not arise, where . . . the only fraud alleged merely relates to a contracting party's alleged intent to breach a contractual obligation.").

### D.      Breach of Fiduciary Duty and Accounting

Finally, the Bedford Parties argue that Plaintiffs breached a fiduciary duty.  In order to plead the breach of a fiduciary duty, a party must allege (1) the existence of a fiduciary duty; (2) the fiduciary's knowing breach of that duty; and (3) resulting damages.  *See Spinelli v. Nat'l Football League*, 903 F.3d 185, 207 (2d Cir. 2018) (quoting *Johnson v. Nextel Commc'ns, Inc.*, 660 F.3d 131, 138 (2d Cir. 2011)).  In order to state a claim for accounting, a party must allege (1) the existence of a fiduciary duty; (2) money or property entrusted to defendants which imposed on them the burden of accounting; (3) the absence of an adequate legal remedy; and (4) a demand for an accounting and a refusal.  *See Nasso v. Bio Reference Labs., Inc.*, 892 F. Supp.

26

2d 439, 453 (E.D.N.Y. 2012).

"Under New York law, a fiduciary relationship exists from the assumption of control and responsibility, and is founded upon trust reposed by one party in the integrity and fidelity of another. A fiduciary relationship cannot arise between parties to an arms length commercial transaction absent extraordinary circumstances." *Credit Suisse First Boston Mortgage Cap. LLC v. Cohn*, 2004 WL 1871525, at *5 (S.D.N.Y. Aug. 19, 2004) (Chin, J.) (internal citations omitted). "[F]iduciary relationships . . . are personal and context-specific. In order to survive a motion to dismiss a claim for breach of fiduciary duty, the plaintiff must set forth specific facts constituting the alleged relationship with sufficient particularity to enable the court to determine whether, if true, such facts could give rise to a fiduciary relationship." *DeBlasio v. Merrill Lynch & Co., Inc.*, 2009 WL 2242605, at *30 (S.D.N.Y. July 27, 2009) (internal quotation marks and citation omitted). Fiduciary relationships are "particularly likely to exist where there is a family relationship or such a relation of confidence as that which arises between physician and patient or priest and penitent." *Wilson-Rich v. Don Aux Assocs., Inc.*, 524 F. Supp. 1226, 1234 (S.D.N.Y. 1981). "The existence of a fiduciary duty normally depends on the facts of a particular relationship, therefore a claim alleging the existence of a fiduciary duty usually is not subject to dismissal under Rule 12(b)(6)." *Abercrombie v. Andrew Coll.*, 438 F. Supp. 2d 243, 274 (S.D.N.Y. 2006). "However, absent an allegation of a special relationship, mere assertions of 'trust and confidence' are insufficient to support a claim of a fiduciary relationship." *Id.* "Where the parties do not create their own relationship of higher trust, courts should not fashion the stricter duty for them. However, it remains fundamental that fiduciary liability is not dependent solely upon an agreement or contractual relation between the fiduciary and the beneficiary but results from the relation." *Brinsights, LLC v. Charming Shoppes of Del., Inc.*,

2008 WL 216969, at *8 (S.D.N.Y. Jan. 16, 2008).

Koch argues that he had a fiduciary relationship with John based on three facts: first, that he had a thirty-year relationship with John and that he provided services to Caro Capital and Caro Partners' clients in reliance on that relationship; second, that John, having accepted Koch's trust, gained a position of superiority and influence over Koch; and third, that John abused that trust for his own gain.

Koch's allegations are not adequate to plead that he had a fiduciary relationship with John, Caro Capital, or Caro Partners.  In the ordinary course, a business relationship is not a fiduciary relationship.  *See In re Koreage Controle et Revision S.A.*, 961 F.2d 341, 353 (2d Cir. 1992) ("Purely commercial transactions do not give rise to a fiduciary relationship."); *Andrews Coll.*, 438 F. Supp. 2d. at 274 ("[F]iduciary relationships typically do not arise between parties engaging in arms length business transactions."); *Argonaut P'Ship L.P. v. Bankers Trustee Co.*, 2001 WL 585519, at *3 (S.D.N.Y. May 30, 2001) ("A conventional business relationship, without more, does not become a fiduciary relationship by mere allegation.") (quoting *Oursler v. Women's Interart Ctr., Inc.*, 566 N.Y.S.2d 295, 297 (1st Dep't 1991)).  Nor is the fact that Koch allegedly placed trust and confidence in John sufficient to create a fiduciary duty, particularly in the absence of any allegation that John accepted that relationship of trust.  *See Andrews Coll.*, 438 F. Supp. 2d at 274 ("[T]he fact that one party trusts the other is insufficient to create a fiduciary relationship.") (quoting *Cumis Ins. Soc'y, Inc. v. Peters*, 983 F. Supp. 787, 797 (N.D. Ill. 1997)); *Holloway v. King*, 361 F. Supp. 2d 351, 361 (S.D.N.Y. 2005) ("[C]onclusory allegations of a 'special relationship,' 'complete trust and confidence,' and a belief by the plaintiffs that [the defendant] 'would look solely to advance and protect the financial interest of all members of [plaintiff's team]' does not transform an ordinary commercial relationship into a

fiduciary relationship.").

