UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------------X
                                               :

CARO CAPITAL, LLC, CARO PARTNERS, LLC,        :
JUPITER WELLNESS, INC., BRIAN JOHN, and     :
RICHARD MILLER,                            :

                     Plaintiffs,          :           20-cv-6153 (LJL)

                                        :      OPINION AND ORDER
        -v-                       :

ROBERT KOCH, BEDFORD INVESTMENT        :
PARTNERS, LLC. KAIZEN ADVISORS LLC, and    :
JOHN DOES 1-10,                       :

                  Defendants.        :

---------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

      Defendants-Counterclaim Plaintiffs Robert Koch ("Koch") and Bedford Investment

Partners ("Bedford") (together, "Defendants") bring a counterclaim against Plaintiffs-

Counterclaim Defendants Caro Capital, LLC ("Caro Capital"), Caro Partners, LLC ("Caro

Partners"), Jupiter Wellness, Inc. ("Jupiter"), Brian John ("John"), and Richard Miller ("Miller")

(collectively the "Caro Parties" or "Plaintiffs").  Dkt. No. 63.  Plaintiffs move, pursuant to

Federal Rule of Civil Procedure 12(b)(6), for an order dismissing the second amended

counterclaim against them.  Dkt. No. 67.

      For the following reasons, the motion to dismiss is granted in part and denied in part.

## BACKGROUND

      Familiarity with the Court's April 23, 2021 Opinion and Order granting Plaintiffs'

motion to dismiss the first set of counterclaims is assumed.  *See* Dkt. No. 53.  For the purposes of

this motion, the Court assumes the truth of the facts asserted in Defendants' second amended

counterclaim (the "Second Amended Counterclaim" or "SAC").  *See Leary v. Al-Mubaraki*,

2019 WL 4805849, at *1 (S.D.N.Y. Sept. 30, 2019); *Safe Step Walk In Tub Co. v. CKH Indus., Inc.*, 2018 WL 4539656, at *4 n.6 (S.D.N.Y. Sept. 20, 2018).

This case arises from a business dispute among alumni of the securities-brokerage firm Stratton Oakmont, Inc. ("Stratton Oakmont").[1]  John, Miller, and Koch have known one another since the three worked together at Stratton Oakmont in the early-to-mid 1990s.  Dkt. No. 63 ¶ 36. Koch pleaded guilty to several felony counts related to securities fraud in connection with a case in which he acted as a cooperating witness for the United States Government; he was sentenced on those counts in June 2012.  *Id.* ¶¶ 37–39.

John and Miller are the two members of Plaintiff Caro Capital.  *Id.* ¶ 43. Caro Capital is "a full service financial consulting firm specializing in assisting emerging growth companies primarily in the sub-$100 million space with Investor Relations, Public Relations, Roadshow & Networking, and Introductions to investment bankers, brokers, market makers, attorneys and auditors and other related services."  *Id.* ¶ 42 (citation omitted).  After Miller was injured in an accident in 2016 and unable to work for a long period of time, John incorporated Plaintiff Caro Partners, a firm of which he is the sole member.  *Id.* ¶¶ 43, 135–36.  The description of Caro Partners is identical to that of Caro Capital.  *Id.* ¶ 137.  Once Caro Partners was incorporated, all future work was performed through that firm and not through Caro Capital.  *Id.* ¶ 136.

Koch is the Managing Director, sole member, and founder of Bedford Investment Partners, LLC ("Bedford"), which is described as a "boutique independent commodity trading

---

[1] Stratton Oakmont was a securities broker-dealer that, after involving itself in various acts of securities fraud, was expelled from the National Association of Securities Dealers.  *See In re Stratton Oakmont, Inc.*, 2003 WL 22698876, at *1 (S.D.N.Y. Nov. 14, 2003).  Stratton Oakmont failed financially, sought protection under Chapter 11 of the Bankruptcy Code, and was placed in liquidation proceedings under the Securities Investors Protection Act of 1970.  *Id.*

company[y]" that "provide[s] integrated trading products and logistics services for participants in the worldwide precious metal and energy markets." Dkt. No. 1 ¶ 32.

The case arises most immediately from the parties' work building a company that develops over-the-counter consumer products infused with cannabidiol, such as sunscreen and eczema treatments. *Id.* ¶ 11. The company was initially incorporated as CBD Brands, Inc. ("CBD Brands") but is now known as Jupiter Wellness, Inc. ("Jupiter") .[2] Dkt. No. 63 ¶¶ 18, 277. In his counterclaim, Koch alleges that he performed a number of services for Jupiter as detailed below, and that John initially promised him 1.4 million shares of Jupiter in exchange, but that in or about February 2019, Koch and John verbally agreed to modify their agreement, reducing Koch's ownership of Jupiter to 1.2 million shares. *Id.* ¶¶ 19–20, 283, 300. John allegedly did not want Koch's name associated with Jupiter, so he stated that he would hold onto Koch's shares in Jupiter but that Koch "should trust John and continue working for [Jupiter] because John would make sure [] Koch received his ownership interest in [Jupiter]." *Id.* ¶ 285. In reliance on this promise, Koch continued to work on Jupiter, *id.* ¶¶ 286, 298.

At some point after February 2019, John told Koch that John intended to retain all the Jupiter shares himself and that Koch would not receive any compensation from Jupiter. *Id.* ¶ 303. On May 15, 2020, Koch sent a demand letter to John, copying CBD Brands' Board of Directors, demanding that John pay Koch and Bedford the 1.2 million shares in CBD Brands that was promised. *Id.* ¶ 311. John replied by email to Koch, copying the Board, that the demand letter was "completely inaccurate and in [his] opinion nothing more than extortion." *Id.* ¶ 312. Plaintiffs allege that Koch and Bedford sent two additional demand letters, with the latter sent on

---

[2] Throughout this Opinion, the Court will refer to Jupiter as both "Jupiter" and "CBD Brands," as do Defendants in their Second Amended Counterclaim. *See* Dkt. No. 63 ¶ 18.

July 31, 2020.  Dkt. No. 1 ¶¶ 62–64.  Shortly thereafter, Plaintiffs filed this action against Koch, Bedford, Kaizen Advisors LLC (another company allegedly controlled by Koch, *id.* ¶ 15), and John Doe defendants, claiming that Koch's demand letter was an extortion intended to derail Jupiter's pending initial public offering, as to which Jupiter had filed an amended registration statement just three days before.  *Id.* ¶ 17.

## I.     The First Set of Counterclaims

With its answer to Plaintiffs' complaint, Defendants filed its first set of counterclaims against Plaintiffs John, Miller, Caro Capital, and Caro Partners, alleging that Plaintiffs did not pay compensation that was owed for Defendants' work pursuant to thirty-five agreements and their work on Jupiter.  Dkt. No. 13.  The counterclaim brought claims for breach of contract, unjust enrichment, fraudulent inducement as to John, breach of fiduciary duty also as to John, accounting as to Caro Capital and Caro Partners, and defamation.  *See id.*

In an Opinion and Order dated April 23, 2021, the Court dismissed the counterclaim, concluding that (1) the breach-of-contract claim failed for indefiniteness; (2) the defamation claim failed because the alleged defamatory statements were absolutely privileged and in any event failed to allege a material false misstatement of fact; (3) the fraudulent-inducement claim failed for absence of scienter and for failure to allege a violation independent of the breach of contract; and (4) the breach-of-contract claim, and a related claim for an accounting, failed for absence of any allegation that would support the existence of a fiduciary duty.  *See* Dkt. No. 53. The Court concluded that the Defendants (referred to therein as the "Bedford Parties") failed to plead contract terms that were sufficiently "definite" to be enforceable as to any of an alleged thirty-five oral contracts.  *Id.* at 14.  It held that "[t]he terms alleged by the Bedford Parties [were] insufficient either to demonstrate that the parties reached a meeting of the minds such that it [could] be said that they formed a contract or to provide the Court or the alleged breaching

4

party any basis upon which to judge whether the alleged non-breaching party ha[d] performed its obligations sufficient to bring a claim for breach of contract." *Id.* at 15.  In particular, the counterclaim was "entirely vague and indefinite as to the nature or quantity of the 'consulting services' Koch was to provide." *Id.*  "[F]or much the same reasons that it concluded the Bedford Parties had not stated a claim for breach of contract," "[t]he Court conclude[d] that the Bedford Parties ha[d] not stated a claim for unjust enrichment."  Dkt. No. 62 at 3–4.