The Bedford Parties could plead a fiduciary relationship if the alleged facts showed that they had "reposed trust or confidence in the integrity and fidelity of another who thereby gain[ed] a resulting superiority or influence over" them. *Teachers Ins. & Annuity Assoc. of Am. v. Wometco Ent., Inc.*, 833 F. Supp. 344, 349-50 (S.D.N.Y. 1993). "Superiority and influence must be substantial." *Better Benefits, Inc. v. Protective Life Ins. Co.*, 2004 WL 633730, at *3 (S.D.N.Y. Mar. 30, 2004). "Indeed, in the absence of dominance and influence there is no fiduciary relationship regardless of the level of trust between the parties." *Id.* (quoting *Lagen v. Balcor Co.*, 653 N.E.2d 968, 975 (Ill. App. 1995)).

The allegations of the Counterclaim are not sufficient to show that the Caro Parties exercised dominance and influence over the Bedford Parties. Although the Counterclaim states that John accepted Koch's trust and thereby gained superiority over him, the allegations are not sufficient to support this conclusion. The principal allegation is that, because John received the revenues and thus was the only person who would have known the amounts that Koch was owed, he held a position of superiority over Koch. But this allegation is not sufficient to transform a claim for breach of contract into a claim for a breach of a fiduciary duty, as it does not pose the sort of "extraordinary circumstance" that would be required to convert a normal business relationship into a fiduciary one.

A court in this district confronted a similar issue in *Holloway v. King*, 361 F. Supp. 2d 351 (S.D.N.Y. 2005). There, the boxer Mike Tyson sued his promoter, Don King, alleging, inter alia, that King had breached a fiduciary duty owed to Tyson. According to Tyson, King had convinced members of Tyson's team to place complete trust in him, had convinced Tyson that he would look solely to advance his financial interests, and that he had exercised complete control

over every aspect of Tyson's finances. *Id*. at 360. The court found that these allegations were not sufficient to allege a fiduciary relationship. The complaint described "only an agreement to share revenues." *Id*. at 361. Thus, the allegations of a relationship of complete trust and confidence and a belief on Tyson's part that King would look solely to his financial interests did "not transform an ordinary commercial relationship into a fiduciary relationship." *Id*.

Even if Koch had adequately alleged a fiduciary relationship between himself and John, his claims are entirely duplicative of his contract claims. Under New York law, "a cause of action for breach of fiduciary duty which is merely duplicative of a breach of contract claim cannot stand." *Phoen. Light SF Ltd. v. Bank of N.Y. Mellon*, 2015 WL 5710645, at *6 (S.D.N.Y. Sept. 29, 2015); *see also 37 E. 50th St. Corp. v. Rest. Grp. Mgmt. Servs., LLC*, 68 N.Y.S.3d 424, 427 (1st Dep't 2017) ("[I]t is well settled that the same conduct which may constitute the breach of a contractual obligation may also constitute the breach of a duty arising out of the relationship created by the contract but which is independent of the contract itself."). The Bedford Parties argue that claims are not duplicative, because the "thrust of the breach of contract claim is a failure to pay for services rendered, whereas the thrust of the breach of fiduciary duty claim is that the defendants abused their fiduciary position of influence and superiority to induce the Koch Parties to provide services to Capital and Partners' clients, and to work on behalf of Jupiter, for their own benefit and to the Koch Parties' detriment." Dkt. No. 35 at 24-25. But this is a mere tautology. The alleged breach of contract is for failure to pay for services, while the alleged breach of fiduciary duty is the inducement to work for compensation that John never intended to pay. The two alleged breaches are sides of the same coin. They allege that the same services were provided and were not paid for. Thus, even if there had been a fiduciary relationship, the claims would be dismissed as duplicative of the contract claims.

Because there was no fiduciary obligation between Koch and John, the accounting claim fails as well.  *See Nasso v. Bio Reference Labs., Inc.*, 892 F. Supp. 2d 439, 454 (E.D.N.Y. 2012) ("[P]laintiff cannot demonstrate the existence of a fiduciary duty or confidential relationship with defendant.  The claim for an accounting must fail on these grounds alone.") (citations omitted).

## CONCLUSION

For the foregoing reasons, the Caro Parties' motion for judgment on the pleadings is GRANTED with prejudice to every claim except for the claims for breach of contract.  The motion is GRANTED without prejudice to the Bedford Parties filing an amended counterclaim with respect to the breach of contract claims on or before May 10, 2021.  The Clerk of Court is respectfully directed to close the motion at Dkt. No. 24.


        SO ORDERED.

Dated:  April 23, 2021
        New York, New York                    _____
                                                         LEWIS J. LIMAN
                                              United States District Judge