The Court also held that Defendants' allegations that the Caro Parties breached an agreement to share the shares of Jupiter with Koch failed to state a claim for relief.  It explained that, "[l]ike the other contracts, the terms are too indefinite for the Court to enforce," and the relevant conversation recounted in the counterclaim did not "explain what Koch was required to do in consideration of the 1.5 million shares he alleges he was initially promised."  Dkt. No. 53 at 18.  The allegations of the "activities Koch engaged in on behalf of the new Company" were insufficient to determine what the parties had agreed upon.  *Id.*[3]  The Court's Order was without prejudice to the filing of an amended counterclaim alleging breach of contract and unjust enrichment.  Dkt. No. 53 at 31; Dkt. No. 62 at 5.

## II.  The Second Amended Counterclaim

On June 4, 2021, Defendants filed their Second Amended Counterclaim.  Dkt. No. 63.  The SAC brings claims against all Plaintiffs, including Jupiter, and asserts a breach-of-contract claim against John, Caro Capital, and Caro Partners, *id.* ¶¶ 408–13, and an unjust-enrichment claim against all Plaintiffs-Counterclaim Defendants, *id.* ¶¶ 414–20.  Both claims are rooted in the work Koch alleges he performed pursuant to consulting agreements and on Jupiter.  *See id.* ¶¶ 408–20.

---

[3] The Court also dismissed the Defendants' claims for defamation, fraudulent inducement, and breach of fiduciary duty and accounting with prejudice.  Dkt. No. 53 at 31.

A.      **Allegations Regarding Clients of Caro Capital and Caro Partners**

The SAC alleges that in early 2015, Caro Capital discontinued working with one of its employees/contractors.  *Id.* ¶ 44.  In or about March 2015, John contacted Koch—who John knew was well connected in the New York financial community and had a vast network of financial-relationship contacts—to work with Caro Capital to assist Caro Capital's clients.  *Id.* ¶ 48.  Having someone who was well connected with financial professionals in New York and elsewhere was particularly important for Caro Capital because of the nature of its business, which included investor relations and public relations.  *Id.* ¶ 45.  The SAC alleges that "knowing just the right person or entity in the investing world can lead to tens of millions, if not hundreds of millions, of dollar in investment capital to a startup, emerging growth, and/or a small-cap [sic] companies."  *Id.* ¶ 46.

Koch's role was to act as "an independent consultant for Caro Capital," *id.* ¶ 49, and render consulting services as an "independent contractor," *id.* ¶¶ 65, 71, 74, 79, 86, 92, 97, 103, 108, 123, 129, 134, 152, 159, 164, 170, 179, 187, 194, 205, 213, 221, 226, 234, 256, 261.  Caro Capital wanted to engage Koch to be an independent consultant because of Koch's connections.  *Id.* ¶ 49.  From 2015 through the date of the filing of the SAC, "Koch and Bedford entered into dozens of oral agreements with John and/or Caro Partners or Caro Capital."  *Id.* ¶ 11.  John requested that Koch and Bedford provide consulting services for certain clients (or prospective clients) of Caro Capital or Caro Partners; the requested services included providing investor relations by facilitating introductions to other financial-relations and financial-services companies and "facilitating introductions to various securities dealers, investment advisors, funding sources and other members of the financial community with whom Mr. Koch had established relationships to enhance the visibility of certain clients (or prospective clients) of Caro Capital or Caro Partners in the financial community."  *Id.* ¶ 12; *see also* ¶¶ 49, 52.  Each of

these clients or prospective clients was a corporation that either was a publicly traded corporation or that wished to become a publicly traded corporation. *Id.* ¶ 13. In exchange for their consulting services, and "[d]epending on various factors involved in each arrangement," John promised Koch and Bedford that they would receive either one-third, forty percent, or half of all compensation—including cash and corporate stock and/or warrants—that Caro Capital or Caro Partners received from their corporate clients. *Id.* ¶¶ 14, 15, 54.[4]

1.      **Caro Capital**

The SAC alleges that Caro Capital had a standard contract with clients that obligated it to use its best efforts:

> to (a) provide the [client] with corporate consulting services in connection with introductions to other financial relations companies and other financial services companies and other financial services; (b) contact the [client's] existing shareholders, responding in a professional manner to their questions and following up as appropriate; and (c) introduce the [client] to various securities dealers, investment advisors, analysts, funding sources and other members of the financial community with whom it has established relationships, and generally assist the [client] in its efforts to enhance its visibility in the financial community.

*Id.* ¶ 5. Caro Capital would typically attempt to have new clients sign a contract for an initial term of three or six months, and it would attempt to renew the contract for another six-month period on each successive end date. *Id.* ¶ 59. The portion of the standard agreement quoted in the counterclaims contains no reference to compensation. *Id.* ¶ 51.

---

[4] According to the SAC, the compensation structure was dependent on timing, with Koch and Bedford receiving one-third of the compensation received from deals by Caro Capital, half of the compensation received by Caro Partners before February 2019, and forty percent of the compensation received by Caro Partners thereafter. *Id.* ¶ 15; *see also id.* ¶ 53 ("John verbally promised Mr. Koch that he and Bedford would receive on-third (1/3) of all compensation (cash and corporate stock and/or warrants) paid to Caro Capital by its corporate clients to whom Mr. Koch and Bedford rendered consulting services, less any office costs and expenses."); ¶ 262 ("In February 2019, John asked Mr. Koch to change their oral agreements moving forward so that John would receive sixty percent (60%) and Mr. Koch would receive (40%) [sic] of all compensation . . . paid to Caro Partners by its corporate clients to whom Mr. Koch rendered his consulting services less any office costs and expenses.").

The SAC also alleges:

> All of the oral agreements between Plaintiffs and Mr. Koch could have been performed within one year.  Indeed, in the securities industry, consulting services for purposes of raising funds for public corporations can be accomplished in a very short time, well within one year, and can result in tremendous stock valuations that translate into enormous compensation for the consulting firm.

*Id.* ¶ 16.

Defendants make nearly identical allegations with respect to each of the thirteen clients of Caro Capital, differing only in client name and in the amount of financing the client wished to obtain.  The allegations are that John asked Koch and Bedford, and Koch and Bedford performed requests:

- to provide consulting services to American Cannabis Company, Inc. ("AMMJ") during the period from May 2015 to January 2016, including meeting the AMMJ's chairman, participating in phone calls with AMMJ as needed or requested by John, and facilitating key introductions to prospective sources of capital and investment interest, *id.* ¶¶ 60–65;

- to provide consulting services to PetVivo Holdings Inc. ("PETV"), including by helping Caro Capital to assist PETV in obtaining financing by facilitating introductions to prospective sources of capital and investment interest, *id.* ¶¶ 66–71;

- to help Caro Capital "free up stock" that One Clean Planet, Inc. ("CLPT") was supposed to provide Caro Capital pursuant to a consulting agreement; Koch contacted and spoke to CLPT's CEO on numerous occasions, *id.* ¶¶ 72–73;

- to contact numerous individuals and companies in the financial community to help MassRoots, Inc. attain financing, *id.* ¶¶ 75–78;

- to assist TapImmune, Inc. in raising capital through Koch's connections in the financial community; Koch introduced that company to numerous prospective sources of capital and investment, *id*. ¶¶ 80–85;

- to introduce Cardiff International, Inc. to prospective sources of capital and investment; Koch made himself available twenty-four hours per day, seven days per week to speak with that company's CEO, *id.* ¶¶ 88–91.

The SAC also alleges that John engaged Koch and Bedford to facilitate key introductions for various clients to prospective sources of capital and investment—specifically, to help Caro

Capital assist: Alliance Bioenergy Plus, Inc. in attaining $2 to $3 million in financing, *id.* ¶¶ 94–-96; Star Mountain Resources, Inc. to attain $3 million in financing, *id.* ¶¶ 99–102; Next Graphite, Inc. to attain $3 million in financing, *id.* ¶¶ 105–17; Iac Kun Group Holding Company to secure financing to obtain a casino in South Korea, *id.* ¶ 111–13; Pivot Pharmaceuticals Inc. to attain $3 million in financing, *id.* ¶ 120–22; International Western Petroleum, Inc. to attain $8 to $10 million in financing, *id.* ¶¶ 125–28; and the Chron Organization, Inc. to attain $1 million in financing, *id.* ¶¶ 130–33.

### 2.   Caro Partners

In October 2016, John asked Koch and Bedford to perform consulting services for the corporate clients of Caro Partners. *Id.* ¶ 138. John verbally promised Koch and Bedford that they would receive fifty percent of all compensation, less any office costs and expenses, paid to Caro Partners by the corporate clients to whom Koch and Bedford rendered consulting services. *Id.* ¶¶ 138–39. The standard consulting contract Caro Partners signed with its corporate clients appears to be identical to the contract Caro Capital signed with its clients. *Compare id.* ¶ 51 *with id.* ¶ 143. The services Koch and Bedford agreed to perform for Caro Partners are identical to those Koch and Bedford performed for Caro Capital, but the identity of the ultimate client usually differs, and the amount of funding sought differs. *See, e.g.*, *id.* ¶ 146 (assisting AppYea, Inc. in obtaining funding); *id.* ¶ 156 (helping to assist Caro Partners obtain $3 to $5 million in funding for Green EnviroTech Holding Corp.); *id.* ¶ 161 (assisting Drone USA, Inc. to obtain $5 to $10 million in funding); *id.* ¶166 (assigning the Chron Organization, Inc. in obtaining funding); *id.* ¶ 175 (assisting Pressure Biosciences Inc. in attaining $10 million in financing); *id.* ¶ 184 (assisting Fision Corp. to obtain $3 to $5 million in financing); *id.* ¶ 189 (assisting Medical Cannabis Payment Solutions to obtain $3 million in financing); *id.* ¶ 200 (assisting OriginClear, Inc.to obtain financing); *id.* ¶ 210 (assisting Spindle, Inc. to obtain $3 to $5 million in financing);

*id.* ¶ 218 (assisting TapImmune, Inc. in attaining financing); *id.* ¶ 223 (assisting Water Technologies International, Inc.in attaining financing); *id.* ¶ 231 (coordinating and facilitating introductions to prospective sources of capital and investment interest for Tonix Pharmaceuticals Holding Corp.); *id.* ¶ 242 (assisting Genprex, Inc. to obtain $5 to $8 million in financing); *id.* ¶ 258 (assisting Dyadic International, Inc. in obtaining financing); *id.* ¶ 268 (helping Edison Nation, Inc. to obtain $5 million in financing).

Some of these clients were introduced to Caro Capital or Caro Partners by Koch. *See, e.g.*, ¶¶ 110, 228.  In some cases, Caro Capital or Caro Partners originated the client.  In every case, the company is described as a client of Caro Capital or Caro Partners.  In each of these arrangements, Koch's assignment was essentially the same—to facilitate key introductions to prospective sources of capital and to do so by making introductions to brokers and other members of the financial community with whom he had long-standing relationships.

Tellingly, the SAC does not allege that any of the introductions resulted in an investment or a capital raise.[5]  It also does not allege the compensation that Caro Capital or Caro Partners actually received as a result of these arrangements, only what Defendants believe the compensation to be.  Defendants nonetheless allege that "[a]lthough Mr. Koch and Bedford fully performed the consulting work requested for Caro's [sic] clients pursuant to multiple oral agreements, they were only paid a fraction of the total amount they are owed on those agreements."  *Id.* ¶ 21.

---

[5] Defendants do allege that, with respect to one agreement, they performed their consulting services by, among other things, "coordinating a convertible promissory note" for one client from another Caro Partners client for $360,000.  Dkt. No. 63 ¶ 225.

B.      **Allegations regarding Jupiter Wellness, Inc.**

The SAC contains allegations with respect to Jupiter that are substantially similar to those in the first set of counterclaims that the Court found insufficient to state a claim for relief.  It alleges that in the spring of 2017, John and Koch discussed creating the company that ultimately became Jupiter and that the two worked together to build the company.  *Id.* ¶¶ 276–77.

Koch performed a number of services for Jupiter, including coming up with a name for the sunscreen, *id.* ¶ 278, registering domain names, *id.* ¶¶ 279, 312–16, developing logos, *id.* ¶ 280, helping to prepare a summary business plan, *id.* ¶ 290–91, introducing John to potential investors in Jupiter and setting up meetings with potential investors and merger partners, *id.* ¶¶ 289, 299, asking at least one individual to serve on the Board of Directors of Jupiter, *id.* ¶¶ 292–93, drafting a presentation to be shared with potential investors in Jupiter, *id.* ¶¶ 294–95, 297, and introducing John to investment bankers who could potentially assist in helping Jupiter go public, *id.* ¶ 299.  As part of his work on Jupiter, Koch also set up meetings with potential underwriters of a public offering, including the corporation that ultimately became the main underwriter for Jupiter's initial public offering.  *Id.* at 310.

The SAC alleges that in approximately October 2018, John and Koch verbally agreed that John would register a corporation that could use one of the domain names that Koch had already registered, that the two of them would own Jupiter, and that John would own slightly more than fifty percent of the company and Koch would own slightly less than fifty percent.  *Id.* ¶ 283.  To prevent Koch's name from being associated with the Jupiter, given his criminal history, John informed Koch that Koch's shares would be held in John's name.  *Id.* ¶¶ 285, 288.  In February 2019, John asked Koch to change their agreement so that John would receive sixty percent of the shares and Koch would receive forty percent, and Koch agreed.  *Id.* ¶¶ 300–02.

11

The SAC adds lengthy allegations setting forth what Koch did after February 2019 to earn the 1.2 million shares, including "continu[ing] to provide information about [Jupiter] to potential investors and other parties in the investment community," *id.* ¶ 304, contacting "potential investors and other possible sources of funding," *id.* ¶ 305, maintaining his relationship with the individual that he asked to be on the Board of Directors and "work[ing] to make sure the [he] would, indeed, become . . . Chairman of the Board," *id.* ¶ 306, making required administrative changes to share agreements, *id.* ¶ 308, and sending information about Jupiter to members of the financial community, *id.* ¶ 309.  The SAC also adds allegations that Koch transferred the web domain cbdbrands.net to Jupiter in March 2019, was given an employee discount on Jupiter purchases in February and May 2019, and received an email from John "sending a picture of a competitive product" with John explaining "this is what we compete with." *Id.* ¶¶ 312–19.

According to the SAC, "despite Mr. Koch's performing work for [Jupiter], and in direct contravention of John's promises that Mr. Koch is entitled to own shares in [Jupiter], John has now informed Mr. Koch that Mr. Koch is not entitled to any ownership of [Jupiter] or any compensation for the work he performed for [Jupiter]." *Id.* ¶ 24.

## LEGAL STANDARD

"A motion to dismiss a counterclaim is evaluated under the same standard as a motion to dismiss a complaint." *Holborn Corp. v. Sawgrass Mutual Ins. Co.*, 304 F. Supp. 3d 392, 397 (quoting *Orientview Techs. LLC v. Seven for All Mankind, LLC*, 2013 WL 4016302, at *2 (S.D.N.Y. Aug. 7, 2012)).  Thus, the Court must "accept all factual allegations in the [counterclaim] as true and draw all reasonable inferences in [P]laintiff's favor." *Hayden v. Paterson*, 594 F.3d 150, 160 (2d Cir. 2010) (quoting *Johnson v. Rowley*, 569 F.3d 40, 43–44 (2d Cir. 2009) (per curiam)).  Defendant's motion must be granted unless the counterclaim includes

"sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555).  Likewise, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause action will not do.'" *Id.* (quoting *Twombly*, 550 U.S. at 555).  Put another way, the plausibility requirement "calls for enough fact to raise a reasonable expectation that discovery will reveal evidence [supporting the claim]." *Twombly*, 550 U.S at 556; *see also Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 46 (2011).

## DISCUSSION

Plaintiffs argue that the Second Amended Counterclaim should be dismissed for several reasons.  First, they argue that the oral agreements alleged by Defendants are void under New York's Statute of Frauds.  In the alternative, they argue that, to the extent the purported agreements are not for services covered by the Statute of Frauds, they still fail for lack of definiteness.

## I.     Counterclaim Based on the Consulting Contracts and the Statute of Frauds

"The primary function of the Statute of Frauds is an evidentiary one; it is intended to 'guard against the peril of perjury' and 'prevent the enforcement of unfounded fraudulent claims' by limiting the range of evidence permitted to prove the existence of an agreement that lacks a formal writing." *Zhi Zhong Qiu v. Diamond*, 2020 WL 978352, at *4 (S.D.N.Y. Feb. 27, 2020) (quoting *Springwell Corp. v. Falcon Drilling Co.*, 16 F. Supp. 2d 300, 304 (S.D.N.Y. 1998) (Sotomayor, J.)); *see also Morris Cohon & Co. v. Russell*, 245 N.E.2d 712, 715 (N.Y. 1969).  "In short, the purpose of the Statute of Frauds is simply to prevent a party from being held responsible, by oral, and perhaps false, testimony, for a contract that the party claims never to

have made." *William J. Jenack Estate Appraisers & Auctioneers, Inc. v. Rabizadeh*, 5 N.E.3d 976, 980 (N.Y. 2013) (quoting 73 Am. Jur. 2d, Statute of Frauds § 403); *see also Wolet Cap. Corp. v. Walmart Inc.*, 2021 WL 242297, at *6 (S.D.N.Y. Jan. 25, 2021).

New York's Statute of Frauds, N.Y. Gen. Oblig. Law § 5-701(a)(10), requires that a contract "to pay compensation for services rendered in negotiating a loan, or in negotiating the purchase, sale, exchange, renting or leasing of any real estate or interest therein, or of a business opportunity, business, its good will, inventory, fixtures or an interest therein" be in writing.  N.Y. Gen. Oblig. L. § 5-701(a)(10).  The law provides that "'[n]egotiating' includes procuring an introduction to a party to the transaction or assisting in the negotiation or consummation of the transaction." *Id.*

Under the New York statute, "the contracts required to be evidenced by writing include a contract or agreement for the compensation of a business broker for acting as a 'finder,' 'originator' or 'introducer,' or for assisting in the negotiation or consummation of the transaction . . . ." *Springwell Corp.*, 16 F. Supp. 2d at 304 (quoting N.Y. Legis. Doc. No., 1964, 65(F)). If services are "performed as part of or in furtherance of negotiation," *JF Cap. Advisors, LLC v. Lightstone Grp., LLC*, 37 N.E.3d 725, 729 (N.Y. 2015) (emphasis omitted), they are "rendered in negotiating" within the meaning of Section 5-701(a)(10).  Services that "fall within the scope of section 5-701(a)(10)" include "performing due diligence and financial analysis for a transaction covered by section 5-701(a)(10), seeking out and interacting with potential sources of financing, preparing presentations for potential investors, and developing a general negotiating strategy for accomplishing any proposed transactions." *Chardan Cap. Mkts., LLC v. Nw. Biotherapeutics, Inc.*, 2018 WL 3733948, at *4 (S.D.N.Y., Aug. 6, 2018) (citing *Ely v. Perthuis*, 2013 WL 411348, at *3–4 (S.D.N.Y. Jan. 29, 2013)); *GEM Advisors, Inc. v. Corporacion Sidenor, S.A.*,

667 F. Supp. 2d 308, 324 n.5 (S.D.N.Y. 2009); *Zeising v. Kelly*, 152 F. Supp. 2d 335, 343

(S.D.N.Y. 2001)); *see also* A*TG Cap. LLC v. MGT Cap. Invs., Inc.*, 2018 WL 1406917, at *9

(S.D.N.Y. Mar. 19, 2018) ("Negotiating a business opportunity includes providing services such

as: (1) identifying and analyzing the business opportunity; (2) identifying and analyzing potential

business partners; (3) and being a major contributor to the eventual formation of the business

opportunity." (internal quotation marks and citation omitted) (alteration adopted)).

     For the Statute of Frauds to apply, the "party to be charged" need not be "a principal to

an enumerated transaction, *i.e.*, . . . a lender, borrower, purchaser, or seller in one of the

transactions listed in Section 5-701(a)(10))." *Belotz v. Jeffries & Co., Inc.*, 213 F.3d 625, 2000

WL 665564, at *1 (2d Cir. May 22, 2000).  Where a party "is claiming the right to payment on

an oral agreement for services listed in Section 5-701(a)(10)," the counterparty "with the alleged

duty to pay for these services" is "'the party to be charged' within the meaning of Section

5-701(a)." *Id.*  The Statute of Fraud's purpose to avoid "unfounded and multiple claims for

commissions," *id.* (quoting *Minichiello v. Royal Bus. Funds Corp.*, 223 N.E.2d 793, 795), "is no

less paramount where . . . a claimant asserts the right to payment on an alleged oral agreement

with a consultant for the value of services provided by the claimant to a third party," *id.*

     "The affirmative defense of the Statute of Frauds is appropriately raised on a motion to

dismiss." *Reives v. Lumpkin*, 2012 WL 2045854, at *8 (S.D.N.Y. June 4, 2012) (citing *Rosbach

v. Indus. Trading Co., Inc.*, 81 F. Supp. 2d 522, 524 (S.D.N.Y. 2000)); *see also Wolet*, 2021 WL

242297, at *4; *Ridenhour v. Bryant*, 2020 WL 1503626 at *3 (S.D.N.Y. Mar. 29, 2020); *Knapp

v. Maron*, 2015 WL 2452409 (S.D.N.Y. May 22, 2015).

     Defendants' counterclaim regarding the consulting contracts is barred by the Statute of

Frauds.  New York's Statute of Frauds applies both to equity and debt instruments.  It requires

any contract for the negotiation of the sale of an "interest" in a business to be in writing.  N.Y.

Gen. Oblig. L. § 5-701(a)(10).  It also requires "a contract to pay compensation for services

rendered in negotiating a loan" to be in writing.  *Id.*  The courts have held the Statute of Frauds

to apply to assistance in obtaining financing by, for example, the sale of stock and warrants.

*Chardan Cap. Markets, LLC*, 2018 WL 3733948, at *1–5.  The sale need not be of a controlling

interest.  *Id.* at *4.  "[S]eeking out and interacting with potential sources of financing, preparing

presentations for potential investors, and developing a general negotiating strategy for

accomplishing any proposed transactions" all constitute services "rendered in negotiating" a loan

or the sale of an interest in a business.  *Id.* at 84.

The oral agreements alleged by the counterclaims fit comfortably within this definition.

They concern either the negotiation or assistance in the negotiation of an "interest" in a

business—the businesses of the clients of Caro Capital or Caro Partners—or, if the financing was

to take the form of a loan, the negotiation of a loan.  The SAC alleges that the consulting

contracts required Koch and Bedford to "provide consulting services . . . by facilitating

introductions to other financial relations companies and other financial services companies and

facilitating introductions to various securities dealers, investment advisors, funding sources, and

other members of the financial community with whom Mr. Koch had established relationships to

enhance the visibility of [those clients] in the financial community."  Dkt. No. 63 ¶ 12; *accord*

*id.* ¶¶ 53, 138, 144.  Each of the alleged oral agreements involve the same services performed in

essentially the same manner—assisting a client in obtaining financing by making introductions to

prospective sources of capital and members of the financial community.  In each instance, Koch

and Bedford were to seek out, interact with, and make introductions to potential investors, and to

help arrange for promotional pitches.  Following the plain language of the New York Statute of

Frauds—and respecting its purpose—the agreements were required to be in writing for them to be enforceable.  *See Ely*, 2013 WL 411348, at *3 ("Section 5–701(a)(10) is a broad umbrella that 'includes the use of "connections," "ability" and "knowledge" to facilitate or assist in the transaction by helping the acquirer of the business opportunity meet the right people and have the right information.'") (quoting *Orderline Wholesale Distribs., Inc. v. Gibbons, Green, van Amerongen, Ltd.*, 675 F. Supp. 122, 128 (S.D.N.Y. 1987)).

Nonetheless, Defendants argue that the services alleged go "beyond the negotiation or consummation of a business opportunity."  Dkt. No. 79 at 17 (quoting *Dorfman v. Reffkin*, 37 N.Y.S.3d 517, 521 (1st Dep't 2016)).  They contend that relevant agreement was for Koch and Bedford to provide services to Caro Capital and Caro Partners—not to their ultimate clients— and that as a result, New York's Statute of Frauds does not apply.

New York courts have explained that Section 5-701(a)(10) does not apply when the "plaintiff's role was more extensive than merely negotiating a business opportunity" and extends to "render[ing] a wide variety of  services," *Super v. Abdelazim*, 485 N.Y.S.2d 612, 614 (3d Dep't 1985), or to more than "the limited purpose of negotiating a business opportunity," *Riley v. N.F. S. Servs., Inc.*, 891 F. Supp. 972, 978 (S.D.N.Y. 1995); *see also Dorfman*, 37 N.Y.S.3d at 523–24 (explaining that Section 5-701(a)(10) does not apply to claims involving services "related to a purpose other than 'assisting in the negotiation or consummation' of a business opportunity . . . .").  The New York Court of Appeals has remarked, "in the course of holding a plaintiff's claim to be barred by [Section] 5-701(a)(1), that the plaintiffs [sic] role in a transaction was 'limited and transitory,'" but it noted that "that does not mean that every broker or finder who plays more than a 'limited and transitory' role in a transaction is entitled to recover" in the absence of a written agreement.  *Snyder v. Bronfman*, 912 N.E.2d 567, 570 (N.Y. 2009) (citing

*Freedman v. Chemical Constr. Corp.*, 372 N.E.2d 12, 16 (N.Y. 1997)).  The relevant inquiry is the scope of activities included in the plaintiff's role; "where the intermediary's activity is that of providing 'know-how' or 'know-who,' in bringing about between principals an enterprise of some complexity or an acquisition of a significant interest in an enterprise, the statute of fraud applies."  *Id.* (internal quotation marks and alterations omitted) (quoting *Freedman*, 372 N.E.2d at 16).

The exception to Section 5-701(a)(10) for extensive activities does not apply here. Accepting the allegations of the SAC as true, Koch and Bedford were retained for a limited purpose—to assist the Caro Parties' clients in obtaining financing.  To do so, Koch was required to utilize his contacts in the financial community.  He does not allege he contributed any service or asset to the clients other than exploiting his contacts in the financial community and arranging opportunities to present to investors—his "know-how" and "know-who"—or that he provided any value to those clients other than what would come from securing investments and fundraising.  This is thus not a case like *Dorfman*, 37 N.Y.S.3d at 521–22, in which the plaintiff developed materials to secure investor backing, recruited engineers and others to join the defendant company and developed details of how the company's software product would be architected.  Nor is it a case like *JF Capital Advisors, LLC*, 37 N.E.3d at 729, where the plaintiff's obligation could be fairly characterized as work performed to inform defendants whether to partake in a business opportunity rather than work negotiating or assisting in the negotiation of a business opportunity.  Koch has not alleged that he was hired to perform services other than the raising of capital.  Therefore, the Statute of Frauds applies.  *See Snyder*, 921 N.E.2d at 570; *see also Belotz v. Jefferies & Co., Inc.*, 1999 WL 587916, at *4 (S.D.N.Y. Aug. 4, 1999), *aff'd*, 213 F.3d 625 (2d Cir. 2000) (summary order); *Ely*, 2013 WL 411348, at

*3–4 (holding that agreement "to pay compensation for services rendered in negotiating a business opportunity, procuring an introduction, or assisting in the negotiation or consummation of the transaction" "falls squarely within New York's Statute of Frauds" (internal quotation marks omitted) (alterations adopted)); *cf. United Res. Recovery Corp. v. Ramko Venture Mgmt., Inc.*, 584 F. Supp. 645, 654 (S.D.N.Y. 2008) (rejecting argument that relationship between parties "was 'so extensive' that the Statute of Frauds' writing requirement can be overlooked," and explaining that "[i]t is the nature of the alleged agreement, and not the parties' relationship, that governs whether section 5-701(a)(10) applies").

Koch also relies on the limited exception to the Statute of Frauds carved out by the New York Court of Appeals in *Dura v. Walker, Hart & Co.*, 267 N.E.2d 83 (N.Y. 1971). The court in *Dura* held that the Statute of Frauds does not require an agreement between two finders to share in the commission that one of them had received from a third-party principal to be in writing. *Id.* at 85. In *Dura*, the plaintiff had been enlisted to, in exchange for a finder's fee, obtain a purchaser for a block of stock; in turn, the plaintiff offered the defendant an opportunity to work as a finder on a participating basis and introduced the defendant to plaintiff's principal as plaintiff's agent. *Id.* at 83. The defendant found a purchaser, and plaintiff sued for its share of the commission. *Id.* In concluding that no writing was required for an enforceable agreement to exist between the parties, the New York Court of Appeals explained that the concerns underlying the Statute of Frauds were not applicable, noting that "the plaintiff is suing not an employer or principal for a fee but a fellow finder for a portion of a fee already received by the latter, on the strength of an agreement by the two of them that they pool their efforts and share the benefits." *Id.* at 85.

Since *Dura*, the New York Court of Appeals has made clear that the exception applies only to arrangements that are "closely akin to that of joint venture." *Haskins v. Loeb, Rhoades & Co.*, 52 N.Y.2d 523, 525 (1981) (internal quotation marks omitted); *see also Dura*, 267 N.E.2d at 85 (explaining that where the allegations had "overtones of fiduciary obligation . . . there is no requirement that there be a writing to evidence the agreement"); *cf. Vanacore v. Vanco Sales LLC*, 2017 WL 2790549, at *3 (S.D.N.Y. June 27, 2017) ("Plaintiffs appear to argue that the agreement here is more akin to a joint venture, to which the statute of frauds may not apply . . . ."); *Ely*, 2013 WL 411348, at *4 n.2 ("Pleading a joint venture partnership agreement would allow an oral contract to be enforceable despite the Statute of Frauds.").  Characterization as a "joint venture" is not, alone, sufficient to take an agreement outside of the scope of New York's Statute of Frauds where a party's claim of entitlement to compensation is for "procuring an introduction to a party, or a prospective party" to a business transaction.  *Alkholi v. Macklowe*, 858 F. App'x 388, 391 (2d Cir. 2021) (summary order) (holding that *Dura* exception to the Statute of Frauds did not apply where parties characterized themselves as having a "long-term business relationship with fiduciary obligations to each other as partners in a Joint Venture" where "[t]he essence of plaintiffs' claims is that they are entitled to compensation for procuring an introduction to a party, or a prospective party, to a real estate transaction" (internal quotation marks and citations omitted)); *see also Snyder*, 921 N.E.2d at 569 (concluding that Section 5701(a)(10) barred claims for unjust enrichment and quantum meruit based on an otherwise unenforceable joint venture agreement where "plaintiff [was] seeking compensation for services rendered in finding and negotiating a business opportunity").  And the Second Circuit has declined to apply the exception to situations "where a plaintiff seeks compensation for a range of services, including finding services, in the absence of both an agreement with a third party to pay

20

a finder's fee and an agreement with the defendant to share that fee." *Belotz*, 2000 WL 665564, at *1.

The *Dura* exception does not apply here. Defendants allege neither that the third-party client agreed to pay a finder's fee nor that the Defendants' agreement with Plaintiffs was to share a finder's fee. The agreements cited in the SAC are alleged to be for "corporate consulting services" and for introductions to financial services companies and other financial services, as well as for contact with shareholders and securities dealers. Dkt. No. 63 ¶ 53. No mention is made of the basis on which the Plaintiffs were to be paid or that any such payment would be contingent upon success in finding an investment. The oral agreements between Koch and Bedford on the one hand and Caro Capital or Caro Partners on the other also are not stated to involve the sharing of a finder's fee. According to the allegations, Caro Capital or Caro Partners agreed simply to pay Koch and Bedford compensation for their services—regardless of the ultimate success of finding investments for clients—calculated as a percentage of what Caro Capital or Caro Partners receive.

The oral agreements between Defendants and Plaintiffs contain none of the features of a joint venture or of a pooling of interests and efforts that could take them within the scope of *Dura*, 267 N.E.2d at 85. Each of the arrangements with the thirty-five different clients is alleged to constitute a separate one-off oral agreement. There is no allegation that the parties agreed to be joint venturers, that each made a contribution to their supposed joint venture, that there was any provision for the sharing of profits as well as losses, or that there was any joint control or management over the parties' affairs. *See Orderline*, 675 F. Supp. at 126 (describing elements of joint venture under New York law). Koch describes himself as an "independent" contractor and an "independent" consultant, not as a partner or joint venture. *See, e.g.*, Dkt. No. 63 ¶¶ 49, 65,

71, 74, 79, 86, 92, 97, 103, 108, 123, 129, 134, 152, 159, 164, 170, 179, 187, 194, 205, 213, 221,

226, 234, 256, 261, 271.  Moreover, the SAC describes Koch being given assignments by

Plaintiffs, not as agreeing on any joint effort.  Indeed, the SAC goes to great lengths to

repeatedly claim that Koch and Bedford had no control over the efforts of, and rewards received

by, the Plaintiffs.  The SAC alleges that both Caro Capital and Caro Partners were "corporate

entit[ies] in which Mr. Koch and Bedford have no equity ownership and for which they rendered

consulting services as an independent contractor . . . ."  *See, e.g.*, *id.* ¶¶ 65, 71, 79, 86, 92, 97,

103, 108, 123, 164, 170, 187, 256.

Because the alleged oral agreements for "consulting services" are agreements to

"negotiat[e] . . . a business opportunity" within the meaning of New York's Statute of Frauds,

they were required to be written to be enforceable.  Because they were not, the

breach-of-contract and unjust-enrichment claims based on these alleged agreements must be

dismissed.  *See Snyder*, 921 N.E.2d at 269 (holding that unjust-enrichment claims seeking

compensation for services rendered in negotiating a business opportunity are subject to the

statute of frauds).

## II.    Jupiter Wellness, Inc.

Plaintiffs also move to dismiss the Second Amended Counterclaim to the extent it alleges

claims for breach of contract or quasi-contract arising out of their failure to provide Koch the

shares in Jupiter they allege he was promised by John.  Dkt. No. 68 at 18–19.  The Court

previously dismissed this claim for failure to allege an enforceable contract.  In its April 23, 2021

Opinion and Order, the Court explained that the oral conversations that, according to Koch, gave

rise to his claim for the shares were insufficient to create an enforceable contract because the

conversations relayed did not define what it was what Koch was to do in order to receive the

shares he alleges he was promised.  *See* Dkt. No. 53 at 18.

Plaintiffs argue that the SAC fails to address the deficiencies the Court identified in the Defendants' previously dismissed counterclaim.  They point out that, while the SAC adds twenty new paragraphs explaining the Defendants' performance after the alleged February 2019 contract modification, it does not allege what, if any, duties were imposed pursuant to that modification. Dkt. No. 68 at 18.  They also argue that "even if the SAC's post-February 2019 Jupiter Contract performance allegations would otherwise be sufficient to prove the Contract's actual terms, all of those allegations plead exactly the same type of oral contract barred by Section [5-701 (a)(10)]." *Id.* at 19.

In response, Defendants argue that the SAC now sufficiently alleges the terms of the contract regarding Jupiter because it "added 20 paragraphs detailing the terms of the contract, duties required of Mr. Koch, and Mr. Koch's performance of those duties after February 2019." Dkt. No. 79 at 13 (citing Dkt. No. 63 ¶¶ 301–319).  They also point to a February 9, 2019, email from John to Koch, in which John writes "I value what you do bring to the equation, but fair is fair and I won't hit you with a 70-30 split like almost everyone suggest but I defiantly [sic] think 60-40 is fair."  *Id.* (quoting Dkt. No. 63 ¶ 352).  Koch responded "I agree with the 60/40 split going forward including CBD Brands . . . ."  *Id.* (quoting Dkt. No. 63 ¶ 353).  Defendants further argue "the SAC contains allegations sufficient to establish that Mr. Koch provided services that went far beyond the limited services contemplated by [Section] 5-701(a)(10)," Dkt. No. 79 at 12, but that, regardless, "an email alone can form a valid, binding agreement," *id.* at 14.

The alleged contract fails for lack of definiteness.  As the Court explained in its prior Opinion and Order:

> It is well settled that for a contract to be valid, the agreement between the parties must be definite and explicit so their intention may be ascertained to a reasonable degree of certainty.  Even if the parties believe that they are bound, if the terms of the agreement are so vague and indefinite that there is no basis or standard for

> deciding whether the agreement had been kept or broken, or to fashion a remedy, and no means by which such terms may be made certain, then there is no enforceable contract.

Dkt. No. 53 at 12 (internal quotation marks omitted) (quoting *Foros Advisors LLC v. Digital Globe, Inc.*, 333 F. Supp. 3d 354, 360 (S.D.N.Y. 2018)).  The additional allegations made in the SAC do not provide a "basis or standard for deciding whether the agreement had been kept or broken."  *Foros Advisors LLC*, 333 F. Supp. 3d at 360; *see also Cobble Hill Nursing Home, Inc. v. Henry & Warren Corp.*, 548 N.E.2d 203, 206 (N.Y. 1989) ("[U]nless a court can determine what the agreement is, it cannot know whether the contract has been breached, and it cannot fashion a proper remedy.").  Rather, they speak to additional activities that Koch undertook, as opposed to what actions, if any, he was *required* to perform by the agreement regarding Jupiter.

The allegations Defendants added to the SAC concern Koch's activities: creating a PowerPoint presentation that formed the basis for presentations that were later shared with potential investors, Dkt. No. 63 ¶ 297; continuing, after February 2019, to provide information about Jupiter to those in the investment and financial communities, *id.* ¶¶ 304–305, 309–311; maintaining a relationship with the ultimate Chairman of the Board and working to make sure he would enter into such a position, *id.* ¶ 306–307; making required administerial changes to Jupiter's Common Stock and Warrant Subscription Agreement, *id.* ¶ 308; hiring marketers to drive traffic to Jupiter's website, *id.* ¶ 311; and transferring to Jupiter, without compensation, a domain name Koch had previously registered, *id.* ¶¶ 312–317.  These allegations do not add definition to the alleged agreement between John and Koch.  They do not speak to obligations imposed by the agreement, which could in turn shed light on some material terms of the alleged agreement, and there are no allegations that Koch did any of these things because he was required by contract to do them.  Without allegations as to what Koch was required to do under

the agreement, the Court "can[not] determine what the agreement is" and "cannot know whether the contract has been breached." *Cobble Hill Nursing Home*, 548 N.E.2d at 206.

Defendants lean heavily on the February 2019 email exchange between John and Koch, in which John allegedly offered a sixty-forty split of their business dealings, and Koch accepted the split, adding in his acceptance that it would "include[e] CBD Brands." Dkt. No. 63 ¶¶ 352–353. The email exchange—attached to Defendants' memorandum of opposition to the motion to dismiss and incorporated by reference into the SAC, *see Gray v. Wesco Aircraft Holdings, Inc.*, 454 F. Supp. 3d 366, 382–83 (S.D.N.Y. 2020)—does not cure this lack of definiteness. First, as Plaintiffs point out, the email exchange, viewed in its entirety, does not demonstrate that there was an agreement reached between John and Koch as to the split of Jupiter ownership. *See D'Artagnan, LLC v. Sprinklr Inc.*, 144 N.Y.S.3d 177, 179 (1st Dep't 2021) ("A contract is unenforceable if there is no meeting of the minds . . . ." (internal quotation marks and citation omitted)). The initial email in the exchange—which appears to contain the subject line "Caro," not "Jupiter" or "CBD Brands"—speaks in generalities about John and Koch's "current situation" and, while naming CBD Brands alongside other deals, discusses the sixty-forty split without reference to any particular project or client. *See* Dkt. No. 79, Ex. 1 at 2. In response to Koch's email that he "agrees with the 60/40 going forward including CBD Brands," John did not agree; instead, he wrote back "? You forget that Carroll [sic] is my business and my company . . . ." *Id.* at 2. The email exchange thus does not reflect that the parties even agreed to a split in ownership (as opposed to in profit-sharing) with respect to CBD Brands (as opposed to with respect to the other engagements for which Koch was an independent consultant). But even if there was an agreement as to the split, a party alleging breach of contract must allege "a manifestation of mutual asset sufficiently definite to assure that the parties are truly in agreement

with respect to *all material terms*." *Anders v. Verizon Comms., Inc.*, 2018 WL 2727883, at *8 (S.D.N.Y. June 5, 2018) (emphasis added) (quoting *Saul v. Cahan*, 61 N.Y.S.3d 265, 269 (2d Dep't 2017)); *see also Town & Country Linen Corp. v. Ingenious Designs LLC*, 2021 WL 3727801 at *46 (S.D.N.Y. Aug. 23, 2021) ("[E]ven if email correspondence between the parties could create a binding obligation . . . it could do so only if that email correspondence reflected an agreement between the parties on all of the material terms of a transaction.  In the absence of agreement on material terms, there is no contract.").  Beyond the questionable "split" language discussed above, the SAC does not allege *any* terms of an agreement.  Because the SAC does not allege terms of an agreement, "there is no basis or standard for deciding whether the agreement had been kept or broken . . . and no means by which such terms may be made certain," and thus "there is no enforceable contract."  *Foros Advisors LLC*, 333 F. Supp. 3d at 360.  Defendants' breach of contract claim as to an alleged agreement regarding Jupiter once again fails for indefiniteness.

Defendants also allege that Plaintiffs were unjustly enriched by "induc[ing] Mr. Koch to work for [Jupiter] knowing that they would benefit from the services that Mr. Koch provided," Dkt. No. 63 ¶ 416, and that "[t]he work that Mr. Koch performed for [Jupiter] inured to the benefit of [Plaintiffs] at Mr. Koch's expense."  *Id.* ¶ 418.  Plaintiffs argue that this claim should be dismissed because it is duplicative of the breach-of-contract claim and because it is barred by the Statute of Frauds.  Dkt. No. 68 at 22–23.  Defendants respond that their services with respect to Jupiter went "beyond the negotiation of a business opportunity" and thus would fall outside Section 5-701(a)(10)'s writing requirement.  Dkt. No. 79 at 17 (quoting *Dorfman*, 37 N.Y.S.3d at 521).

"Unjust enrichment . . . [is a] quasi-contract claim[]." *Union Bank, N.A. v. CBS Corp.*, 2009 WL 1675087, at *6 (S.D.N.Y. June 10, 2009). "Under New York law, where a valid contract governs the subject matter of a plaintiff's claims, the plaintiff may not recover in quasi contract, and it is appropriate to dismiss the claims sounding in quasi contract." *Gemma Power Sys., LLC v. Exelon W. Medway II, LLC*, 2019 WL 3162088, at *5 (S.D.N.Y. July 1, 2019). Where there is no contract, or where a contract is unenforceable or void, a valid contract does not govern the claims, so a plaintiff can recover under a quasi-contract theory. *See id.* ("[T]he limitation of pleading claims sounding in quasi contract does not apply when . . . the contract is not valid or enforceable."); *see also Goldman v. Metro Life Ins. Co.*, 841 N.E.2d 742, 746 (N.Y. 2005) ("The theory of unjust enrichment . . . is an obligation the law creates in the absence of any agreement."); *Taylor & Jennings, Inc. v. Bellino Bros. Const. Co., Inc.*, 483 N.Y.S.3d 813, 815 (3d Dep't 1984) ("Since the trial court correctly voided the subcontract as induced by fraud . . . recovery under the equitable doctrine of *quantum meruit* was proper . . . ."); *State v. Indus. Site Servs., Inc.*, 862 N.Y.S.2d 118, 1161 (3d Dep't 2008) ("In light of our conclusion that the contract provision at issue was enforceable, plaintiff's unjust enrichment claim must be dismissed as duplicative of the breach of contract cause of action."). Here, the Court has concluded that Defendants have not alleged that a valid and enforceable agreement exists as to their work on the Jupiter business; there is thus no contract to act as a bar to Defendants' unjust-enrichment claim.

Nor is the unjust-enrichment claim entirely barred by the Statute of Frauds. While it is true that "claims for . . . unjust enrichment cannot be used to circumvent the Statute of Frauds," *Foros Advisors LLC*, 333 F. Supp. 3d at 366 n.2, the allegations of the SAC regarding Defendants' activities with respect to Jupiter indicate work that goes beyond merely

"negotiating. . . a business opportunity," N.Y. Gen. Oblig. L. § 5-701(a)(10).  The SAC alleges that Koch was working with John to build Jupiter as a company and that he was entitled to an ownership interest as a result.  While the process of creating a company may have included negotiating the sale of business interests, the SAC "contains allegations that, if accepted by the trier of fact, demonstrate that plaintiff's role consisted of more than functioning as an intermediary that assisted in the negotiation or consummation of the business opportunity." *Dorfman*, 37 N.Y.S.3d at 523–24.  The SAC alleges that, in addition to introducing potential investors to John, Dkt. No. 63 ¶¶ 289, 299, and reaching out to investors, *id.* ¶¶ 309–310, Koch registered domain names for the business and transferred at least one to it, *id.* ¶¶ 279, 314, developed logos for the skincare brand, *id.* ¶ 280, recruited an individual to join the Board of Directors, *id.* ¶¶ 292–293, drafted a summary business plan and PowerPoint presentation for submission to investors, *id.* ¶¶ 291, 294, 297 and hired marketers to drive traffic to Jupiter's website, *id.* ¶ 311.  In *Dorfman*, the court "held that a portion of plaintiffs' claims for unjust enrichment and quantum meruit was not subject to the statute of frauds set forth at [Section] 5-701(a)(10).  Specifically, those allegations were that Dorfman 'developed materials to secure investor backing, recruited engineers and others to join [the company], and developed the details of how [the company's] software product, web, and mobile applications would be "architected."'" *Dorfman v. Reffkin*, 119 N.Y.S.3d 567, 568–69 (1st Dep't 2020) (alterations adopted) (quoting *Dorfman*, 37 N.Y.S.3d at 521).  As in *Dorfman*, Koch "allegedly rendered a wide variety of services, which presumably took place after the company came to fruition, making these services related to a purpose other than 'assisting in the negotiation or consummation' of a business opportunity, so as to escape the strictures of General Obligations Law 5-701(a)(10)." *Dorfman*, 37 N.Y.S.3d at 524.  Thus, to the extent that Defendants claim

unjust enrichment for services that went beyond the negotiation or consummation of a business opportunity, the unjust-enrichment claim survives.  *See Dorfman*, 37 N.Y.S.3d at 524 ("[W]e simply hold that Dorfman's unjust enrichment and quantum meruit claims were properly sustained, *but only insofar as they involved services that went beyond the negotiation or consummation of a business opportunity* pursuant to [Section] 5-701(a)(10)." (emphasis added)); *see also Hanson v. Hanson*, 2019 WL 935127, at *5 (S.D.N.Y. Feb. 26, 2019) ("To the extent that the oral agreement involved services that went beyond the negotiation or consummation of a business opportunity pursuant to General Obligations Law 5-701(a)(10), claims based on that portion of the agreement are not barred by § 5-701(a)(1)." (internal quotation marks) (alteration adopted)).

"To prevail on a claim of unjust enrichment, a party must show that (1) the other party was enriched, (2) at that party's expense, and (3) that it is against equity and good conscience to permit the other party to retain what is sought to be recovered."  *Foros Advisors LLC*, 333 F. Supp. 3d at 364 (quoting *Old Republic Nat'l Title Ins. Co. v. Luft*, 859 N.Y.S.2d 261, 262 (2d Dep't 2008)).  "The essential inquiry . . . is whether it is against equity and good conscience to permit the defendant to retain what is sought to be recovered."  *Paramount Film Distrib. Corp. v. State of N.Y.*, 285 N.E.2d 695 (N.Y. 1972).  "Generally, courts will look to see if a benefit has been conferred on the defendant under mistake of fact or law, if the benefit still remains with the defendant, if there has been otherwise a change of position by the defendant, and whether the defendant's conduct was tortious or fraudulent."  *Id.*; *see, e.g.*, *Trenholm-Owens v. City of Yonkers*, 153 N.Y.S.3d 26, 30 (2d Dep't 2021) (holding that unjust-enrichment claim should not have been dismissed where benefit was conferred on defendant through allegedly tortious conduct).  "Courts applying New York law require a plaintiff to allege some expectation of

compensation that was denied in order to demonstrate that equity requires restitution." *Tasini v. AOL, Inc.*, 851 F. Supp. 2d 734, 740 (S.D.N.Y. 2012).

Koch has alleged that Jupiter and John, as owner of Jupiter, have benefitted from Koch's actions by, among other things, acquiring a domain name that was used to conduct sales of Jupiter's products and having Dr. Wilson serve on the Board of Directors.  Koch has further alleged that this was at his expense, in that he had expended time and resources in connection with these actions and was not compensated.  Koch alleged that he was promised that he would receive an ownership interest in Jupiter and that he performed his work in reliance on that promise.  In this circumstance, and assuming the truth of the allegations, it would be against equity and good conscience to allow John and Jupiter to retain the benefit of Koch's work when Koch provided that work with the expectation that he would be compensated for it.  *See Tasini*, 851 F. Supp. 2d at 740–41 (dismissing unjust-enrichment claim when plaintiffs plead no expectation of compensation for their services); *Silipo v. Wiley*, 30 N.Y.S.3d 716, 719 (3d Dep't 2016) ("Given that the evidence defendants produced on the motion revealed a factual dispute as to whether [defendant] promised, and plaintiff expected, compensation above and beyond her salary for her role in the sale, defendants failed to demonstrate their entitlement to summary dismissal of plaintiff's unjust enrichment claim and their motion was properly denied in that regard."); *cf. Goel v. Ramachandran*, 975 N.Y.S.2d 428, 438 (2d Dep't 2013) (dismissing unjust-enrichment claim where complaint did not allege that defendant was enriched "through some mistake or deception practiced upon [plaintiff] by [defendant]").  The motion to dismiss the unjust-enrichment claim is therefore denied insofar as the claim seeks compensation from John and Jupiter for services that went beyond the negotiation or consummation of a business opportunity.  *See Di Simone v. CN Plumbing, Inc.*, 2014 WL 1281728, at *6 (E.D.N.Y. Mar. 31,

2014) (denying motion to dismiss unjust-enrichment claim where claim was based on allegations that plaintiff was not properly compensated for the hours he worked).[6]

## CONCLUSION

The motion to dismiss is GRANTED in part and DENIED in part.  The motion is granted with prejudice as to the breach-of-contract claims and the unjust-enrichment claim for the consulting contracts.  *See Ely*, 2013 WL 411348, at *8 (dismissing claims with prejudice where "statute of frauds infirmity discussed above render futile any proposed amendment" (quoting *Transition Invs., Inc. v. The Allen O. Dragge, Jr. Family Tr.*, 2012 WL 1848875, at *10 (S.D.N.Y. May 21, 2012)).  The motion is denied with respect to the unjust-enrichment claim as it relates to Defendants John and Jupiter for work done on Jupiter.

The Clerk of Court is respectfully directed to close Dkt. No. 67.

SO ORDERED.

Dated: February 14, 2022
      New York, New York

LEWIS J. LIMAN
United States District Judge

---

[6] Defendants bring their unjust-enrichment counterclaim against all Plaintiffs but plead facts that could support a showing only that John and Jupiter were enriched.  Therefore, the unjust-enrichment claim only survives as to those two plaintiffs.